# United States Court of Appeals for the Federal Circuit

DIANA Z. KAMMUNKUN,

*Petitioner,*

– v. –

DEPARTMENT OF DEFENSE,

*Respondent.*

*On Appeal from the Merit Systems Protection Board in No. SF-0752-17-0667-M-2*

## BRIEF FOR PETITIONER

CHRISTOPHER H. BONK
RENN C. FOWLER
KEVIN OWEN
GILBERT EMPLOYMENT LAW, P.C.
8403 Colesville Road, Suite 1000
Silver Spring, Maryland 20910
(301) 608-0880
cbonk@ggilbertlaw.com
rfowler@ggilberlaw.com
kowen@ggilbertlaw.com

*Counsel for Petitioner*

OCTOBER 7, 2024

 COUNSEL PRESS    (800) 4-APPEAL • (331999)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1900

**Short Case Caption** Kammunkun v. Defense

**Filing Party/Entity** Petitioner

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 06/27/2024

Signature: *Christopher H Bonk*

Name: Christopher H. Bonk

**FORM 9. Certificate of Interest**                                     Form 9 (p. 2)
                                                                         March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. <br><br> ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. <br><br> ☑ None/Not Applicable |
| Diana Z. Kammunkun | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable                    ☐     Additional pages attached

| | | |
|---|---|---|
| Gary M. Gilbert | Elbridge Z. Smith | |
| Renn C. Fowler | Gilbert Employment Law, P.C. | |
| Elbridge W. Smith | Smith Himmelman AAL | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)   ☐  No   ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable                    ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Table of Contents

**Page**

Table of Authorities ............................................................................................. iii

Statement of Related Cases ................................................................................... 1

Jurisdictional Statement ........................................................................................ 2

Statement of the Issues .......................................................................................... 2

Statement of the Case ............................................................................................ 3

Summary of the Argument ..................................................................................... 4

Argument ................................................................................................................ 5

    I.     Standard of Review ................................................................................. 5

    II.    The Risk of a Deciding Official's Bias Must Be Assessed
          Objectively ............................................................................................. 6

         a.    Whether Circumstances Indicate an Impermissibly
              High Probability of Bias is Evaluated Objectively ..................... 6

         b.    This Court's Discussions on Due Process by
              Decisionmakers in *Ward*, *Stone* are Relevant in
              Addressing Decisionmaker Bias .............................................. 10

         c.    The Board Erred in Misapplication of and Reliance on
              Recent Board Decisions on Bias .............................................. 12

    III.   Circumstances Clearly Indicate a High Probability of Actual
          Bias, or an Intolerable Risk of Unfairness, in Winbush
          Serving as Deciding Official ................................................................ 17

         a.    The Decisionmaker Prepared Allegations Against
              Kammunkun and Revised All Investigative Findings
              Into Those Allegations ............................................................. 18

              i.     Allegation 1 ................................................................. 19

              ii.    Allegation 2 ................................................................. 20

              iii.   Allegation 3 ................................................................. 21

              iv.   Allegation 5 ................................................................. 21

v.     Allegation 6 ...................................................................22

vi.     Allegation 9 ..................................................................22

vii.     Allegation 10 ...............................................................23

b.     The Decisionmaker Provided Guidance and a Framework for the Proposal to Remove ...................................24

c.     The Depth of the Decisionmaker's Involvement Creates an Unconstitutionally High Risk of Bias .....................25

Conclusion ..........................................................................................27

# Table of Authorities

**Page(s)**

**Cases:**

*Am. Cyanamid Co. v. FTC*,
363 F.2d 757 (6th Cir. 1966)................................................................7

*Amos Treat & Co. v. SEC*,
306 F.2d 260 (D.C. Cir. 1962) ............................................................7

*Arnett v. Kennedy*,
416 U.S. (134) ...................................................................................10

*Becker v. Off. Of Pers. Mgmt.*,
853 F.3d 1311 (Fed. Cir. 2017)............................................................5

*Blank v. Dep't of the Army*,
247 F.3d 1225 (Fed. Cir. 2001)..........................................................11

*Caperton v. A.T. Massey Coal Co., Inc.*,
566 U.S. 868 (2009) .............................................................................6

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009) .............................................................................9

*De Sarno v. Dep't of Commerce*,
761 F.2d 657 (Fed. Cir. 1985)............................................................10

*Dickey v. Office of Pers. Mgmt.*,
419 F.3d 1336 (Fed. Cir. 2005)............................................................5

*Goss v. Lopez*,
419 U.S. (565) ...................................................................................10

*In re Murchison*,
349 U.S. 133 (1955) .........................................................................6, 7

*Johnson v. Dep't of the Air Force*,
50 F.4th 110 (Fed. Cir. 2022).............................................................12

*Khan v. United State*,
201 F.3d 1375 (Fed. Cir. 2000) ............................................................5

*Lange v. Dep't of Justice*,
119 M.S.P.R. 625 (Jul. 8, 2013)................................................... *passim*

*Martinez v. Dep't of Veterans Affairs*,
119 M.S.P.R. 37 (2012) ....................................................... 12, 14, 15, 16

*Richardson v. Perales*,
402 U.S. 389 (1971) ................................................................................8

*Svejda v. Dep't of the Interior*,
7 M.S.P.R. 108 (1981) ........................................................ 12, 16, 17

*Trans World Airlines v. CAB*,
254 F.2d 90 (D.C. Cir. 1958) ................................................................8

*Tumey v. Ohio*,
273 U.S. 510 (1927) ...............................................................................7

*Williams v. Pennsylvania*,
136 S. Ct. 1899 (2016)........................................................................6, 9

*Withrow v. Larkin,*
421 U.S. 35 (1974) .................................................................. *passim*

## Statutes & Other Authorities:

5 U.S.C. § 7703(c) ....................................................................................5

18 U.S.C. § 1001 ....................................................................................26

28 U.S.C. § 1295(a)(9).............................................................................2

Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267 (1975)......................10

**Statement of Related Cases**

The termination at issue in this appeal was previously before this Court in an appeal encompassing Ms. Kammunkun's Chapter 75 and Individual Right of Action claims (2019-1374). On April 6, 2020, the Court remanded Ms. Kammunkun's Chapter 75 claims to the Merit Systems Protection Board for further proceedings.

## Jurisdictional Statement

Ms. Kammunkun filed an appeal of her termination against her former employer, the Defense POW/MIA Accounting Agency (DPAA), Department of Defense (DoD) ("Agency") before the U.S. Merit Systems Protection Board ("MSPB"). Following the MSPB's dismissal of Ms. Kammunkun's Chapter 75 claims, this Court reviewed, with jurisdiction under 28 U.S.C. § 1295(a)(9), and remanded for further proceedings. The MSPB issued a Final Order on Ms. Kammunkun's Chapter 75 claims on April 5, 2024. Ms. Kammunkun filed a timely notice of appeal on May 30, 2024. This Court again has jurisdiction under 28 U.S.C. § 1295(a)(9).

## Statement of the Issues

(1) Whether the MSPB erred in finding no due process violation (denial of impartial deciding official) in Acting Director Winbush ordering an investigation into allegations crafted by Ms. Winbush, changing the investigation's finding to conform to her allegations, ordering an immediate subordinate to take any appropriate action (e.g., serve as the proposing official), and upholding Ms. Kammunkun's removal based on Ms. Winbush's allegations.

**Statement of the Case**

In 2016, Diane Kammunkun served as the Agency Records Manager for the Defense Prisoner of War/Missing in Action Accounting Agency (DPAA). From June 25 through July 2, 2016, Ms. Kammunkun engaged in a review of documents at March Air Force Base.

In September 2016, Acting Director Winbush drafted allegations of misconduct by Ms. Kammunkun in connection with the recent document review and ordered an investigation. Appx1446-48. The investigator's December 2016 report and findings did not wholly sustain Ms. Winbush's allegations. Appx1412-43. Ms. Winbush then revised and conformed those findings so all were deemed sustained in a February 2017 memorandum and, based on those findings directed her Acting Chief of Staff (ACOS) to take action against agency personnel implicated by the conformed findings. Appx1408-11.

On March 21, 2017, the ACOS proposed Ms. Kammunkun's removal based upon the conformed findings in Ms. Winbush's February 2017 memorandum. Appx1502-07. Ms. Winbush served as the deciding official and upheld all allegations, removing Ms. Kammunkun from Federal service effective July 26, 2017. Appx1957-60.

Ms. Kammunkun appealed her termination to the Merit Systems Protection Board, which was concurrently docketed as a Chapter 75 appeal (Board No. SF-

0752-17-0067-I-1) and an Individual Right of Action appeal (SF-1221-17-0675-W-1). Following a hearing, the administrative judge issued a September 25, 2018, Initial Decision dismissing her Chapter 75 action, and denying her Individual Right of Action appeal, which sought relief for whistleblower reprisal, including her termination from Federal service. Appx5700-44. The administrative judge's decision became the final decision of the MSPB, and Ms. Kammunkun appealed to the Federal Circuit Court of Appeals. On April 6, 2020, this Court vacated the administrative judge's dismissal of Ms. Kammunkun's Chapter 75 claims and remanded for further proceedings. Appx118-20.

On September 22, 2021, following further hearing, the MSPB administrative judge issued an Initial Decision on Ms. Kammunkun's Chapter 75 claims (MSPB No. SF-0752-17-0667-M-2), sustaining the termination and finding that the Agency provided Ms. Kammunkun with requisite due process. Appx20-110. Ms. Kammunkun petitioned the Board for review on issues of due process, which the Board denied in an April 5, 2024 Final Order. Appx1-13.

The instant appeal follows.

## Summary of the Argument

Ms. Kammunkun's due process right to an impartial decider was violated: Acting Agency Director Winbush drafted allegations against Ms. Kammunkun, ordered an investigation into those allegations, unilaterally conformed those

findings to match her initial allegations, directed a subordinate (an immediate report) to take action based on those conformed findings, and relying on her conformed findings, Ms. Winbush terminated Ms. Kammunkun from Federal service.

The Board's final decision errs in finding *inter alia* but primarily by a subjective, not the required objective, assessment of Ms. Winbush's impartiality. Simply, a subjective test in these circumstances is meaningless; under an objective test, no reasonable person could conclude, based on the facts here, that Ms. Winbush was an impartial decider.

**Argument**

## I.     Standard of Review

This Court reviews MSPB decisions for whether they are (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); *see Dickey v. Office of Pers. Mgmt.*, 419 F.3d 1336, 1339 (Fed. Cir. 2005). The MSPB's legal determinations are reviewed de novo. *Becker v. Off. Of Pers. Mgmt.*, 853 F.3d 1311, 1313 (Fed. Cir. 2017). The court must reverse a decision of the Board if it is not in accordance with constitutional due process requirements. *Khan v. United States¸*201 F.3d 1375, 1382 (Fed. Cir. 2000).

5

**II.     The Risk of a Deciding Official's Bias Must Be Assessed Objectively.**

The Board erred in finding no due process violation through Ms. Winbush's direct involvement through the stages of Ms. Kummunkun's termination. Due process prohibits a biased deciding official. Assessing whether the degree of bias reaches a constitutionally impermissible threshold requires an objective evaluation, rather than the subjective assessment applied by the Board.

**a.     Whether Circumstances Indicate an Impermissibly High Probability of Bias is Evaluated Objectively.**

The Supreme Court emphasizes objectivity, rather than subjectivity, in assessing unconstitutional bias in a decisionmaker. "The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.''" *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (citing *Caperton v. A.T. Massey Coal Co., Inc.*, 566 U.S. 868, 881 (2009)). The Court "has determined that an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." *Id*. (citing *In re Murchison*, 349 U.S. 133, 136-137 (1955)).

Crucially, the Supreme Court's discussion on bias does <u>not</u> impose a burden on an employee to conclusively demonstrate actual bias. Rather, the Court makes clear its consideration of whether "the <u>probability</u> of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v.*

*Larkin*, 421 U.S. 35 at 47 (1974) (emphasis added). The appellant must demonstrate "an unconstitutional <u>risk</u> of bias," but is not burdened with proving a decisionmaker was personally biased. *Id*. In assessing this risk of bias, the Supreme Court has looked not to a subjective determination of bias, but a more objective approach, as in *Withrow* where it weighed whether a particular "sequence of functions" would give rise to a "risk of bias of prejudgment." *See Withrow*, 421 U.S. at 57.

This distinction has significance. "[O]ur system of law has always endeavored to prevent even the probability of unfairness." *Withrow*, 421 U.S. at 47 (citing *In re Murchison*, 349 U.S. 133, 136 (1955); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)). The Court looked to avoid the "possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position." *Id*. at 57.

Courts of appeals decisions finding improper bias noted by the Court in *Withrow* include *Am. Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966), finding improper risk of bias "based upon the depth" of a Subcommittee commissioner's role in the prior investigation and presentation of data to his own committee; *Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962), finding improper risk of bias where a Commission member had participated in the investigation of charges before the Commission, despite an express disclaimer of personal bias or prejudice

by the Commissioner; *Trans World Airlines v. CAB*, 254 F.2d 90 (D.C. Cir. 1958), finding a violation of due process where an attorney signed a brief on behalf of the Post Office Department to the Civil Aeronautics Board, then became a member of the Board, and cast the deciding votes on decisions in favor of the Postmaster General on those same matters. *Withrow*, 421 U.S. at 50 fn.16. Each of these situations illustrate a decisionmaker developing a matter that was then presented before the decisionmaker for adjudication, such that there reasonably exists an objective potential for bias. The decisionmakers had a hand in framing and presenting the matter that ultimately came before them for a decision, and pledges of impartiality cannot cure the risk of bias and the probability of unfairness.

The Supreme Court acknowledges there is something "to the argument that those who have investigated should not then adjudicate." *Withrow*, 421 U.S. at 50. Yet, while the decision in *Withrow* pushes back against a general prohibition on an investigator also adjudicating, the Court's discussion of separation of administrative functions within agencies contemplates a somewhat different framework than that faced in the instant matter. The facts in *Withrow*, akin to other situations mentioned by the Supreme Court, are in the context of an administrative adjudicator, with a Social Security examiner responsible for both developing facts and deciding disability claims. *Withrow*, 421 U.S. at 49-50 (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971)).

Unlike the instant matter, the adjudication in *Withrow* was not a prosecutorial setting where the decisionmaker crafted allegations against the appellant, guided investigation of those allegations, crafted the framing of those investigatory findings into updated allegations, and then ruled upon those allegations. Here, the scope and depth of Winbush's role is substantively distinct from that of a judge or benefits adjudicator. Winbush was not just part of an investigation: she was both accuser and adjudicator, a prohibited combination with a prohibited potential for bias. *See Williams*, 136 S. Ct. at 1905.

In more recent years the Court continues to maintain that, when assessing bias of a decisionmaker, "[t]he inquiry is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009). Similarly, in *Williams v. Pennsylvania*, 579 U.S. 1 (2016), the Court found a due process violation where a judge participated on a panel, even without a decisive vote, in not overturning a death sentence request that he had previously approved as district attorney. "[A]n unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case," a dual role held here by Winbush. *See Williams*, 579 U.S. at 8.

9

### b. This Court's Discussions on Due Process by Decisionmakers in *Ward*, *Stone* are Relevant in Addressing Decisionmaker Bias.

The objective versus subjective consideration for matters of due process is central to this Court's own jurisprudence. Decisions in *Ward*, *Stone*, and their progeny, while centering on the due process implications of *ex parte* communications, discuss core due process considerations that are similarly applicable to assessing the bias of a deciding official.

In addressing claims of bias, this Court has referenced back to the Supreme Court's determination in *Loudermill*:

> The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. See Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1281 (1975). The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. See *Arnett v. Kennedy*, 416 U.S. [134] at 170-171 (Opinion of POWELL, J.); *id*. at 195-196 (Opinion of WHITE, J.); see also *Goss v. Lopez*, 419 U.S. [565] at 581. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*See, e.g.*, *De Sarno v. Dep't of Commerce*, 761 F.2d 657 (Fed. Cir. 1985).

This Court refined the examination of *Loudermill* and an employee's due process rights in *Ward* and *Stone*:

> The Supreme Court expressly noted that the need for a meaningful opportunity for the public employee to present his or her side of the case is important in enabling the agency to reach an accurate result for two reasons. First, dismissals for cause will

often involve factual disputes and consideration of the employee's response may help clarify such disputes. In addition, even if the facts are clear, "the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect."

*Stone*, 179 F.3d at 1376. This Court's discussion in *Stone* focuses in no small part on the <u>potential</u> for non-objective consideration by the deciding official. *See id*. ("It is constitutionally impermissible to allow a deciding official to receive additional material information <u>that may undermine the objectivity required to protect the fairness of the process</u>.") (emphasis added).

In *Ward*, this Court reiterated that there is not an examination of whether introduction of new and material information could be excused as harmless error; a due process violation occurs if, through an objective assessment, it is found that an *ex parte* communication is "so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Ward*, 634 F.3d at 1279 (citing *Blank v. Dep't of the Army*, 247 F.3d 1225, 1229 (Fed. Cir. 2001); *Stone*, 179 F.3d at 1377).

Under *Ward* and *Stone*, the focus is not a subjective assessment of whether a deciding official's receipt of new and material information is harmless error, such that any procedural error was not likely to have caused the agency to reach a different conclusion. *See Stone*, 179 F.3d at 1377; *Ward*, 634 F.3d at 1281. Rather, there is an <u>objective</u> inquiry of "whether the *ex parte* communication is so

11

substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Stone*, 179 F.3d at 1377. Actual influence on the deciding official is not part of the analysis, the potential for bias is key. *See id.*; *see also Withrow*, 421 U.S. at 57.

Even a decisionmaker's credible testimony establishing absence of a subjective influence does not preclude a due process violation. *See Johnson v. Dep't of the Air Force*, 50 F.4th 110, 116 (Fed. Cir. 2022) (citing *Ward*, 634 F.3d at 1280; *Stone*, 179 F.3d at 1373)). We have found no instance, nor do we think any exists, where a deciding official has acknowledged his or her bias and inability to be impartial.

### c. The Board Erred in Misapplication of and Reliance on Recent Board Decisions on Bias.

The Board has long acknowledged that an employee "has a due process right to have an unbiased decision maker adjudicate [her] case." *See Lange v. Dep't of Justice*, 119 M.S.P.R. 625, 629 (Jul. 8, 2013) (citing *Martinez v. Dep't of Veterans Affairs*, 119 M.S.P.R. 37 (2012); *Svejda v. Dep't of the Interior*, 7 M.S.P.R. 108 (1981)). While the Board's case law allows for some predisposition in a deciding official (*see, e.g.*, *Martinez*), the scope and depth of Ms. Winbush's involvement in Ms. Kammunkun's termination far exceeds that constitutionally permissible threshold.

Further muddying the waters, the Board's recent assessments of the permissible risk of bias from a deciding official take a more subjective approach that is, in some ways, inconsistent with both this Court's evaluation of due process violations and underlying Supreme Court jurisprudence on the significance of objectivity in assessing the neutrality of a decisionmaker.

In finding no due process violation for the instant matter, the Board looked to its decision in *Lange*. Appx6 (citing *Lange v. Dep't of* Justice, 119 M.S.P.R. 625, 629 (Jul. 8, 2013). While the facts in Ms. Kammunkun's matter more clearly establish a constitutionally impermissible risk of bias than those in *Lange*, the Board's analysis in *Lange* also sets the stage for subjectively assessing actual bias rather than examining an objective risk of bias.

The administrative judge in *Lange* held due process violated where the deciding official was "clearly involved" in the misconduct investigation that served as a basis for the appealed termination. *See Lange*, 119 M.S.P.R. at 628. The pre-removal investigative involvement by the deciding official encompassed: briefing a member of the Agency's OIG about the investigation; was assigned the initial responsibility to screen additional allegations of misconduct by the employee not included in the proposed adverse action; and, receipt of a memorandum regarding the final report into the employee's conduct. *See Lange*, 119 M.S.P.R. 629.

The Board overturned and found no violation of due process, but did so concluding that none of these areas of investigative involvement "were relied upon by the deciding official in considering the appellant's case. . . ." *Lange*, 119 M.S.P.R. at 629. In doing so, however, the Board applied a subjective evaluation of whether the deciding official's "instances of involvement" were "relied upon by the deciding official in considering the appellant's case". *Id*. at 629. The Board in *Lange* went on to broadly conclude that "a deciding official only violates due process when he relies upon his personal knowledge of an employee's background, without notice to the employee, as 'a basis for [his] determinations on either the merits of the underlying charge or the penalty to be imposed.'" *Lange*, 119 M.S.P.R. at 630 (citing *Norris*, 675 F.3d at 1354; *Martinez v. Dep't of Veterans Affairs*, 119 M.S.P.R. 37 (Nov. 1, 2012). This centers the bias assessment on measuring actual, subjective impact, rather than likelihood of bias by the decisionmaker.

To be clear, in the instant matter, Ms. Winbush's involvement goes well beyond the deciding official's investigative involvement addressed in *Lange*. *See* discussion *infra* Section III.

Furthermore, application of the Board's approach in *Lange* raises the bar for an employee's claims of a due process violation. *Lange* misapplies, to a degree, this Court's finding in *Norris*, where the deciding official's mere knowledge of an

employee's background, absent that knowledge serving as a basis for the deciding official's determination, was not found to violate due process. *See Norris v. SEC*, 675 F.3d 1349 (Fed. Cir. 2012). The *Norris* discussion cited by the Board in *Lange* goes to the assessment of whether an improper *ex parte* communication occurred, rather than the bias of the deciding official. *See Lange*, 119 M.S.P.R. at 629-630 (citing *Norris*, 675 F.3d at 1354).

The Board in *Lange* takes this *ex parte* communication discussion from *Norris* and notes the due process significance of *Ward* and *Stone* in addressing the need to have "an unbiased decision maker," and the need to assess whether there exists an "intolerably high" risk of unfairness. *Lange*, 119 M.S.P.R. at 629. Yet, rather than continue the natural course of that assessment and apply the *Ward* and *Stone* focus on an objective evaluation for a violation of due process, the Board reverts to a subjective consideration of the final impact of a deciding official's prior involvement in a case. *Lange*, 119 M.S.P.R. at 629. This incorrectly narrows the lens used to assess whether circumstances give rise to an impermissible risk of bias by the decisionmaker.

This discussion in *Lange* includes reference back to the Board's own holding in *Martinez*. *See* 119 M.S.P.R. at 629. In *Martinez*, the Board looked to *Svejda* and *Withrow* in concluding that "[t]he burden is on the appellant to establish actual bias or an intolerable risk of unfairness." *Martinez*, 119 M.S.P.R. at 42. As noted, this

stands subtly apart from the Supreme Court's holdings on due process; the burden

is not to establish actual bias, the question is instead whether the circumstances

give rise to an unconstitutional risk of bias. *See Withrow*, 421 U.S. at 47.

The Board remand in *Martinez* addressed the decisionmaker's role:

reviewing an investigation and supporting moving forward with an adverse action.

*Martinez*, 119 M.S.P.R. at 41.[1] But here, the decider went much further; Winbush

ordered an investigation into allegations she drafted as misconduct charges, and

when the investigation's findings did not wholly match with her allegations, she

changed them. Appx1408-09; Appx1424-29; Appx1446-47.

The Board's 1981 decision in *Svejda* (relied upon in *Lange*, *Martinez*, and

the instant matter) predates *Ward* and *Stone* (and thereby predates this Court's

discussion on due process in those cases). In *Svejda*, an official rated the

employee's performance as unsatisfactory; then, acted as the deciding official for

the employee's termination for unsatisfactory performance. *Svejda*, 7 M.S.P.R. at

110. The Board's rationale in finding no impermissible bias centered on there being

"no general proscription of the appointment as a deciding official of a person who

is familiar with the facts of the case and has expressed a predisposition contrary to

the appellant's interests." *Id*. at 111. This is distinguishable from the instant matter

---

[1] The Board did not ultimately issue a final order on whether an impermissibly
high risk of bias existed in *Martinez*; the matter settled following the Board's
remand to the administrative judge.

16

where Ms. Winbush was not simply aware of prior, related misconduct by Ms. Kammunkun, but rather was immersed the crafting the allegations, investigative findings, and the ultimate decision on those allegations.

Additionally, the Board in *Svejda* required the appellant establish "either actual bias on the part of the decisionmaker," or "that the situation created by the agency by its nature established an intolerably high risk of unfairness." *Svejda*, 7 M.S.P.R. at 111. *Svejda* asks an employee to establish a decisionmaker's "actual bias" rather than the "risk of actual bias" articulated in *Withrow*, and in doing so set the stage for the Board's focus on a subjective assessment of bias. *See id.*; *Withrow*, 421 U.S. at 47.

These Board decisions on bias, while based on fact patterns distinguishable from Ms. Kammunkun's circumstances, have developed an emphasis on subjectively assessing a decisionmaker's bias in a manner that is inconsistent with the foundational case law set by the Supreme Court, and this Court's discussions of due process.

### III. Circumstances Clearly Indicate a High Probability of Actual Bias, or an Intolerable Risk of Unfairness, in Winbush Serving as Deciding Official.

The totality of Ms. Winbush's involvement in each step leading to Ms. Kammunkun's termination was so extensive that it creates a constitutionally

impermissible risk of bias. *See Withrow*, 421 U.S. at 57. The Board erred in finding otherwise.

Ms. Winbush crafted the initial allegations of misconduct against Ms. Kammunkun and ordered an investigation into those allegations. Appx1446-48. Upon receipt of the report of investigation, Ms. Winbush revised the findings. Appx1408-11. Ms. Winbush then took the new findings, which she had personally adjusted, and which were the result of the investigation that she had crafted and ordered be conducted and had them sent to Mr. Gagne for action. *Id*. Mr. Gagne proposed Ms. Kammunkun's termination based on the materials and instruction from Ms. Winbush, and Ms. Winbush affirmed. Appx1502-07; Appx1957-60. The instant circumstances reveal more than mere knowledge of or permissible involvement in a preceding investigation; Ms. Winbush was the driving force behind the investigation, framing the allegations that she ultimately relied upon to terminate Ms. Kammunkun, with personal involvement that objectively precluded her from serving as an unbiased deciding official.

### a. The Decisionmaker Prepared Allegations Against Kammunkun and Revised All Investigative Findings Into Those Allegations.

In initiating an investigation against Ms. Kammunkun in September 2016, Ms. Winbush proffered ten (10) specific allegations to frame and guide the investigation. Appx1446-47. Ms. Winbush explicitly names Ms. Kammunkun in most. *Id*. Ms. Winbush directed the investigator (Mr. Kramer) to "[s]pecify whether

each allegation is substantiated, unsubstantiated, or undetermined. . . .” *Id*. Mr. Kramer complied, issuing in December 2016, a 32-page investigative report directly to Ms. Winbush. Appx1412-43.

Yet, Mr. Kramer's findings did not wholly substantiate all Ms. Winbush's allegations. *Id*.; Appx1446-47. Ms. Winbush thereafter issued her own personal revisions to Mr. Kramer's findings, in which she deemed every one of her own allegations to be "Substantiated". Appx1408-11. Even for allegations that Mr. Kramer had deemed substantiated, Ms. Winbush retroactively reframed the underlying allegations in ways that enhanced potential culpability to Ms. Kammunkun. Those allegations that implicate Ms. Kammunkun are addressed in turn below.

### i. Allegation 1

Ms. Winbush initially alleged that Ms. Kammunkun, with others, "discovered approximately 100 classified documents among the shipment of DPAA documents sent to the NARA Riverside facility." Appx1446. Mr. Kramer found this "Undetermined," noting that the review "certainly ***decreases the likelihood*** that a large number of classified documents was actually found at March AFB." Appx1424 (emphasis in original).

Ms. Winbush substantively revised the finding to "Substantiated," and changed the underlying allegation from discovery of 100 classified documents to "an unknown number, but more than two classified documents. . . ." Appx1408.

Ms. Winbush's revisions impacted the foundation of the Agency's termination action. Charges 1, 2, 3 (specification 1), and 4, all center around an assumption that a large number of classified documents were found, with a core focus on whether "more than two" documents were discovered, in light of Ms. Kammunkun's statement that only two documents were discovered. Appx1502-03. Ms. Winbush's changes to the investigative findings were in a manner geared toward pursuing, and sustaining, adverse action against Ms. Kammunkun.

### ii. Allegation 2

Ms. Winbush's Allegation 2 asserts that Ms. Kammunkun directed contractors "to remove the classified documents from the holdings and replace them with unclassified documents." Appx1446. Mr. Kramer found this "Partially substantiated," concluding that Ms. Kammunkun "***did not*** direct the two contractors to replace, nor did either of the two contractors replace, removed classified documents with unclassified documents." Appx1426 (emphasis in original). Ms. Winbush revised the finding to "Substantiated". Appx1408.

Ms. Winbush's revision runs contrary to Mr. Kramer's findings and returns to play the allegation that Ms. Kammunkun directed the replacement of documents.

Without this change by Ms. Winbush there would be no Charge 4 specification in the proposed removal on directing contractor employees to remove classified documents. *See* Appx1503.

### iii. Allegation 3

Ms. Winbush initially alleged Ms. Kammunkun and/or Mr. Williams was "responsible for the purchase and use of a commercial shredder not approved to dispose of classified materials to shred the approximately 100 classified documents," and then returned the shredder to Wal-Mart. Appx1446. Mr. Kramer found the allegations "[p]artially substantiated," where Mr. Williams purchased and returned the shredder, assessing Ms. Kammunkun responsible for its use to the extent she was "in overall charge of the operation" and "asserted *de facto* authority over the entire operation." Appx1426-27. Mr. Kramer did not substantiate the claim that approximately 100 documents were shredded. *See id*. Yet, Ms. Winbush changed the findings to "Substantiated," in doing so replacing implied culpability with actual culpability in both the purchase and return of the shredder, and use of the shredder on some great volume of documents. Appx1408.

### iv. Allegation 5

Ms. Winbush alleged Ms. Kammunkun and/or Mr. Williams "directed the two contractors that they must 'get their stories straight' about the discovery of the approximately 100 classified documents discovered and shredded at the March

AFB facility". Appx1446. Mr. Kramer's conclusion, while "Substantiated," was missing the most serious element of culpability: he had already discounted the shredding of approximately 100 classified documents. Appx1427-28. What remains is a remark lacking much clarifying context, and easily misconstrued.

Ms. Winbush retained Mr. Kramer's finding of "Substantiated," but revised the surrounding allegations, writing around the unsupported claims of discovery and shredding of 100 classified documents, and adding in new sources of culpability in claiming that Ms. Kammunkun made intentionally false statements (which was not a conclusion made in Mr. Kramer's report). *See* Appx1409.

### v. Allegation 6

Ms. Winbush alleged two contractors were instructed to refer anyone who might ask them about the documents search to the Contracting Officer's Representative (COR). Appx1447. Mr. Kramer found this "Substantiated," but omitted any reference to Ms. Kammunkun. Appx1428. Ms. Winbush's revised findings name Ms. Kammunkun, explicitly implicating her where the investigation had not. Appx1409.

### vi. Allegation 9

Ms. Winbush first alleged that Mr. Williams submitted a written statement that only two classified documents had been discovered. Appx1447. Mr. Kramer found that "Substantiated." Appx1428. Ms. Winbush then amended the findings to

include two oral statements on the discovery of only two documents, and the assertion that such statements, written and oral, were "untrue" based upon Ms. Winbush's own changed findings on Allegation 1. Appx1409. While neither Ms. Winbush nor Mr. Kramer explicitly name Ms. Kammunkun in this allegation, Ms. Winbush's expanded findings reference her Allegation 1, which names Ms. Kammunkun in the dispute over the number of discovered documents, and in turn necessarily implicates her here.

### vii. Allegation 10

Ms. Winbush alleged Ms. Kammunkun created a hostile work environment by threatening contractors "after they informed Ms. Kammunkun that shredding classified documents on a commercially available shredder was not an authorized destruction method under current DoD policies and regulations." Appx1447. Mr. Kramer found the claim "Partially substantiated," noting that "[t]here is no indication that Ms. Kammunkun did any of this in response to either of the contractor employees informing her that shredding classified documents on a commercially available shredder was not an authorized destruction method under current DoD policies and regulations." Appx1428-29.

Ms. Winbush revised the conclusion to "Substantiated" alongside reframing the underlying allegation. Appx1409. Where Mr. Kramer's findings exonerate Ms. Kammunkun as to a hostile environment predicated on a shredder, Ms. Winbush

substitutes in allegations of "a perception in at least one contractor's mind," rather than actual conduct by Ms. Kammunkun, as well as a claim that she "conveyed to the contractor employees that they were there to shield her. . . ." *Id*. Ms. Winbush's revised findings reinforce what came to be the proposed removal's Charge 4, Specifications 2 and 3. *See* Appx1503-04.

### b. The Decisionmaker Provided Guidance and a Framework for the Proposal to Remove.

Ms. Winbush's February 7, 2017 Memorandum of revised investigatory findings directed that the Acting Chief of Staff, George Gagne (Ms. Winbush's direct subordinate), receive her memorandum and the related investigation "for his consideration regarding what, if any, administrative personnel actions are appropriate for DPAA employees." Appx1410. Mr. Gagne complied and proposed Ms. Kammunkun's removal. Appx1502-07.

Mr. Gagne's proposed removal declines to mention the investigator's December 2016 findings, instead noting Ms. Winbush's February 7 memorandum, wherein she "determined that a number of the allegations were substantiated, and the investigation was closed." Appx1502. The charges and specifications of the proposed removal rely fundamentally on Ms. Winbush's revised and reframed findings. *Compare* Appx1408-09 *with* Appx1502-04. Absent Ms. Winbush's revisions the proposed removal loses bite; the severity of the allegations necessarily decreases. *See* discussion *supra* at Section III.

24

### c. The Depth of the Decisionmaker's Involvement Creates an Unconstitutionally High Risk of Bias.

The materiality of Ms. Winbush's involvement at each stage is noteworthy, but it not raised here to subjectively argue animus and actual bias. That is not dispositive. Rather, it is the depth of the decisionmaker's involvement at each stage of this process that gives rise to an objectively high, constitutionally untenable risk of bias. *See Withrow*, 421 U.S. at 50.

Where a weighing of actual bias does not control, the Board's assessments on subjective bias are in error. The judge credited Ms. Winbush's testimony disclaiming bias. Appx95-97. The Board noted that Ms. Winbush's testimony denying bias wasn't the sole basis for the judge's holding. Appx9-10. Yet, it is not enough that such testimony be weighed as but one part of the whole; it should be largely irrelevant. *See Stone*, 179 F.3d at 1372 (rejecting decisionmaker's testimony affirming lack of bias). It would be a rare decisionmaker who would attest to anything other than complete impartiality, regardless of the reality. And so, for considerations of due process, the risk of bias is necessarily assessed through a more objective consideration on the circumstances of the decisionmaker's involvement in the process outside the decision itself. *Withrow*, 421 U.S. at 48-50.

Ms. Winbush's involvement goes far beyond mere familiarity with the facts. *See* discussion *supra* at Section III. Her adjustments to the investigative findings were substantial and material. Ms. Winbush, beyond the investigator's findings,

propounded her own "Further Substantiated Findings Pertaining to Ms. Kammunkun" which plugged gaps in culpability that would otherwise exist based on just the investigator's report. Appx1410. In her "Further" findings, Ms. Winbush accuses Ms. Kammunkun of directing the destruction of classified documents, a key point that the investigation did not find. *Id.*; *see* Appx1424-29. Ms. Winbush also accuses Ms. Kammunkun of improperly destroying more than classified documents (e.g., consult files). Appx1410. Ms. Winbush further finds that Ms. Kammunkun committed what would be a 18 U.S.C. § 1001 false statements violation. *Id.*

These "Further" findings are serious allegations and combined with Ms. Winbush's substantive revision of 7 out of 10 investigative findings, and referral of her findings to her subordinate for action, before her decision on her own findings, it is clear that Ms. Winbush was intimately involved such that she crossed the *Withrow* line, thus denying Ms. Kammunkun her due process rights.

As the Supreme Court said in *Withrow*, 421 U.S. at 57, such involvement means an adjudicator could be so "psychologically wedded" to her position that she could consciously or unconsciously give the appearance of having an open mind. Quite simply, the Board cannot hold that it is constitutionally acceptable for an agency decider to order an investigation into misconduct allegations crafted by the decider, then revise the investigation's findings (no matter how conscientiously

done, no matter how benign the revisions are), have an employee charged on the revised findings, and then decide the employee's reply.

## Conclusion

The Board erred in holding that Ms. Winbush's role as the decisionmaker in Ms. Kammunkun's removal from the Federal service did not violate requirements of due process. The Court should overturn the Board's decision and reverse the constitutionally impermissible termination.

Respectfully submitted,

/s/ Christopher H. Bonk
CHRISTOPHER H. BONK
RENN C. FOWLER
KEVIN OWEN
GILBERT EMPLOYMENT LAW, P.C.
8403 Colesville Road, Suite 1000
Silver Spring, Maryland 20910
(301) 608-0880
cbonk@ggilbertlaw.com
rfowler@ggilberlaw.com
kowen@ggilbertlaw.com
*Counsel for Petitioner*

# ADDENDUM

DIANA Z. KAMMUNKUN,
        Appellant,

v.

DEPARTMENT OF DEFENSE,
        Agency.

DOCKET NUMBER
SF-0752-17-0667-M-2

DATE: April 5, 2024

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Elbridge Z. Smith, Esquire, Renn C. Fowler, Esquire, and Gary M. Gilbert, Esquire, Silver Spring, Maryland, for the appellant.

Elbridge W. Smith, Esquire, Honolulu, Hawaii, for the appellant.

Loraine Kovach-Padden, Esquire, and Ryan L. Wischkaemper, Esquire, Washington, D.C., for the agency.

## BEFORE

Cathy A. Harris, Chairman
Raymond A. Limon, Vice Chairman

## FINAL ORDER

The appellant has filed a petition for review of the initial decision, which sustained her removal. Generally, we grant petitions such as this one only in the following circumstances: the initial decision contains erroneous findings of

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision. 5 C.F.R. § 1201.113(b).

## BACKGROUND

The appellant filed this chapter 75 appeal, challenging her removal from service. *Kammunkun v. Department of Defense*, MSPB Docket No. SF-0752-17-0667-I-1, Initial Appeal File (IAF), Tab 1. She indicated in her initial appeal that she had filed a whistleblower reprisal complaint with the Office of Special Counsel (OSC) regarding matters arising before her removal. *Id.* The Board therefore docketed an individual right of action (IRA) appeal. *Kammunkun v. Department of Defense*, MSPB Docket No. SF-1221-17-0675-W-1, Initial Appeal File (0675 IAF), Tab 2. The appellant subsequently submitted evidence showing that she amended her OSC complaint to add an allegation that she was removed in reprisal for her whistleblowing. 0675 IAF, Tab 22. The administrative judge therefore joined the removal and IRA appeals. 0675 IAF, Tab 54.

The administrative judge held a hearing and issued a single initial decision in the joined appeals. 0675 IAF, Tab 68, Initial Decision. He found that the appellant was permitted to challenge her removal in a direct Board appeal or an OSC complaint, but not both, and that the appellant made a binding election to pursue the matter in an OSC complaint. *Id.* at 7-8. As a result, the administrative

judge addressed the merits in just the IRA appeal, concluding that the appellant was not entitled to corrective action regarding her removal or any other personnel action. *Id*. at 14-52. Among other things, he found that the agency's evidence in support of the appellant's removal was strong. *Id*. at 45-49; *see Soto v. Department of Veterans Affairs*, 2022 MSPB 6, ¶ 11 (2022) (identifying the strength of an agency's evidence in support of a personnel action as one factor relevant to its burden of proving that it would have taken the same personnel action in the absence of an employee's protected disclosures or activity).

The appellant challenged the initial decision before the U.S. Court of Appeals for the Federal Circuit (Federal Circuit). Although the court affirmed regarding the appellant's IRA appeal, it remanded for further proceedings regarding the appellant's chapter 75 appeal. *Kammunkun v. Department of Defense*, 800 F. App'x 916, 917 (Fed. Cir. 2020). The court explained that the appellant, who was a supervisor, was not an "employee" subject to the relevant statutory and regulatory election of remedy requirements. *Id.*; *see Requena v. Department of Homeland Security*, 2022 MSPB 39, ¶¶ 7-8, 10-12 (acknowledging that the Federal Circuit's decision in *Kammunkun* properly determined that supervisors are not required to elect between filing a direct adverse action appeal with the Board or an OSC complaint followed by a Board appeal).

On remand from the Federal Circuit, the administrative judge held a new hearing and further developed the record.[2] *E.g.*, *Kammunkun v. Department of Defense*, MSPB Docket No. SF-0752-17-0667-M-2, Refiled Remand File (M-2 RF), Hearing Transcript. He then issued a remand initial decision that affirmed the appellant's removal. M-2 RF, Tab 9, Remand Initial Decision

---

[2] The administrative judge dismissed the remanded chapter 75 appeal without prejudice to accommodate scheduling delays, which resulted in two docket numbers for the one matter. *Kammunkun v. Department of Defense*, MSPB Docket No. SF-0752-17-0667-M-1, Remand File, Tab 55; *Kammunkun v. Department of Defense*, MSPB Docket No. SF-0752-17-0667-M-2, Refiled Remand File, Tab 1.

(RID). Among other things, this decision rejected the appellant's various claims of due process violations. RID at 69-86.

The appellant has filed a petition for review. *Kammunkun v. Department of Defense*, MSPB Docket No. SF-0752-17-0667-M-2, Petition for Review (PFR) File, Tab 1. In her petition, the appellant exclusively challenges just one aspect of the remand initial decision—the administrative judge's findings regarding due process requirements as they relate to an impartial deciding official. *Id.* at 4-26 (referencing RID at 74-85). The agency has filed a response, to which the appellant has replied. PFR File, Tabs 3-4.

## ANALYSIS

Before we turn to the appellant's discrete arguments about due process, the only matter she challenges on review,[3] we will provide a brief overview of the circumstances giving rise to her removal. The appellant held the position of Supervisory Records and Information Management Specialist for an entity that was previously known as the Joint POW/MIA Accounting Command but is more recently named the Defense POW/MIA Accounting Agency (DPAA). IAF, Tab 21 at 8, Tab 22 at 5. Over the course of a couple of years, the agency conducted multiple investigations, each of which found that the appellant and others repeatedly mishandled classified materials. The first was a 2015 investigation about the review and transfer of files to the National Personnel Records Center, a National Archives and Records Administration (NARA) facility in St. Louis, Missouri, that is not equipped to store classified materials. IAF, Tab 18 at 11-21, Tab 22 at 6-8. The second was a 2016 security inquiry about the improper alteration of classification markings. IAF, Tab 11 at 5-16, Tab 22 at 9. The third was a 2016 investigation about the transfer and review of more records to a different NARA facility that cannot store classified materials,

---

[3] The appellant does not challenge the administrative judge's findings regarding the charges, nexus, and penalty. We have reviewed those findings and see no basis to disturb them.

this time in Riverside, California, along with subsequent actions of the appellant and others when they traveled to Riverside to review the records again. IAF, Tab 15 at 9-40, Tab 22 at 10-15. It was this third investigation, the one about Riverside, that led to the appellant's removal.

The appellant played a primary role in the initial review of records for the removal of classified material before their transfer to Riverside, in December 2015. *E.g.*, IAF, Tab 15 at 11, 55-56. She then led a trip to Riverside to review the records again, in June 2016, with the help of two contractors. *Id.* at 12, 46, 55. One of those contractors submitted a "statement for the record," dated July 2016, alleging that the appellant engaged in various improprieties during their Riverside trip. *Id.* at 46. Broadly speaking, she alleged that the appellant removed classified materials they found, improperly shredded them, replaced them with unclassified documents to fill the gaps, and then lied to agency officials about this while coaxing the contractors to do the same. *Id.*

In September 2016, the Acting Director of DPAA—who would later be the deciding official in the appellant's removal—initiated an investigation regarding these allegations. *Id.* at 43-46. She identified 10 specific matters for the investigator to consider. *Id.* at 43-44. The investigator did so and issued a December 2016 report about the same. *Id.* at 9-40. The Acting Director then reviewed the investigator's evidence and findings before creating a February 2017 memorandum of record, which described her own analysis of the situation. *Id.* at 5-8. This memorandum directed the Acting Chief of Staff—who would become the proposing official in the appellant's removal—to consider whether any DPAA employees should be subject to personnel actions. *Id.* at 7.

In March 2017, the Acting Chief of Staff proposed the appellant's removal for (1) lack of candor, (2) failure to carry out written or oral regulations, orders, rules, procedures, or instructions, (3) mishandling Government documents, and (4) misuse or abuse of contractor employees. IAF, Tab 16 at 5-10. Each stemmed from the Riverside matter. *Id.* at 5-7. After the appellant responded to

the charges, *e.g.*, IAF, Tab 19 at 4-18, the Acting Director, i.e., the deciding official, sustained all of the charges and the removal, IAF, Tab 21 at 9-28.[4]

<u>The agency did not violate the appellant's due process rights.</u>

The Acting Director's involvement in this case prior to her decision to remove the appellant forms the basis of the appellant's petition for review. *E.g.*, PFR File, Tab 1 at 4-26. The appellant's argument can be summarized as follows: the Acting Director ordered the investigation about allegations that she crafted, she overrode the investigative report to make her own investigatory findings, and then she instructed another official to consider remedial actions, which led to the proposed removal that the Acting Director sustained. *Id.* According to the appellant, these circumstances are such that the Acting Director was not an impartial deciding official. *Id.*

The administrative judge considered but rejected this argument below. RID at 74-85. Among other things, he found that the Acting Director credibly testified that she wrote the February 2017 memorandum because the prior report from the investigator could have been more succinct. RID at 76. He further found that the appellant was overstating the significance of any differences between the investigator's report and the Acting Director's memorandum. RID at 76-77 (referencing IAF, Tab 15 at 5-8 (Acting Director's memorandum), 9-40 (investigator's report)). The administrative judge also rejected the appellant's contention that the deciding official essentially required that the proposing official propose the removal before us, leaving her with no discretion in the matter. RID at 78-85.

To establish a due process violation based on the identity of the deciding official, an employee must assert specific allegations indicating that the agency's choice of the deciding official made the risk of unfairness to the appellant

---

[4] The administrative judge found that the agency failed to prove specifications 1 and 3 of its fourth charge, RID at 63, 69, but proved all others for all the charges, RID at 51, 57, 59, 62, 68.

intolerably high. *Dieter v. Department of Veterans Affairs*, 2022 MSPB 32, ¶ 12; *Lange v. Department of Justice*, 119 M.S.P.R. 625, ¶ 9 (2013). However, a deciding official's awareness of background information concerning the appellant, her concurrence in the desirability to take an adverse action, or her predisposition to impose a severe penalty does not disqualify her from serving as a deciding official on due process grounds. *Lange*, 119 M.S.P.R. 625, ¶ 9. Moreover, a deciding official's mere knowledge of an employee's background does not rise to the level of a due process violation unless "that knowledge is a basis for the deciding official's determinations on either the merits of the underlying charge or the penalty to be imposed." *Id.* (quoting *Norris v. Securities & Exchange Commission*, 675 F.3d 1349, 1354 (Fed. Cir. 2012)).

In *Dieter*, an appellant argued that the deciding official was biased for several reasons, including her involvement in an investigation that led to the loss of his ecclesiastical endorsement from an outside entity, which was a condition of his employment with the agency and formed the basis of his removal. *Dieter*, 2022 MSPB 32, ¶¶ 2-4, 13. The Board was not persuaded that these circumstances rose to the level of a due process violation. *Id.*, ¶¶ 13-14.

In *Lange*, the Board similarly considered a deciding official's knowledge of and involvement in an appellant's pre-removal investigation. *Lange*, 119 M.S.P.R. 625, ¶ 10. The administrative judge cited several facts to find that the appellant was denied due process: the deciding official briefed the inspector general's office about the agency's investigation into the appellant's alleged misconduct, he added the appellant's supervisor as a subject of the investigation, he had the initial responsibility of screening additional allegations of misconduct that were not included in the appellant's proposed removal, and he had received a memorandum regarding the final investigatory report about the appellant's conduct. *Id.*, ¶¶ 3-4, 10. The Board, however, disagreed with the administrative judge. The Board explained that none of those instances of involvement were

relied upon by the deciding official in considering the removal and, together, they did not illustrate an intolerably high risk of unfairness. *Id.*, ¶ 10.

Once again, it is the appellant's burden to establish actual bias or an intolerable risk of unfairness amounting to a due process violation. *Martinez v. Department of Veterans Affairs*, 119 M.S.P.R. 37, ¶ 10. The administrative judge found that the appellant failed to meet this burden, and we agree. RID at 74-85.

Although the appellant has cited several cases in her petition for review, none are particularly supportive of her position. For example, the appellant has referred us to a couple of cases in which the Board expressed concern about a deciding official's involvement in underlying charges. PFR File, Tab 1 at 11-12 (citing *Eichner v. U.S. Postal Service*, 83 M.S.P.R. 202 (1999); *House v. U.S. Postal Service*, 80 M.S.P.R. 138 (1998)). But the Board expressed this concern in terms of deciding the appropriate penalty. *Eichner*, 83 M.S.P.R. 202, ¶¶ 19-20; *House*, 80 M.S.P.R. 138, ¶¶ 14-15. The Board did not determine that the deciding officials' involvement violated employees' due process rights in those cases.

The appellant states that the Board erred in the *Eichner* case by treating the issue as concerning the penalty, rather than due process, and this "would not happen today, post-*Ward*, post-*Stone*." PFR File, Tab 1 at 12. Though she has not elaborated, it seems as if the appellant is referencing *Ward v. U.S. Postal Service*, 634 F.3d 1274, 1279-80 (Fed. Cir. 2011), and *Stone v. Federal Deposit Insurance Corporation*, 179 F.3d 1368, 1376-77 (Fed. Cir. 1999). But those decisions establish that a deciding official violates an employee's due process rights when he relies upon new and material ex parte information as a basis for his decisions on the merits of a proposed charge or the penalty to be imposed. *E.g.*, *Singh v. U.S. Postal Service*, 2022 MSPB 15, ¶ 23. The appellant has not explained why *Ward* and *Stone* would require a different result in *Eichner* or this appeal, and we are aware of none. The crux of the appellant's argument seems to be that the deciding official knew too much about the circumstances surrounding

the appellant's misconduct, not that she knew and relied upon new and material information without the appellant's knowledge.

In another example, the appellant has referred us to a civil case in which a judge failed to recuse himself, even though the respondent party facing a $50 million lawsuit had recently contributed $3 million to the judge's election. PFR File, Tab 1 at 9 (referencing *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 872, 883-87 (2009)). There, the U.S. Supreme Court found that a judge violated a petitioner's due process rights when he failed to recuse himself from a case against a company whose chairman and principal officer had donated $3 million to the judge's campaign while the case was pending in the courts. *Caperton*, 556 U.S. at 872, 883-87. The Court reasoned that the facts were "extreme" and reflected a "serious, objective risk of actual bias." *Id.* at 886-87. That extreme set of facts, though, is unlike the circumstances of this appeal, in which the deciding official was merely more familiar with the investigation and charges against the appellant than the appellant may have preferred. Moreover, *Caperton* is distinguishable from the facts before us because that case involved the alleged bias of the judge, whereas this case involves an allegation of bias by the deciding official, whose decision to take an adverse action against the appellant for her alleged misconduct is subject to de novo review. *See Norris*, 675 F.3d at 1355-57 (recognizing that "the Board determines de novo the underlying facts of the case such as whether the employee engaged in the alleged misconduct and whether the agency exceeded its authority in determining that the employee's misconduct would adversely affect the efficiency of the service").

The appellant has also suggested that the administrative judge erred by crediting the testimony of the deciding official because the standard for bias is an objective one. PFR File, Tab 1 at 13-14. However, the administrative judge did not exclusively rely on the deciding official's testimony. He considered and relied upon all the surrounding circumstances while addressing the appellant's claim. RID at 74-85. To the extent that the administrative judge did consider and

rely upon the testimony of the deciding official, the appellant has not presented any persuasive reason for us to disturb the administrative judge's conclusion that the testimony was credible. *See Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002) (providing that the Board must defer to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on observing the demeanor of witnesses testifying at a hearing; the Board may overturn such determinations only when it has "sufficiently sound" reasons for doing so).

The appellant has next described the deciding official as effectively changing the report of investigation in a number of ways, such that she should not have been involved in the proposed removal that followed. PFR File, Tab 1 at 16-24 (referencing IAF, Tab 15 at 5-8 (deciding official's summary of the investigatory report) 9-40 (full investigatory report)). For example, the appellant argues that the deciding official concluded that more than two classified documents were sent to the Riverside facility, when the report of investigation found the matter undetermined. PFR File, Tab 1 at 17 (referencing IAF, Tab 15 at 5, 21-23). In fact, the report of investigation concluded that it was impossible to prove whether relevant parties discovered more than 100 classified documents at the Riverside facility, as had been alleged, since the documents in question were destroyed, preventing a page-by-page analysis of their classification level. IAF, Tab 15 at 21, 43. But the report went on to discuss all the surrounding evidence, both evidence lending credence to the claim that the parties discovered some number of classified documents and other evidence suggesting the number was less than originally alleged. *Id.* at 21-23. The deciding official's subsequent memorandum indicated that the parties "discovered an unknown number, but more than two, classified documents" at Riverside. *Id.* at 5.

Other ways in which the appellant asserts that the deciding official effectively changed the report of investigation include conclusions about the appellant directing contractors to replace removed classified documents with

unclassified documents, PFR File, Tab 1 at 17-18, the appellant's role in the purchase and use of an unapproved commercial shredder, *id.* at 18-19, the appellant instructing contractor employees to state "if asked" that only two classified documents were found, which she "knew to be untrue," suggesting higher culpability, *id.* at 19-20, the appellant being one of two individuals who instructed the contractor employees to refer to the contracting officer's representative anyone who asked about the documents search, *id.* at 20-21, and the appellant creating in the mind of a contractor employee the perception that the appellant could end her job if she did not do what the appellant directed her to do, and conveying to contractor employees that they were to shield the appellant if she did something wrong, *id.* at 22-24. The appellant further argues that the deciding official made additional "gratuitous findings" that the appellant destroyed classified documents and made false statements about doing so. *Id.* at 24-25.

As previously noted, the administrative judge found that the appellant overstated the significance of any differences between the investigator's report and the memorandum of the individual who was both Acting Director and the deciding official. RID at 76-77. We agree. The deciding official's conclusions, as stated in her memorandum, are supported by the report of investigation. Turning back to the example described above to illustrate, the contractor that first alerted the agency of the improprieties surrounding the Riverside trip alleged that she and the others involved found around 100 classified documents, despite the appellant representing that they found only 2. IAF, Tab 15 at 46. The investigator concluded that this was "undetermined," because "[s]ubstantiating this allegation requires disproving a negative," which was "impossible" because the documents at issue were destroyed. *Id.* at 21. Nevertheless, the investigator went on to note that although the appellant was supposed to have removed all classified documents before they were sent to Riverside, the contractor's allegation was plausible, in part because the appellant's "prior incidents involving

the mishandling of classified information undermine any claims of [the appellant's] competence." *Id.* He further described why those who claimed to have found around 100 classified documents were more credible than the appellant and one other official who were also on the Riverside trip. *Id.* at 21-23. In her subsequent memorandum, the deciding official seems to have felt less bound by the absence of the now-destroyed documents. She stated that the parties found some unknown number of classified documents during the Riverside trip, more than the two alleged by the appellant, *id.* at 5, and we agree that the investigatory report supports that conclusion. To further illustrate, the appellant's next claim of the deciding official altering the investigatory report is even less convincing. PFR File, Tab 1 at 17-18. The investigatory report indicates that the appellant directed two others to search for classified documents, remove them, and manipulate those that remained to make it appear as if none had been removed. IAF, Tab 15 at 23. The subsequent memorandum of the deciding official concludes similarly. *Id.* at 5. In her petition, the appellant suggests that there is some meaningful distinction between the language of these two conclusions, but we find none. PFR File, Tab 1 at 17-18.

Broadly speaking, we recognize that the appellant has described the deciding official as having an extensive role in the investigation of the appellant's alleged misconduct. *E.g.*, *id.* at 15-16. We disagree, however, with the appellant's assertions about the resulting risk of unfairness. Once more, the Acting Director of DPAA—who would later be the deciding official in the appellant's removal—initiated an investigation after receiving specific allegations of wrongdoing. IAF, Tab 15 at 43-46. She identified 10 specific matters for the investigator to consider. *Id.* at 43-44. The investigator did so and issued a lengthy report about the same. *Id.* at 9-40. He enclosed hundreds of pages of evidence. IAF, Tabs 12-14, Tab 15 at 41-93. The Acting Director then reviewed the investigator's evidence and findings before creating a memorandum of record, which described her own analysis of the situation. IAF, Tab 15 at 5-8. This

memorandum ordered several remedial actions pertaining to classified materials and directed the Acting Chief of Staff—who would become the proposing official in the appellant's removal—to consider whether any DPAA employees should be subject to personnel actions. *Id.* at 7. Although the memorandum did conclude that allegations of wrongdoing on the part of the appellant and others were substantiated, it did not order the proposing official to initiate any particular adverse action for any employee. To the contrary, the proposing official testified that it was up to him to determine what, if any, discipline should be proposed, and the administrative judge found that testimony credible. RID at 80-84. Even assuming the deciding official influenced the proposing official's actions, we discern no error. The same individual may act as the proposing and deciding official in a chapter 75 proceeding. *Hidalgo v. Department of Justice,* 93 M.S.P.R. 645, ¶ 16 (2003). These are not circumstances in which the agency's choice of the deciding official made the risk of unfairness to the appellant intolerably high. Accordingly, we affirm the initial decision.

## NOTICE OF APPEAL RIGHTS[5]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all

---

[5] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

(1) **Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you receive</u> this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative</u> receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012.** This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[6] The court of appeals must <u>receive</u> your petition for review within **60 days** of the <u>date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(B).

---

[6] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017. The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017. Pub. L. No. 115-195, 132 Stat. 1510.

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:

*Gina K. Grippando*

Gina K. Grippando
Clerk of the Board

Washington, D.C.

# CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

Electronic Service

Diana Kammunkun
Served on email address registered with MSPB

<u>Appellant Representative</u>

Electronic Service

Elbridge Smith
Served on email address registered with MSPB

<u>Agency Representative</u>

U.S. Mail

Loraine Kovach-Padden
2300 Defense Pentagon
Washington, DC, District of Columbia 20301-2300

<u>Agency Representative</u>

U.S. Mail

Ryan Wischkaemper
2300 Defense Pentagon
Washington, District of Columbia 20301-2300

<u>Private Attorney</u>

Electronic Service

Renn Fowler
Served on email address registered with MSPB

<u>Private Attorney</u>

Electronic Service    Gary Gilbert

Served on email address registered with MSPB

<u>Private Attorney</u>

Certified Mail    Elbridge Smith

Gilbert Employment Law, P.C. 8403 Colesville Road, Suite 1000

Silver Spring, Maryland 20910

| 04/05/2024 | *John Hayes* |
|---|---|
| (Date) | John Hayes |

| | |
|---|---|
| DIANA Z. KAMMUNKUN,<br>                    Appellant, | DOCKET NUMBER<br>SF-0752-17-0667-M-2 |
|                v. | |
| DEPARTMENT OF DEFENSE,<br>                    Agency. | DATE: September 22, 2021 |

Elbridge W. Smith, Esquire, Honolulu, Hawaii, for the appellant.

Elbridge Z. Smith, Esquire, Honolulu, Hawaii, for the appellant.

Gary M. Gilbert, Esquire, Silver Spring, Maryland, for the appellant.

Renn C. Fowler, Esquire, Silver Spring, Maryland, for the appellant.

Loraine Kovach-Padden, Esquire, Washington, DC, for the agency.

Ryan L. Wischkaemper, Esquire, Washington, D.C., for the agency.

**BEFORE**
Franklin M. Kang
Administrative Judge

## INITIAL DECISION

### INTRODUCTION

The appellant, through her attorneys, filed this petition for appeal (PFA) challenging her removal from the competitive service position of Supervisory Records and Information Specialist (Supervisory RS or RSS), GS-308-13, in Honolulu, Hawaii effective July 26, 2017, pursuant to a July 25, 2017 letter of decision (LOD).  Initial Appeal File (IAF), Tab 1.  Within her PFA, the appellant

indicated that she also filed a complaint with the Office of Special Counsel (OSC) on February 3, 2017, approximately five months prior to the appealed removal. *Id*. at 5, 328. According to the February 3, 2017 cover letter addressed to OSC and accompanying OSC-11, she alleged that as of February 3, 2017, she had been subjected to disciplinary action, a significant workplace change, and placed on administrative leave, in retaliation for her whistleblowing disclosures. *Id*. at 328-349 (February 3, 2017 OSC-11). Because the appellant's February 3, 2017 OSC-11 identified personnel actions that predated the appealed July 25, 2017 removal letter, the Board separately docketed individual right of action (IRA) appeal. *Kammunkun v. Department of Defense,* MSPB Docket No. SF-1221-17-0675-W-1, slip op. (Initial Decision, September 25, 2018).

The appellant submitted evidence showing that on August 1, 2017, prior to filing this PFA on August 24, 2017, she amended her OSC Complaint, MA-17-1991, to include an additional allegation that since filing her OSC-11, the agency had removed her from service effective July 26, 2017, through the July 25, 2017 LOD, in retaliation for her whistleblowing complaints. IAF, Tab 5 at 17 (item "e" on list of retaliatory actions). Consistent with the Opinion and Order (O&O) in *Corthell v. Department of Homeland Security*, 123 M.S.P.R. 417 (2016), involving a Supervisory Criminal Investigator's (Supervisory CI) claim of an involuntary retirement, the appellant was deemed to have made an election pursuant to 5 U.S.C. 7121(g), challenging her removal from the position of Supervisory RS. IAF, Tab 100; 5 C.F.R. 1209.2(d). *Kammunkun*, slip op. similarly concluded that the appellant made an election pursuant to section 7121(g), and a four day hearing was convened by video conference, and a decision followed. *Id*.; Hearing Compact Discs (HCD); *Kammunkun*, slip op.

The United States Court of Appeals, Federal Circuit (Federal Circuit) thereafter vacated in part, affirmed in part, and remanded the matter. *Kammunkun v. Department of Defense,* 800 Fed. Appx. 916 (Fed. Cir. 2020). The Federal Circuit explained that section 7121(g) did not apply to the appellant

because she is a Supervisory RS, and did not discuss the Board's O&O addressing the Supervisory CI. *Id*.; *see Corthell*, 123 M.S.P.R. at 425. A supplemental hearing was thereafter convened via video-conference. Supplemental Hearing Record (HR); Remand Appeal File (RAF), Tab 55. During the supplemental hearing, the parties agreed to dismiss the matter without prejudice because one of the mutual witnesses was expected to be unavailable for an unspecified period. RAF, Tab 47, 55. The supplemental hearing was thereafter resumed after the agency informed the Board that the previously unavailable witness had returned to work. Refiled Remand Appeal File (RAF-2), Tab 2; HR. For the reasons set forth below, the agency's action is AFFIRMED.

## ANALYSIS AND FINDINGS

Burden of Proof

The agency bears the burden of proof by preponderant evidence with respect to the reasons for the action and its choice of penalty. 5 C.F.R. § 1201.56. Preponderant evidence is defined as the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q). Proof of one or more specifications supporting a charge is sufficient to sustain the charge. *See Greenough v. Department of the Army*, 73 M.S.P.R. 648, 657 (1997), *review dismissed*, 119 F.3d 14 (Fed. Cir. 1997); *James v. Department of the Air Force*, 73 M.S.P.R. 300, 303 (1997) (in resolving the issue of how charges should be construed, the structure and language in the proposal notice must be examined); *Tom v. Department of the Interior*, 97 M.S.P.R. 395, 404 (2004) (the Board will review whether the appellant understood the charges and received fair and sufficient notice of the allegations against him, since hypertechnical common law pleading is not Board practice).

Background and Facts

The appellant was an RSS, GS-308-13, in Honolulu, Hawaii, assigned to the Defense Prisoner of War / Missing in Action Accounting Agency (DPAA). IAF, Tab 21, Subtab 4A. DPAA is the successor organization to the Joint Prisoner of War / Missing in Action Command (JPAC) and other previously separate organizations. *See* HCD (testimony of the appellant).

*July 25, 2017 LOD*

On July 25, 2017, the appellant received an LOD signed by DPAA Principal Deputy Director Fern Winbush in her capacity as the acting Director, sustaining a notice of proposed removal (NOPR) signed by acting Chief of Staff George Gagne, received by the appellant on March 23, 2017. IAF, Tab 16, Subtab 4J; Tab 21, Subtab 4C. The LOD received by the appellant on July 25, 2017 specified:

> If you believe that this personnel action was taken in retaliation for your alleged protected Whistleblowing activities under 5 U.S.C. § 2302(b) (8), you may elect only one of the following two actions: (1) appeal to the MSPB under 5 U.S.C. § 7701; <u>or</u> (2) file a complaint with the Office of Special Counsel (OSC) under 5 U.S.C. § 1214, which may be followed by an Individual Right of Action appeal filed with the MSPB under 5 U.S.C. § 1221.

*Id*., Tab 21 at 27. The LOD granted the appellant a choice of directly filing a PFA, or seeking corrective action from OSC as a binding election, and explained the effects of her actions as follows:

> Your election is deemed to have been made based upon which of the two foregoing actions you file first. If you seek corrective action from the OSC before filing with the MSPB, you would forgo rights[.]

*Id*. (underlining added). The record reflects that prior to the issuance of the NOPR, the agency placed the appellant on paid administrative leave effective September 1, 2016. IAF, Tab 16 at 11.

*August 1, 2017 Letter Adding Removal to OSC Complaint*

Seven days after receiving the LOD with the detailed OSC election information as set forth above, the appellant, through her same attorney,

referenced MA-17-1991 and specified that the agency had taken additional adverse personnel actions since she filed her OSC-11 as set forth above. IAF, Tab 5 at 16-19. Through a detailed letter to OSC written by her attorney, the appellant listed her July 26, 2017 removal as an "adverse personnel action" that she considered "retaliatory" in addition to the other personnel actions as part of complaint MA-17-1991. *Id.* (original underlined). The appellant specified that her attorney emailed this detailed correspondence identifying her removal as an additional adverse personnel action to OSC. *Id*.

*August 24, 2017 PFA*

On August 24, 2017, the appellant filed this PFA challenging the same LOD referenced above. IAF, Tab 1. Referencing her OSC complaint, the appellant informed the Board that her OSC complaint was pending. *Id*. at 5. The appellant attached a December 7, 2016 report of investigation (ROI) addressing allegations that DPAA personnel improperly shipped, stored, and destroyed classified materials at the National Archives and Records Activity (NARA) in Riverside, California, written by Lieutenant Colonel Jacob Kramer (investigating officer or IO) for the acting Director of DPAA. *Id*. at 20-51. The appellant also attached a February 7, 2017 memorandum for record (MFR) written by Winbush in her capacity as the acting Director, reviewing the ROI and making a series of findings on this matter. *Id*. at 16-19. The appellant referenced the February 7, 2017 MFR (2017 MFR) in responding to the NOPR. *See id*. at 14, 53.

*Motions and Exceptions*

While motions and exceptions are addressed throughout the record, certain repeated motions are noted chronologically to increase readability and flow. *See, e.g.,* IAF, Tabs 33, 57; RAF, Tabs 24, 29, 43, 52. The appellant's November 17, 2017 motion to compel responses to untimely propounded discovery, June 3, 2018 request to reconsider the motion to compel responses to untimely propounded discovery, October 9, 2020 request to reopen discovery, October 27, 2020 exception to the denial of request to reopen discovery, November 30, 2020

second exception to the denial of request to reopen discovery, December 3, 2020 motion to disqualify the administrative judge based in part on the denial of her request to reopen discovery, December 14, 2020 argument to disqualify the administrative judge because the Federal Circuit found error, and January 25, 2021 motion in limine for the Board to compel the agency to produce non-Federal employees requested by the appellant are among the motions noted below. *Id.* To minimize repetition, the ROI, 2017 MFR, the appellant's response, and the supplemental responses are set forth below in sequence. *See, e.g.,* IAF, Tab 1 at 9-322. Quoted sections of the ROI and 2017 MFR are broadened within the discussion of the charges to minimize repetition and to ensure that the appellant's arguments are adequately addressed as set forth in detail below. *Id.* References to page numbers are based on the chronological order of documents in the record. IAF, RAF, RAF-2.

*November 17, 2017 Motion to Compel Discovery Responses*

On November 17, 2017, the appellant filed a motion to compel discovery responses based on discovery that the appellant untimely initiated on September 28, 2017, more than 30 days after the appellant and her attorneys received the detailed Acknowledgement Order reiterating the regulatory timeframe for initiating discovery. IAF, Tabs 2, 24, 33. While the appellant cited computer issues, the appellant's submissions show that her attorneys first attempted to email the agency after the deadline for initiating discovery lapsed, and there was nothing in the record to suggest that the appellant attempted to timely serve any discovery by other methods including facsimile and mail. IAF, Tabs 32-33. Accordingly, notwithstanding the appellant's initial representation that she timely initiated discovery, with accompanying certificate of service showing that she timely initiated discovery via email on September 27, 2017, the motion to compel was denied because the signed certificate of service was not accurate, and the underlying discovery was untimely propounded as set forth in the record. IAF, Tab 24 at 5, 29; Tab 33. After addressing the remaining discovery matters, the

Board thereafter issued an Order scheduling the prehearing matters. IAF, Tabs 33 (Order denying motion to compel), 34 (Order scheduling hearing and prehearing).

*June 3, 2018 Request to Reconsider Discovery Ruling*

On June 3, 2018, the appellant moved for reconsideration of the Board's discovery ruling set forth in greater detail above. IAF, Tabs 24, 33, 35, 36. The appellant argued that if she had timely propounded discovery via facsimile, email, or mail on September 27, 2017, the discovery would have been timely propounded. *Id*. Nevertheless, the appellant's submissions show that her attorneys first attempted to email the agency after the deadline for initiating discovery lapsed, and there was nothing in the record to suggest that the appellant *attempted* to timely serve any discovery by other methods including facsimile or mail. *Id*. The appellant's opposed motion was denied on June 19, 2018. *Id*.; IAF, Tab 57.

*June 14, 2018 Requests to Subpoena Non-Federal Employees to Appear*

On June 14, 2018, the agency filed a motion for the Board to issue subpoenas to compel the appearances Jasmine Moore, Chante Rodriguez, and Vincent Walls at the hearing, because Moore, Rodriguez, and Walls are not Federal employees. IAF, Tabs 38-40; 5 C.F.R. § 1201.81. The agency specified that Moore and Walls are Na Ali'i (NAI) employees, and Rodriguez is a former NAI employee, and the requests were timely filed on June 14, 2018 pursuant to the Order received by the parties on May 25, 2018, in compliance with section 1201.81. *Id*.; IAF, Tab 34 at 3.

*June 21, 2018 Incorrect Application of Section 1209.2*

On June 21, 2018, following the conclusion of discovery, and after the parties filed their prehearing submissions for this appeal and the separately filed IRA, the Board convened a prehearing conference to address the appellant's submissions showing that she requested corrective action from OSC prior to filing this PFA for the LOD. *Id*.; IAF, Tab 100. As noted above, the appellant amended OSC Complaint MA-17-1991 on August 1, 2017, claiming that the

agency had removed her from service effective July 26, 2017, through the July 25, 2017 LOD, in retaliation for her whistleblowing complaints, and filed this PFA thereafter on August 24, 2017. IAF, Tab 1; Tab 5 at 17 (item "e" on list of retaliatory actions). Addressing the appeal of a Supervisory CI, the Board explained the application of elections under sections 7121(g) and 1209(d) as follows:

> Ordinarily, an individual who first requests corrective action from OSC will be deemed to have made a binding election to proceed in that forum. *Agoranos,* 119 M.S.P.R. 498, ¶ 14; 5 C.F.R. § 1209.2(d). In such a case, the procedures for an IRA appeal apply, even if the contested personnel action would have been directly appealable to the Board. 5 C.F.R. § 1209.2(d)(2).

*Corthell*, 123 M.S.P.R. at 425. Because the appellant requested corrective action from the OSC prior to filing her PFA, the appellant was deemed to have made a binding election to proceed in that forum, and the parties were informed that the procedures for an IRA appeal would apply; this was incorrect as noted above. *Id*.; *Kammunkun,* 800 Fed. Appx. 916; IAF, Tab 100.

*June 21, 2018 Prehearing Conference*

As noted above, the parties were permitted to timely conduct discovery, request subpoenas, and file prehearing submissions for this Chapter 75 appeal and the IRA, prior to appearing for the June 21, 2018 prehearing conference. IAF, Tab 100. To ensure that the parties had the fullest opportunity to access their submissions in both appeals, these appeals were joined pursuant to 5 C.F.R. § 1201.36. *Id*. at 1, 3, 4.

*June 26, 2018 Issuance of Subpoenas*

The agency's unopposed requests to have subpoenas issued for Walls, Rodriguez, and Moore were granted, and the requested subpoenas were issued on June 26, 2018. *Id*. at 14; IAF, Tab 103. As with the prehearing conference summary, the notice and subpoenas were issued under both docket numbers, and

received by all participants including the appellant's attorneys under both docket numbers.  IAF, Tabs 100, 103.

*July 16, 17, 23, 24, 2018 Hearing, Initial Decision, and Federal Circuit Review*

The hearing was convened over the course of four days, and the initial decision followed.  HCD; *Kammunkun*, slip op.  The appellant, Gagne, Winbush, and former DPAA West Security Manager Shannon Williams testified during the underlying hearing without subpoenas, while Walls, Rodriguez, and Moore were compelled to appear based on the subpoenas served by the agency.  HCD.  NAI attorney Alexander Major appeared for a portion of the hearing that required a subpoenaed NAI employee to appear.  *Id*.  Because these appeals were joined pursuant to section 1201.36, all transcripts display the docket number for this Chapter 75 appeal as well as the IRA, and the underlying proceedings are in the record.  *Id*.  To ensure clarity, the hearing in the underlying matter was opened under both docket numbers.  *Id*. (administrative judge opening the record on July 16, 2018).  The Federal Circuit concluded that section 1209.2(d) was incorrectly applied because the appellant was a Supervisor; the Federal Circuit specified that the election requirement under section 1209.2 does not apply to the appellant based on 5 U.S.C. § 7103(a)(2).  *Kammunkun*, 800 Fed. Appx. 916.

*April 6, 2020 Vacate in Part, Affirm in Part, and Remand*

Through its April 6, 2020 Opinion, the Federal Circuit addressed the improper application of section 1209.2 and remanded the matter as follows:

> Accordingly, the election requirement of § 1209.2 does not apply to Ms. Kammunkun.
>
> We therefore vacate the administrative judge's decision with respect to the Chapter 75 action and remand for further proceedings. The parties disagree as to the appropriate scope of the proceedings on remand. *Compare* Pet'r's Reply Br. 10–14, *with* Resp't's Br. 54. We leave it to the administrative judge to make this determination in the first instance.

We affirm the decision of the administrative judge with respect to the individual right of action claim.

**VACATED-IN-PART, AFFIRMED-IN-PART, AND REMANDED**

*Id.*

*June 12, 2020 Docket Number Erratum*

On June 12, 2020, the Board clarified that the IRA was not an active docket number with the Board because the Federal Circuit affirmed *Kammunkun*, slip op. with respect to IRA. RAF, Tab 6. The remand acknowledgement order followed. RAF, Tab 7.

*September 11, 2020 Order Addressing Scope of Supplemental Proceedings*

The scope of the remanded proceedings was addressed through a detailed Order received by the parties on September 11, 2020. RAF, Tab 14. The parties were informed that while section 1209.2 was incorrectly applied during the June 21, 2018 conference as set forth in detail above, there is little in the record to suggest that this June 21, 2018 error affected the appellant's ability to timely initiate discovery in 2017 pursuant to the Order she and her attorneys received on August 28, 2017 as set forth in the record. *Id*.; *see* IAF, Tab 2 at 2-3 (August 28, 2017 Order addressing discovery deadlines); IAF, Tab 33 (May 25, 2018 Order denying motion to compel untimely initiated discovery), IAF, Tab 57 (June 19, 2018 Order denying request to reconsider discovery ruling); IAF, Tab 100. For these reasons, the parties were informed that there was no reason to reopen deadlines that lapsed in 2017, well before section 1209.2 was improperly applied in 2018 as set forth above in detail. *Id*. The supplemental hearing was thereafter scheduled. RAF, Tab 15.

*October 9, 2020 Request to Reopen Discovery*

On October 9, 2020, the appellant moved to reopen discovery to depose Winbush based on her hearing testimony, arguing in part:

> Winbush revealed for the first time that she considered the investigation "all over the map" and she made findings that became part of the report of investigation. Thus, she jumped in and rewrote

its findings and recommendations and included that as a critical section in the report of investigation.

RAF, Tab 17. The "rewr[i]te" of the findings and recommendations appeared to be a reference to the 2017 MFR, through which Winbush reviewed the ROI and made a series of findings as noted above. IAF, Tab 1 at 16-19 (2017 MFR attached to the PFA). As noted in detail below, the appellant addressed the 2017 MFR that allegedly rewrote the ROI findings and recommendations through her three responses to the NOPR, ROI, and 2017 MFR as set forth below in detail. *See* IAF, Tab 1. Thus, the appellant's submissions showed that she was aware of Winbush's decision to issue the 2017 MFR when she filed this 2017 PFA, well before filing this 2020 motion. *See id*. The appellant failed to adequately support her request to reopen discovery, and this October 9, 2020 motion was denied on October 21, 2020, for the detailed reasons set forth in the record. RAF, Tab 24 at 6-8; *see* RAF, Tab 14.

*October 20, 2020 Updated Prehearing Conference and Supplemental Testimony*

The parties appeared for an updated prehearing conference on October 20, 2020, to discuss the supplemental hearing for this matter. RAF, Tab 24. The appellant informed the Board that she intended to file a motion to have this appeal reassigned to a different administrative judge, as discussed in greater detail below. *Id*. Pursuant to the September 16, 2020 Order scheduling the supplemental hearing, the parties were permitted to request supplemental witnesses, and permitted to timely request subpoenas to compel supplemental witnesses to appear for the supplemental hearing, pursuant to 5 C.F.R. § 1201.81 (requests for subpoenas). RAF, Tab 15. The appellant declined to request any subpoenas pursuant to section 1201.81; the parties were required to immediately notify approved witnesses. RAF, Tab 24 at 9-10. Williams previously testified that he was removed from his position and represented by the same attorney as the appellant, and was approved as a former employee. HCD; RAF, Tab 20 at 12. The appellant's unilateral requests to call non-Federal employee witnesses

Rodriguez, Moore, and Walls were approved; the agency noted that NAI contractors are non-Federal employees. *Id.*

*October 27, 2020 Exception to Denial of Request to Reopen Discovery*

On October 27, 2020, the appellant filed an exception to the October 21, 2020 request to reopen discovery, and moved to reopen discovery to depose Winbush, explaining in part:

> Ms. Kammunkun's newly found evidence is that decider Winbush admitted in the IRA appeal that she was heavily involved in the agency investigation underpinning Ms. Kammunkun's removal, *e.g.*, she directed the investigating officer and then redid his findings because she had significant reservations about his work.

RAF, Tab 25. The appellant added "while some involvement was known, but it was not known, that decider Winbush felt compelled to redo the ROI's findings" because she significantly disagreed with those findings. RAF, Tab 27. As noted in part above, the "redo" of the ROI's findings through the 2017 MFR, and ROI, were both referenced by the appellant's attorneys within the April 13, 2017 NOPR response, and the parties received a subsequent opportunity to initiate discovery. *Id.*; IAF, Tabs 1, 2. Moreover, the appellant addressed the 2017 MFR that allegedly rewrote the ROI findings and recommendations through her two additional responses to the NOPR, ROI, and 2017 MFR as set forth below in detail. *See* IAF, Tab 1. Indeed, as noted in the narrative response received by the appellant on September 18, 2017, the appellant claimed that Winbush was not impartial prior to filing this PFA, and the agency cited *Martinez v. Department of Veterans Affairs,* 119 M.S.P.R. 37 (2012) to address this claim. IAF, Tab 22 at 18; *see* IAF, Tab 1 at 53. As noted above, the appellant failed to timely initiate discovery after receiving this narrative response. *See id.*; IAF, Tab 33. The appellant failed to adequately support her request to reopen discovery, and this October 27, 2020 motion was denied for the detailed reasons set forth in the record. RAF, Tab 29 at 2-4.

*November 30, 2020 Second Exception to Denial of Request to Reopen Discovery*

On November 30, 2020, the appellant filed a second exception to the discovery ruling set forth above. RAF, Tab 37. Through a December 18, 2020 Order, the Board addressed this second exception. RAF, Tab 43 at 7.

*December 3, 2020 Motion to Recuse the Administrative Judge*

After informing the Board on October 20, 2020 that she intended to file a motion for the Board to reassign this remanded appeal as noted above, the appellant filed the motion on December 3, 2020. RAF, Tab 24 at 2; RAF, Tab 40. The appellant argued in part that denying her request to reopen discovery evinced bias. *Id*. The appellant's motion to recuse was denied for the reasons set forth in the record. RAF, Tab 43 at 2-5.

*December 14, 2020 Argument for Motion to Recuse the Administrative Judge*

On December 14, 2020, the appellant moved for the administrative judge to recuse himself, arguing in part:

> Indeed, the reason this case is before the current Administrative Judge is because the United States Appeals Court of the Federal Circuit properly found that the Administrative Judge erred in his original decision regarding Appellant's Whistleblower Appeal and remanded the case.

RAF, Tab 42. The appellant's recusal request was denied on December 18, 2020 for the reasons set forth in the record. RAF, Tab 43 at 1-2.

*January 20, 2021 Order Denying Third Request to Delay*

On January 20, 2021, the Board denied the third request to delay the supplemental hearing based on the unavailability of one witness on the hearing dates. RAF, Tab 45. The Board informed the parties that the single unavailable witness would testify separately outside of the schedule dates. *Id*.

*January 22, 2021 Order Addressing Non-Federal Employees*

On January 20, 2021, the appellant filed a motion claiming that she "anticipated" the agency producing NAI contractors Walls, Rodriguez, and Moore

for the appellant, based on the appellant's request to have these witnesses appear for the supplemental hearing because:

> Most, if not all, government contracts include a standard clause that the contractor must comply with the government's request for cooperation in any matters growing out of or related to the contractors' work, which is what was accomplished during the initial Section 1221 hearing.

RAF, Tab 46 at 5.  As set forth in detail above, Walls, Rodriguez, and Moore were compelled to appear for the joined hearing for this appeal in July 2018 pursuant to a subpoena issued by the Board pursuant to the agency's June 14, 2018 motion under section 1201.81.  *Id.*; IAF, Tabs 38-40; 5 C.F.R. § 1201.81; *see* IAF, Tab 34 at 3 (instructions for requesting subpoenas for non-Federal employees); IAF, Tab 103 (subpoenas for non-Federal employees).  There is nothing in the record to suggest the existence of a "standard clause" requiring cooperation as quoted more fully above, and the agency's June 14, 2018 motion to subpoena the NAI contractors belies the assertion quoted above.  *Id.*  To the extent the appellant was unclear about the process for compelling the appearance of non-Federal employees as supplemental witnesses for the appellant, the appellant was reminded of this procedure on September 16, 2020.  RAF, Tab 15 (Order discussing subpoenas of non-Federal employees under the section titled Supplemental Witnesses).  The Board's January 22, 2021 Order addressed these matters as set forth in the record.  RAF, Tab 49.

*January 25, 2021 Exception to Denial of the Third Request to Delay*

On January 25, 2021, the appellant filed an exception to the January 20, 2021 ruling above.  RAF, Tab 50.  The Board addressed this exception on January 25, 2021.  RAF, Tab 52.

*January 25, 2021 Motion in Limine Regarding Non-Federal Employees*

On January 25, 2021, the appellant filed a motion in limine, arguing that the agency has an obligation to produce non-Federal employees, specifically the NAI contractors, requested solely by the appellant for this supplemental hearing.

RAF, Tab 51.  As noted above, Walls, Rodriguez, and Moore were compelled to appear for the joined hearing in July 2018 pursuant to a subpoena issued by the Board based on the agency's motion under section 1201.81.  IAF, Tabs 38-40; 5 C.F.R. § 1201.81; *see* IAF, Tab 34 at 3 (instructions for requesting subpoenas for non-Federal employees).  The appellant argued in part:

> Ms. Kammunkun requests that the agency be directed to produce those contractors if it intends to rely upon their testimony for this 752 case, and/or be barred from referring to or relying upon any testimony or documents related to each.

RAF, Tab 51.  As noted above within the section discussing the October 20, 2020 updated prehearing conference and supplemental testimony, the NAI contractors were solely requested by the appellant as witnesses for this supplemental hearing. RAF, Tab 24.  The appellant declined to adequately explain why the agency attorneys, rather than the law firms and attorneys representing the appellant, are obligated to file motions for the Board to issue subpoenas for the appellant's witnesses.  RAF, Tab 51.  The appellant also declined to adequately explain why she declined to request any subpoenas for the NAI contractors to appear as her witnesses, even after the agency confirmed during the updated prehearing conference that NAI contractors remain non-Federal employees.  *Id*.; RAF, 24 at 9.  To the extent the appellant was unfamiliar with section 1201.81 when filing this January 25, 2021 motion, the appellant was again reminded of her obligation to timely request subpoenas for non-Federal employees to appear for the supplemental hearing, through an Order received by her and her attorneys on September 16, 2020.  RAF, Tab 15; *see* IAF, Tab 34 at 3.  The appellant's January 25, 2021 motion was denied on that same date, for the reasons set forth in the January 22, 2021 Order.  RAF, Tab 52.

*Supplemental Hearing*

The supplemental hearing was convened over the course of two days as set forth in the record.  HR.  Williams, Walls, Rodriguez, and Moore were approved to testify in the underlying hearing; these four witnesses were approved to appear

again at the supplemental hearing solely at the request of the appellant as noted above. HCD; HR; RAF, Tabs 15, 19, 24. During the first day of the supplemental hearing, the appellant, through her attorneys, confirmed, "we're not going to call Williams" to provide supplemental testimony in the supplemental hearing, and two of her attorneys confirmed "we did not reach out to them at all" in reference to the NAI employees requested by the appellant. *Id.* As noted above, the parties were required to immediately contact their witnesses; Walls, Rodriguez, and Moore were requested by the appellant to testify at the supplemental hearing as non-Federal employee witnesses at the sole request of the appellant. RAF, Tab 24 at 9-10 (October 21, 2020 Order discussing supplemental hearing and rulings on witnesses).

*Additional Discussion of Evidence, Testimony, and Findings*

As discussed above, the Federal Circuit vacated the joined underlying decision with respect to this Chapter 75 action, affirmed the decision with respect to the IRA, and remanded for further proceedings. *Kammunkun,* 800 Fed. Appx. 916.

CHARGE I: Lack of Candor or Truthfulness

In *Ludlum v. Department of Justice*, 278 F.3d 1280 (Fed. Cir. 2002), the Federal Circuit explained that a lack of candor charge may be proven by showing that the respondent failed to disclose something that, in the circumstances, should have been disclosed in order to make the given statement accurate and complete; lack of candor can be established by showing that the appellant did not respond fully and truthfully to the questions he was asked. Lack of candor is a broader and more flexible concept than falsification, and as such, its contours and elements depend on the particular context and conduct involved. It may involve a failure to disclose something that, under the circumstances, should have been disclosed to make a statement accurate and complete. *Id*.

Specification: On or about June 30, 2016, you reported to DPAA leadership and members of the Classified Materials and Records Management Working Group (CMRMWG) that the team found only 2 classified documents during its records review in Riverside, CA. Your statement was untruthful in that approximately 100 documents containing classified markings were found during the security review. *See* Reference A, Enclosures 2, 13, 17.

IAF, Tab 1 at 9. Reference A is the ROI with enclosures closed on February 7, 2017, the date of the 2017 MFR. *Id*. at 14; IAF, Tab 16 at 5. The appellant described the 2017 MFR as a letter transmitting the December 7, 2016 ROI though an electronic bookmark. IAF, Tab 1. The appellant's submissions show that Enclosures 2, 13, and 17 are statements from Rodriguez and Moore. *Id*. The discussion that follows is lengthy to ensure a comprehensive consideration of the appellant's arguments. *See, e.g., id.*

*RSS Appointment and Shipment to Unclassified Records Facility*

The appellant testified that she was hired by the agency to oversee the DPAA records management program. HCD. Because DPAA absorbed JPAC in January 2015, she served as the records manager for both DPAA sites in Virginia and Hawaii. *Id*. She explained that around this time, she was in the process of sending agency records to the NARA facility in Riverside, California. *Id*. The agency was seeking to have these records scanned or digitized. *Id*. It is undisputed that the Riverside NARA facility in question is an unclassified facility that cannot store or handle classified information, and none of the Riverside NARA personnel are permitted to handle the agency's classified documents. *See id*.; IAF, Tab 20. The record reflects that the appellant signed a Standard Form (SF) 312 Classified Information Nondisclosure Agreement. IAF, Tab 10 at 195-96 (signed SF-312).

*December 2015 Formation of the Working Group*

The record reflects that on December 2, 2015, DPAA Director Michael Linnington appointed Senior Intelligence Officer (SIO) Jay Basham to lead a newly formed classified materials and records management working group (WG),

led by Basham, to address "persistent poor records management" and the mishandling of potentially classified information. IAF, Tab 18 at 6. Linnington wrote in part:

> As a result of several recent DPAA investigations substantiating the mishandling of potentially classified info1mation (hard copy and electronic), and the persistent poor records management by DPAA predecessor organizations inherited by DPAA, I ask you to establish a standing working group and, working with Agency staff, develop and implement a plan to fix the problems identified in the investigations and any related problems you may discover. As outlined in more detail below, create a working group led by Mr. Jay Basham, that will lead the working group's examination of Agency procedures relating to the handling of classified materials and of records handling procedures to determine whether they should be revised, as well as an inventory of all Agency records to determine whether they are properly declassified. Under your oversight, the working group is to develop and implement a plan to properly mark and/or destroy mismarked records; and implement procedures to prevent recurrence of these issues.

*Id*. Williams testified that the intent of the broader WG and scanning project was to clean up the records that the agency had accumulated over the years. HCD. This is the WG referenced within the specification. *See id*.

*December 2015 Shipment to Riverside NARA*

In December 2015, the appellant oversaw the shipment of approximately 113 boxes of materials, grouped within "tri-walls," to the Riverside NARA facility. HCD (testimony of the appellant); *see* IAF, Tab 11 at 91. The appellant testified that she indeed reviewed these documents prior to shipment to NARA with the assistance of three other employees, page by page. HCD; HR. During the remand proceeding, the appellant clarified that she found classified documents during this pre-shipment review as follows:

> So I requested those file custodians to come with me, and there were three of us -- four of us total, and go page by page through all of the documents that were there to ensure that there was no classified in there. And, as a result of that, we found lots of classified.
>
> ...

> And so we pulled all of those documents out, we spent a week going through, page by page, and then we placed all of the documents into the safes that we had.
>
> ...
>
> So once that was done, then we palletized everything in (indiscernible) and they were shipped to Riverside.

HR. Using the terms record and non-record, the appellant further explained:

> So record, in a nutshell, is basically anything that -- that was used to record Agency business. ... So non-record material are things like menus, horoscopes -- we found a lot of that stuff inside of the -- the documents that were in the warehouse. There was also like, some emails that were just personal emails. It -- if it doesn't have anything to do with the Agency, and the Agency's business, then it's not a record, and there's no -- we don't keep it.

*Id*. On December 17-18, 2015, Winbush expressed concern that the agency had shipped classified materials to NARA. IAF, Tab 11 at 92-93. On December 24, 2015, the appellant responded to Winbush in part as follows:

> We conducted a page by page inventory of all five tri-walls sent to Riverside ensuring there were no classified documents being transferred, I have all of the inventories from our shipment.

*Id*. at 91. As noted below, two contractors from the agency's Crystal City office reviewed the boxes while in Riverside and testified that there was nothing in the shipment to indicate that a page by page inventory had been conducted on the shipment, and nothing in the shipment to indicate that any inventories had been conducted as claimed by the appellant in her email to Winbush. *See* IAF, Tab 11 at 91 (appellant's email discussing page by page" inventory of Riverside shipment); HCD.

*February 2016 Email to Appellant about Status of Documents Marked Classified*

Winbush testified that Archivist Jim Cloninger first reported improper use of a declassification stamp (DS), and brought it to the WG's attention. HCD. The record reflects that Cloninger discovered in February 2016 that a Central Intelligence Agency (CIA) originated message with clearly recognizable security markings had been improperly altered as followed:

> Cloninger noted that some security classification markings had been partially obliterated and the document had been marked as having been "Declassified by JPAC."

IAF, Tab 11 at 7. Cloninger's report to Basham in his capacity as the SIO was significant because JPAC would not have had the authority to declassify CIA original classification (OCA) documents; DS and OCA are discussed in greater detail below. *See id.* It is undisputed that the appellant has never been trained or appointed as an OCA. *See id.*; HCD (testimony of the appellant). Indeed, there is nothing in the record to suggest that the appellant had any authority to declassify any document at any time for any agency. *Id.* The record reflects that on February 12, 2016, Winbush emailed the appellant ("Dee Dee") to share Cloninger's discovery as follows:

> Thanks Dee Dee ... all makes sense.
>
> Related. but separate issue. Jim found a doc with source data that had been stamped declassified by someone in JPAC. As you know this is really bad: source data document from a lettered agency, declas'd by someone other than the originator, and we don't know the extent of this type of mismarking or whether docs have gone outside the agency because they were marked declas in this manner ... really really bad.
>
> ...
>
> To temp stop the bleeding if there is any, I will need to send an all hands note directing that everyone NOT ship, transfer, declassify, or release any documents labeled in this manner.

IAF, Tab 14 at 66. Winbush explained while Winbush had OCA to declassify DPAA documents, inclusive of its earlier organizational components, in her capacity as the acting Director, no other agency employee, including the appellant, has the authority to declassify anything. HCD. Through this February 12, 2016 "Stand Down" email, the appellant was reminded that documents marked classified are treated as classified until the materials are properly declassified by an OCA. *See* IAF, Tab 14 at 66.

*June 6, 2016 SIO MFR and Declassification of Materials*

The appellant testified that prior to the events at issue in this appeal, she and others used a "JPAC stamp" that had been purchased "through some company, local company" to indicate that document had been declassified, and specified that she used the DS to stamp "four documents[.]" HCD. She testified that she and others "believed we had the authority" to use the DS. *Id*. She testified that a classified materials records management working group was formed to identify and fix problems related to classified documents. *Id*. To this point, the record reflects that on June 6, 2016, Basham, in his capacity as the SIO, issued an MFR stating that the appellant had used the DS on documents, even though the appellant was not the OCA, and did not have the authority to declassify materials. IAF, Tab 11 at 33-34. The appellant disagreed with sections of the MFR; she specified, *inter alia*, that she used the stamp to "correct documents in the RCFs" in a reference to resolved case files (RCF), and believed she had the authority to do so. *Id*. at 33-36 (June 6, 2016 MFR with appellant's response stating she and others believed they had the authority to stamp documents). Related to this point of an individual's authority to correct documents marked classified, Winbush testified that none of the individuals conducting the records review at issue in this specification in Riverside had the authority to determine whether documents marked classified were truly classified, because none of these individuals conducting the records review in Riverside, including the appellant, had OCA authority. HCD.

*June 2016 Riverside Assignment to Review Shipment to NARA*

Winbush testified that the appellant, referred to by her pronoun below, and her "team" were sent to Riverside to conduct a page by page review of the records shipped to NARA, to ensure that there were no classified documents, and explained:

> I directed her to make sure that if any were found, because Shannon Williams, who's one of our security managers, was accompanying

her, that if anything was found that it would be either wrapped and carried back, or if it was too much, for it to be shipped back.

...

And because she wasn't trained in equities, she suggested that she take the two contractors, which I agreed to, and then also Shannon Williams, to make sure that the documents were properly handled.

...

She was to oversee the team, to make sure that the process was followed, and that anything that was found, any classified documents that were found, would -- would be brought back.

...

What she described to me was the same process that she had used to review other official records, which was review page by page, the contractors who were trained in, you know, by WHS standards, would segregate classified documents, and that Shannon would be responsible for wrapping them and bringing them back, or shipping them back if it was too -- it was too much.

HR. Winbush testified that neither the appellant nor Williams was authorized to determine whether documents with questionable classified marking or mismarked documents were classified or not; rather, these documents were to be brought back from Riverside. *Id*. Williams similarly testified that he, in his capacity as the security manager, was sent with the appellant to NARA to "go down to verify" that no classified materials had been sent to Riverside. HCD. His role was to serve as the "carrier" if any classified documents were found at the NARA facility. *Id*. The appellant, Williams, Rodriguez, and Rodriguez's NAI supervisor Moore, travelled to Riverside from Sunday, June 26, 2016 to Saturday, July 2, 2016, to review the approximately 113 boxes of documents. *See* HCD (testimony of Williams, Rodriguez, Moore). Moore and Rodriguez similarly testified that they travelled to Riverside as part of the four person team to review documents that had already been sent to Riverside NARA. HCD. The appellant testified, "we got the rental car" then made arrangements to have a "NARA truck" convey the 113 boxes of documents to the March Air Reserve Base (AFB).

HR. The appellant testified that she was "overall responsible for all of the details" for this Riverside trip. *Id*. As the Supervisory RS and ranking agency employee for the Riverside trip, she made the arrangements for the AFB space and ensured that shipping arrangements were in place as follows:

> We -- we coordinated with the, it's called the Base Information Transfer System Office (audio interference) how they send the mail out. We -- we also talked to the post office. We went to a few different places to make sure we had everything in order in the even that that happened. And we also had courier cards if we needed to courier something back if it wasn't a lot. So I was basically just overall responsible. And also to -- to look at the documents and determine if it was record material or not. My job as the Agency Records Manager, that was my role.

*Id*.

*July 2016 Report of Shredding of Classified Materials and Report to WG*

On July 15, 2016, after returning from Riverside, Rodriguez wrote a Statement for the Record (SFR) stating that while it was her understanding that a Walmart shredder purchased by Williams would be used to shred consult files, it was used to shred classified documents as follows:

> 28 Jun 16, Shannon purchased a shredder. It was my understanding that the shredder was to be used to shred consult files, but it actually was used to shred the classified material as well.
>
> On 30 Jun 16, DeDe and Shannon was attended a teleconference and during the conference they gave a brief on the progress of our trip. DeDe briefed that we had found 2 classified documents. In all actuality we have found close to or over 100 classified documents and case file documents. DeDe explained that she only stated that we found 2 documents rather than the actual amount, because she didn't want the agency to learn that she didn't review the documents prior to shipping the boxes to NARA. She additionally did not to mention the removal of the case files, because she would have needed to go through NARA prior to doing so.
>
> …
>
> DeDe said to Jasmine and me "OK. We need to get our stories straight. What are you going to say when Jay comes and ask you how man documents that were found. What are you going to say if he

pressures you?" I did not respond to her questions. Jasmine did response but I cannot recall her comments, but DeDe did not appear please with Jasmine's response.

…

1 Jul 16 … the shredder was returned to Walmart.

IAF, Tab 13 at 21. As discussed in greater detail below, the appellant testified that teleconference referenced within the SFR involved a telephone call with members of the WG on Thursday, June 30, 2016, using the appellant's cell phone speakerphone feature. HCD. Rodriguez testified that she shared this information with her second level supervisor and Cloninger. HCD. Moore similarly testified that she shared information about the Riverside trip with her supervisor, and that this information was passed to the agency as set forth below. *Id*. Thereafter, on July 25, 2016, Williams wrote an MFR describing the "finding of Classified Material" as follows:

> Documents discovered to knowledge:
>
> A. One JPRC five to six page document with a confidential portion marking. The document had improper stamped declassification markings.
>
> B. One UNK sixty to sixty-five page document with secret portion markings. The unidentified document did not contained any classified header and/ or footer markings.

IAF, Tab 13 at 61. There is nothing in the MFR explaining the documents shredded in California as set forth above. *Id*.

*August 2016 Memorandum Addressing Automatic Declassification (ADC)*

On August 25, 2016, DPAA General Counsel (GC) Catherine Knowles issued a memorandum confirming that the DPAA director has OCA to classify or declassify materials up to and through Secret level. IAF, Tab 12 at 158-64. Because DPAA absorbed JPAC, this same OCA flowed to the receiving organization. *Id*. Knowles specified that ADC based on the passage of time can only occur when the subject records have been originally classified by the agency in possession of the records. *Id*. Williams similarly testified that even when a

declassification time lapses, "you still have to treat that document as a classified document" until an OCA properly declassifies the material. HCD. Thus, documents bearing classification markings remain classified, notwithstanding the passage of time and/or ADC. *See id*. The appellant's August 2016 emails to Winbush, Gagne, Williams, GC, SIO, Director of Security Dave Singh, and others indicate that screening for classified materials within shipments of documents to NARA remained relevant. IAF, Tab 91 at 8-9, 21-22; Tab 92 at 4-5. The appellant was placed on administrative leave after she sent the August 26, 2016 update to Winbush, Gagne, Williams, GC, SIO, Singh, and others as set forth below. IAF, Tab 16 at 11; Tab 92 at 4 (appellant's August 26, 2016 email).

*September 2016 Placement on Leave and Investigation*

On September 1, 2016, the appellant was placed on administrative leave. IAF, Tab 16 at 11. Five days later, on September 6, 2016, citing the SFR, Winbush appointed Kramer to serve as an IO with Knowles as the legal advisor. IAF, Tab 15 at 43. Referencing Rodriguez's SFR, the appointment letter tasked Kramer with investigating the allegations contained with the SFR as follows:

> You are hereby appointed to conduct an investigation into the following allegations. In June. 2016, Ms. Diana Kammunkun and Mr. Shannon Williams travelled to March Air Force Base at or around Riverside, CA, to search through documents that had been shipped from DPAA West to a NARA facility in Riverside. California for digitizing and archiving. At some stage, NARA or DPAA transferred the collection to a vault on March AFB. The purpose of the DPAA employees' travel was to determine whether any classified documents were shipped to the NARA facility, which was not certified for storage of classified information. As indicated in the attached "Statement for the Record," it is alleged that the following actions occurred from June 26 – 30:"

*Id*. at 43-45. The document stated in part:

> Specify whether each allegation is substantiated, unsubstantiated, or undetermined and provide the rationale for your findings, as well as any opinions you develop as the Investigating Officer, and any recommendations for my consideration.

*Id*.  On September 22, 2016, during an interview with Kramer and a second uniformed member, the appellant explained that the two contractors from NAI were included because they are trained to meet the agency's Washington Headquarters Services (WHS) standards for resolved case files.  *Id*., Enclosure 4. She denied committing misconduct as set forth in the record.  *Id*.  She testified that Kramer took "verbatim" notes of her responses from what she could see, adding that a female Naval officer was also present for the interview.  HCD.

*December 2016 ROI*

On December 7, 2016, Kramer issued the ROI to Winbush as noted in part above.  IAF, Tab 1 at 20-38.  Through the ROI, Kramer made a series of findings and explained the bases for his conclusions pursuant to Winbush's appointment document quoted in part above.  *Id*.  The first addressed whether the Riverside team discovered 100 classified documents as alleged, to which he wrote "**Undetermined**" and explained in part:

> Substantiating this allegation *requires disproving a negative.* This is impossible in this case since the documents in question were destroyed and nobody can ever determine for certain their actual level of classification. Additionally, we have no page-by-page, document-by-document inventory recording the original documents in the shipment with which to compare to the remaining documents in storage.

*Id*. at 32 (emphasis in original).  He noted that the appellant had performed a pre-shipment review of these same documents as set forth above within the quoted section of the appellant's supplemental testimony.  *Id*.; HR (testimony of the appellant).  He continued:

> At the same time, the IO *cannot rule out* that some classified material did, in fact, arrive in Riverside because the overall levels of competency of the personnel reviewing the documents to identify classified material ranges from questionable to incompetent. Ms. Kammunkun's prior incidents involving the mishandling of classified information undermine any claims of competence.

*Id*. at 32 (emphasis in original).  Addressing the NAI employees Rodriguez and Moore, the IO noted in part:

Both Ms. Moore and Ms. Rodriguez - the two members of the team most familiar with the nature and content of DPAA's various collections, both of whom have considerable experience working with classified materials, and the two people at Riverside with the most credibility- claim to have pulled in excess of l00 classified documents.

*Id*. at 33. Addressing Williams, the IO referenced a potential use of the DS, writing in part:

He agrees that in addition to the Consult Files, old itineraries, menus, and blank pieces of paper, there was a large number of emails with classification markings stamped at the header and footer of the pages; however, he also stated those "classified" documents' headers and footers were then lined out in blue pen (for example) in what appeared to him to be an attempt at improper declassification. ... Mr. Williams informed the IO that the boxes in Riverside still contain JCRC reports and documents that JPAC previously improperly marked as unclassified, likely using the recently confiscated JPAC and JCS stamps, to indicate authority to declassify, which DPAA has now determined remain classified.

*Id*. at 33-34.

*February 7, 2017 MFR and Receipt of the Materials by Appellant*

On February 7, 2017, Winbush issued an MFR substantiating the portion of the ROI discussed above, in part as follows:

Based on my careful review of the statements and exhibits (marked as enclosures), as well as the investigating official's findings, recommendations, and opinions, I make the following findings:

**Allegation 1:** Ms. Kammunkun, Mr. Williams, and two DPAA Na Ali'i contractor employees (Ms. Chante Rodriguez and Ms. Jasmine Moore) discovered approximately l00 classified documents among the shipment of DPAA documents sent to the NARA Riverside facility.

**Finding: Substantiated as follows:** Ms. Kammunkun, Mr. Williams, and two DPAA Na Ali'i contractor employees (Ms. Chante Rodriguez and Ms. Jasmine Moore) discovered an unknown number, but more than two, classified documents among the shipment of DPAA documents sent to the NARA Riverside facility.

*Id*. at 16-19. When asked why she wrote the 2017 MFR, Winbush noted the ROI was "all over the map" and could have been more succinct:

> Yes, so the -- the all over the map was no slight to Lt. Col. Kramer because again, he did -- his investigation covered what happened at Riverside, but it included a lot of statements and -- and allegations about three GS employees, not just Ms. Kammunkun. So there was a lot of information, and it was all over the map. And so my MFR pulled everything together in a succinct way that I could understand, which I thought was important, since I had to make the -- the final decision.

HR (testimony of Winbush). During the initial hearing, Winbush similarly explained that she issued the 2017 MFR because the ROI "all over the map" as follows:

> The document was to clarify the findings, because the report that was given to me was frankly all over the map. And being a very visual person myself, I wanted to make sure that I understood what I asked him to look at, what he provided, and then what the witnesses responded to. And so that was the document that I drafted.

HCD. According to the appellant, she received the ROI with 2017 MFR as part of the NOPR, and on April 13, 2017, the appellant responded to the NOPR, ROI, and 2017 MFR by addressing Winbush. IAF, Tab 1 at 53.

*May 8, 2017 Oral Reply to Supplement April 13, 2017 Written Response to NOPR*

According to the appellant's PFA, following her April 13, 2017 written response (WR) to the NOPR, she delivered an oral response (OR) on May 8, 2017, wherein she indicated that Rodriguez was disgruntled as follows:

> Why they would do what they did? I would be speculating, I don't know. If you read my written report to you, I do think that Chante, she says it herself that she was basically disgruntled. She wasn't happy with Na Ali'i, she wasn't happy with the contract. She said that, I believe she said that Vince Walls and they didn't believe her and they didn't trust her. She said a lot of things. In most of her statement she talked about how she wasn't happy with Na Ali'i. I don't know. I've never criticized them, in fact, we all got along fine. I talked to Jasmine almost on a daily basis because she was the lead on the contracts -- so it was almost every single day I talked with Jasmine. Chante, the only time we ever had any interaction was at

Riverside. While we were at Riverside, again in my written report, we went to dinner together every night, we had drinks at the hotel every night, and we socialized. I didn't get any indication that there was anything wrong or any type of uncomfortable feelings from either Chante or Jasmine. Chante says in her statement that she believes that Na Ali'i is only interested or only cares about their contracts so that could be a reason why later Jasmine and Vince and Jason all decided to side with Chante, I don't know.

*Id*. at 267-77. The appellant addressed the pre-shipment review and addressed which documents were pulled in Riverside:

When we were first went through everything in December we weren't looking for that stuff, we were looking for classified documents. So, I didn't give those instructions to the small team that we had put together out in Hawaii to pull out any duplicates or paper that we didn't need. We were just looking for classified. So, while we were there, it was actually Jasmine that brought it up, she said, Hey Dee Dee, I'm finding a lot of duplicate copies and extra things that we don't need. Would you like us to pull them out? And, I said, that's a great idea Jasmine, and that's how it got started. Because it was a scanning project, so it wouldn't make sense to keep that material in there.

*Id*. She addressed the Riverside shredding as follows:

I was going to take the stuff to the shredding company but there wasn't one that was nearby, it was a distance, and plus I didn't have a way to pay for it, it was going to be expensive, and we were only there for five days, and I knew there was no way we were going to be able to go through what ever system we needed to get that purchased, and I didn't want to make that purchase on my own. So, it was actually Shannon that suggested just getting a shredder and I asked him so do they make them according to whatever specs we need? And he said, ya, ya they do. So that's when we went out and started Looking for a shredder. We didn't go to Walmart first, we went to some kind of home office store initially and then we found one at Walmart.

*Id*.

*June 2, 2017 Notice of Additional Considerations to NOPR*

On June 2, 2017, the appellant, through her attorney, received 10 additional days to respond to the NOPR and 2017 MFR based on the statements Walls,

Rodriguez, and Moore, conveyed after the issuance of the NOPR. IAF, Tab 1 at 278-98. When asked about these statements, Winbush explained:

> The questions, I prepared ahead of time and asked them when the contractors came for the interview. And then we typed up their answers to those questions and provide it to them for them to review and sign them.

HR.

*June 12, 2017 Supplemental Response and Additional Considerations*

On June 12, 2017, the appellant submitted her additional response to supplement her earlier responses (SR) to the NOPR, supplementing her earlier oral and written responses to the NOPR as set forth above in detail. IAF, Tab 1 at 299-322. Through her attorneys, she argued in part:

> Although it is documented that both Mr. Basham and Mr. Singh have threatened both Ms. Moore and Ms. Rodriguez, these ladies now do their bidding to protect themselves and enhance their future careers.

*Id*. The LOD followed on July 25, 2017, as noted above. *Id*. at 323.

*Additional Discussion of Events in Riverside*

The appellant, Williams, Rodriguez, and Moore presented testimony addressing the review in Riverside. HCD; HR. As set forth in greater detail below, the documents shipped to NARA were transported to a military base for review. *Id*.

*Review of Documents Shipped to NARA*

Williams testified that during the course of this Riverside review, conducted at the AFB, the appellant found and brought him menus, horoscopes, unclassified threat briefs, emails, pictures, personnel information, personally identifiable information (PII), duplicates, blank pages, chain of custody documents, consult files, and various other documents that should not have been included as records. HCD. His understanding was that Rodriguez and Moore were there to assist the appellant to find "anything that wasn't a record" and indicated that the appellant led this effort that started on a Monday. *Id*. He testified that the appellant determined whether a document was a record, and he

determined whether the document was classified. *Id*. The appellant testified that Moore handed documents to her for review, including declassified documents, and Williams performed a second review prior to shredding the papers. HCD. The appellant testified that she gave emails, loose documents, and declassified documents to Williams to shred; however, no classified materials were shredded, and "No records were destroyed." *Id*. She testified that the two contractors knew that she was only looking to distinguish records from non-records. *Id*. She testified that she did not remove items such as consult files, chain of custody receipts, translations, horoscopes, restaurant menus, and training materials from this shipment during the course of her earlier reviews including the page by page review as set forth above, because "I was focused" on ensuring that no classified documents were shipped to Riverside. *Id*.

She testified that all of the materials found by the two contractors were given to her for review, adding that approximately two boxes of documents were shredded. *Id*. She explained that Winbush failed to give her appropriate instructions for her trip and that the shredding "wasn't a big deal." *Id*. As noted below, both of the contractors at issue have been trained by the agency to identify classified materials and understand classified markings; the appellant does not dispute the contractors on these qualifications. *See id*. According to Williams, after pulling out a series of documents as set forth above, the appellant made phone calls to inquire about shredding services; ultimately, he and the appellant made the decision to purchase a shredder. *See* HCD.

*AFB Facility*

Under DoD Manual 5200.01, classified information must be protected at all times. IAF, Tab 10. Consistent with the testimony discussed above, the ability to downgrade or otherwise change the level of classification rests with the OCA. *Id*.; 44 U.S.C. § 3105. Rodriguez opined that based on her training and experience with classified materials and facilities, the AFB facility was inadequate to hold classified materials because the boxes were left unsecured

within an inadequately protected building that lacked two-point verification, and lacked cipher locks. HCD. She testified that she received WHS training to recognize classified markings and explained the significance of portion markings and stamped documents in detail. *Id*. She testified that the appellant and Williams do not have the authority to declassify documents because they lack OCA. *Id*. Consistent with the testimony of Winbush, she explained that only the owner of a classified document has the authority to take such an action, adding that neither the appellant nor Williams had the authority to deem a document marked classified, to be unclassified. *Id*.

Under DoD Manual 5200.01, classified materials are required to be secured in an appropriately locked container or room; however as noted below, Williams testified that the entry door to the office building space was left open for a "nicer breeze" as the four reviewed the boxes of documents. HCD. Moore testified that an unidentified series of individuals entered their office suite as they were reviewing the documents, including the Air Force liaison that secured the space for their use, and other potential tenants entering to view the available AFB space for their tenant activity. HCD. She testified that the AFB liaison had keys to unlock and enter the AFB office space used by the DPAA group to review the documents at issue, including the classified materials referenced by Williams above. *Id*.

*Review of Documents and "cover-up"*

Rodriguez testified that after arriving at NARA, the documents were transferred by van to the AFB. HCD. She testified that as she reviewed the boxes in the unsecured reception area of the AFB building, she found classified documents that were marked classified, bearing Secret and Confidential stamps on the tops and bottoms of the documents, and/or classified portion markings. *Id*. She testified at length about her ability to identify classified documents, adding that the documents bearing the Secret and Confidential stamps displayed these classification markings. *Id*. She testified that she "found a lot" of classified

documents adding that these documents had classified markings "of some sort." *Id*. She also found consult files that should not have been sent to NARA. *Id*. She testified that the classified materials were placed in a "pile," and the "pile grew" as she continued to review boxes. *Id*. These classified documents were initially placed into a drawer, then placed into a "duffle bag" that may have been brought to the office. *Id*. When she objected to removing documents from the boxes, the appellant informed her that the documents were "duplicates" and assured her that it was an acceptable practice. *Id*. Rodriguez testified that her concerns continued to grow as the appellant instructed her to replace removed documents with other papers because Rodriguez believed that it was then a "cover up." *Id*. She specified that even though the appellant's instructions to replace removed documents applied to consult files, it was wrong because you "can't shred anything" from the boxes shipped to NARA without proper coordination. *See id*. She explained:

> You really can't just shred anything from that box, whether it was classified or not. And that's kind of like saying even the consult files. You can't shred the consult files because those files are part of that box. Anything that's a part of that record, that box is no longer ownership to DPAA. DPAA has no voice as to what happens to that box.

*Id*. The appellant testified that while she instructed the contractors to "redistribute" documents to spread out the materials, she did not tell the contractors to replace removed materials. HCD. As the pile of documents including classified materials continued to grow, Rodriguez testified that she overheard the appellant and Williams discuss shredding these documents as set forth below. *Id*.

*Classified Markings, Lack of Prior Review, and Inventory*

Moore testified that she served as Rodriguez's supervisor and project manager for NAI. HCD. With 20 years of experience working with classified materials, she testified about her experience with classified documents, apart

from her WHS training. *Id.* She testified that she travelled to Riverside on Sunday evening, and that the review of the documents occurred at the AFB in a four room office building secured by a physical key lock. *Id.* Upon reviewing the boxes at the AFB, it was clear that the documents had not been reviewed by DPAA because there were no inventory sheets and no description of documents in the boxes. *Id.* She testified that this lack of review and lack of inventory was apparent as she continued to open the boxes of documents shipped to NARA. *See id.* Consistent with the testimony of Rodriguez, she testified that she and Rodriguez found approximately 100 classified documents, with each of these classified documents bearing visible classification markings. *Id.*

Moore testified that the classification markings on these documents included header and footer classification markings and/or portion markings. *Id.* Moore added that some of these classified documents included documents that had been improperly "declassified" by JPAC using the DS. *Id.* She testified that she and Rodriguez would hand the classified documents to the appellant, and that the appellant would then deliver the documents to Williams to shred within this four room office space, using the Walmart shredder. *Id.* Although Rodriguez sat in a different room, Moore testified that she sat with the appellant in the same office. *Id.* Moore and Rodriguez similarly explained that when a document is marked classified, it remains classified until properly declassified or downgraded by a proper authority; thus, neither the appellant nor Williams were permitted to deviate from this requirement; this is consistent with the testimony of Winbush as set forth in detail above. *See* HCD. The appellant testified that the contractors are "confused" about these matters. *Id.*

*Need for Shredding in Riverside*

Winbush testified that she "was shocked" upon learning that a shredder had been purchased and used during the Riverside document review. HR. She further addressed this topic as follows:

Q Did you ever discuss shredding documents at Riverside?

A No.

Q Would there be any reason in your mind to shred any documents from the box of records at Riverside?

A No.

HR. Winbush testified that if documents sent to NARA needed to be shredded while at the AFB, the appellant should have coordinated with the AFB to have the materials shredded as follows:

Q Okay. If documents needed to be shredded while at Riverside, is there something that could've been accommodated with the personnel through March Air Force Base?

A I think so, because Dee Dee had already coordinated with the personnel there to have the documents moved to a secure facility. In addition, they had -- at March Air Force Base, they should've had the ability to either shred documents, if they needed to do that, which was not part of what I asked them to do, or to put them in burn bags for destruction.

*Id*.

*Shredder Purchase at Walmart and Return to Walmart After Use*

Rodriguez testified that the appellant and Williams discussed using an AFB shredder but decided that they could not do so because the Air Force personnel would question what was being shredded. HCD. She testified that she objected to shredding the documents, but the appellant informed her that these were merely duplicates. *Id*. Rodriguez testified that she was not comfortable with the shredding of documents shipped to NARA because it was her understanding that documents shipped to NARA could not be shredded without proper coordination as discussed above; nevertheless, the appellant and Williams decided to purchase a shredder. *Id*. Williams testified that the four individuals travelled to a Walmart store together where he purchased a shredder with his personal credit card for approximately $50 or $60. HCD. When Rodriguez and Moore questioned the wisdom of purchasing the shredder, he told them, "What's done is done." *Id*. As noted in part above, Moore and Rodriguez stated that Williams returned the shedder to Walmart prior to departing Riverside. IAF, Tab 1 at 295; Tab 13 at

21. According to Kramer's interview notes, the appellant informed Kramer that Williams returned the shredder to Walmart prior to departing Riverside. IAF, Tab 15, Enclosure 4. Moore similarly informed the agency through a written statement that Williams returned the shredder to Walmart after using the machine. IAF, Tab 1 at 295.

Under DoD Manual 5200.01, only crosscut shredders listed on the NSA/CSS Evaluated Products List (EPL) for High Security Crosscut Paper Shredders may be used; while Williams testified that he searched for a comparable shredder at Walmart, there is nothing in the record to suggest that the Walmart shredder was on the EPL. *See* HCD (testimony of all); HR (testimony of all). The appellant testified that the shredder was acceptable because no classified documents were shredded; rather PII and other documents were shredded. HCD.

*Shredding of Documents Shipped to NARA*

Rodriguez testified that she saw Williams shredding documents, specifying that she "watched him" shred documents, adding that the shredder "burnt out" because Williams shredded so many documents. HCD. As noted above, the volume of documents, including ones marked classified, continued to grow as the documents were placed into a duffle bag then placed into a growing pile for shredding. *See id*. All four of the individuals could hear the shredding throughout the office suite. *See id*. Moore testified that she and the appellant saw Williams shredding the documents that the appellant delivered to him, including classified documents as set forth above. HCD. To this point, Moore testified:

> Q So when you found the classified document -- each time you found a classified document, what did you do with it?
>
> A At times, I handed them to Dee Dee; at times, I handed them to Shannon.
>
> Q And where were Dee Dee and Shannon each time you handed
>
> them the document?

A In the room where I sat.

Q So what did Dee Dee do with the documents when you handed them to her?

A She handed them to Shannon.

Q And Shannon was in the room at the same time?

A He would come into the room and collect the documents.

*Id*. Moore testified:

Q Okay. And you never -- did you ever get up and take a document to give to Shannon, directly, yourself?

A Shannon would come into the room where we were, where Dee Dee and I sat.

*Id*. Moore and Rodriguez also testified in detail about the size of this facility and described in detail their awareness of what took place in each of its rooms. HCD. The appellant described a process where Moore and Rodriguez brought documents to her for review as follows:

Q All right, we've now talked about two kind of categories, were there any other documents that Jasmine Moore brought to your attention as being questionable documents that you needed to look at and/or Mr. Williams needed to look at?

A There were several record collections, again, that were declassified, and I'm no -- I don't remember all the different categories or what they were, but anything that was marked declassified, yes, either Ms. Rodriguez or Ms. Moore brought it to my attention, along with all of the other miscellaneous, non-record material and duplicates she -- she brought to my attention.

HCD.

In addressing whether he shredded any classified documents, Williams testified, "not to my knowledge" adding "anything is possible." HCD. Williams testified that the documents were being shredded because the documents contained PII, and explained that he filled several "kitchen" and/or "medium" sized bags that he "compressed" because there were "a lot of materials" created by the shredder from Walmart as follows:

Q Okay. There was some discussion by other witnesses as to, do you have any idea of how many bags of shredded information you ended up with?

A Several bags, because the -- it wasn't -- like I said, it was the large brown trash bag. It was a medium-sized bag, so quite a few.

HCD. Williams and the appellant similarly testified that a variety of documents were removed from the Riverside NARA shipment and shredded using the Walmart shredder. HCD. When the appellant was asked about what was shredded, she claimed that restaurant menus, horoscopes, flyers, and other "non-record material," defined by the appellant as set forth in the quoted section above within the discussion of the December 2015 Shipment to NARA, were shredded:

Q And you described earlier, but let me be clear, what documents did -- were being shredded?

A Non-record material, such as duplicate copies of same documents, translations, foreign translations, menus, horoscopes, flyers, illegible sheets of paper; all non-record material. And then the consult -- consultation chain of custody receipts.

HCD. As noted below, the appellant declined to explain why restaurant menus, flyers, and horoscopes were shredded using the shredder purchased from Walmart. *Id*. Williams similarly testified that he shredded menus and horoscopes, in addition to consult files as follows:

Q Okay. Well, what documents -- there were documents there you talked about, menus, and horoscopes and consult documents. Why were any of those then shredded?

A Because I was already shredding stuff. And plus, like I said, I mean, when you're shredding stuff, it's always recommended that, you know, just because you have important stuff you think is important, you know, you shred that with non-important stuff.

HCD. Addressing the volume of shredded materials, Williams explained in part:

So after I shredded something, open the bag, poured it in. When it got to a point to where I could tie it and secure it, and then that was a full bag.

...

I compressed the bag.

...

So pressing that down, releasing the air, you get -- you get a lot of material.

...

I had several bags.

*Id*. He agreed that Riverside NARA was an unclassified facility, and testified that he found two classified documents on Tuesday or Wednesday, but did not report the spillage until Thursday as set forth below. *Id*. He explained that a "pile" of documents sat next to the shredder as noted above, and recalled that the Walmart shredder was heating up during the course of shredding "hundreds of pages" of documents. *Id*.

Addressing her view of the shredding and disposal, Rodriguez testified:

The room had -- the no doors were opened -- I mean, no doors were closed. I literally could see him shredding documents. I didn't have to sit in the room with him to – to stand by him to watch him shred every page. It's an open space. The room is not -- the office is not huge. The – it didn't require any sneak attempt to see him shred. I watched him. I watched him take all of the shred bags and dispose of them. It was not an -- it wasn't a hidden thing. It was widely discussed. It was, like, joked about. The shredder was -- burnt out, because it was so much to shred. I watched this.

HCD. As noted above, Williams returned the shredder to Walmart thereafter. IAF, Tab 1 at 295; Tab 13 at 21; Tab 15 at 61.

*June 30, 2016 Conference Call to Management and WG – Williams, Winbush*

Williams testified that on Thursday, June 30, 2016, he and the appellant joined a conference that included the WG, also referred to as the CMRMWG, and DPAA managers from the AFB office. HCD. During the course of this speakerphone call, Winbush, asked the two agency employees on the Riverside team whether they found classified documents in Riverside. *Id*. He and the appellant separately informed Winbush that they found only two classified documents, and did not inform Winbush that they shredded documents. *See id*.

He testified that he did *not* inform his supervisor Singh that he was shredding documents from Riverside NARA at the AFB. *Id*. Williams testified that the AFB office used to review the boxes for classified materials was sufficiently secure notwithstanding the testimony of the contractors and his own testimony about the status of access doors as set forth above. *Id*. As noted above, he testified that the "pile" of documents was placed next to the shredder, and the entry door to the office building space was left open for a "nicer breeze" notwithstanding the agency's security requirements as set forth in greater detail above. *Id*.

Winbush recalled the phone conference with the WG, Williams, and the appellant as follows:

> Q Once the team was in Riverside, did you have any phone calls -- did you receive any phone calls from Ms. Kammunkun?
>
> A I did.
>
> Q Okay. Can you describe the phone call?
>
> A During one of the working group meetings, Dee Dee dialed in, and I asked her how things were going at Riverside, and she said they were going great, everything was set up. And asked -- I asked if there had -- if they had found anything. And after a bit of discussion, it wasn't an immediate yes, we found two, she said that they had found two documents, and then an individual on the classified materials working group asked again, did you only find two documents, and she said yes, and then she had Mr. Shannon Williams confirm what she was stating, that they had only found two documents of classified, secret, and confidential.

HR.

*June 30, 2016 Conference Call to Management and WG - Appellant*

The appellant similarly recalled joining the conference call using her cellular speakerphone with the interior door partially closed to report "what we found" to the WG, Winbush, and others. HCD. When Winbush addressed the appellant, the appellant testified that she informed Winbush that the Riverside team "found two documents that are potentially classified" during their Riverside

review. *Id*.; *see* HR. She testified that someone outside of room could have heard the speakerphone conversation. HCD. She described the WG conversation as follows:

> Q And do you remember, what did you disclose in that conference as to what you had found and what had happened to it?
>
> A Because I -- I remember when -- when I came out, I told -- I gave a recap of the meeting -- I didn't know they were actually listening. So I gave them a recap of what – what occurred during -- during the meeting. And at that time – and I don't remember all the details of it, but whatever -- whatever was said during that meeting, I remember telling them.
>
> Q Okay. But what I want to specifically ask you is did the issue come up with -- did you or Shannon volunteer it, or were you asked did you find any classified documents?
>
> A Yes. Yeah, I -- I told them that -- that we had -- and I reported that we had -- what we found. And I -- I think I – I remember saying it because I was like, you know, I'm sure Jay is going to just be all over that one or Jay is going do something with that information, and -- but I -- yeah.

HCD. While testifying that she removed a variety of fliers, restaurant menus, horoscopes, and other materials from the Riverside NARA shipment as set forth above, there is nothing in the record to suggest that she reported the removal and/or shredding of any documents shipped to Riverside NARA during the course of this June 30, 2016 conference call. *See id*.

*June 30, 2016 Conference Call to Management and WG - Contractors*

Rodriguez testified that on Thursday, June 30, 2016, while still in the AFB office, she and Moore overheard the appellant and Williams state over a speakerphone that the Riverside team had only found two classified documents, even though Rodriguez alone had "personally saw several documents" with "classified" markings as set forth above. HCD. Following a careful review of the entire record, including the testimony of the appellant during the hearing and supplemental hearing, I find that the agency has shown by preponderant evidence that on or about June 30, 2016, the appellant reported to DPAA leadership and

members of the CMRMWG that the Riverside team found only two classified documents during its records review in Riverside, California.

As noted in part above, Moore separately testified that the contractors had together found approximately "give or take a hundred" classified documents. HCD. Rodriguez described her placement and the placement of others within the office as follows:

> Dee Dee and Shannon had a phone conference with DPA[A] security. There's like a security group, and they had a phone conference, and the space that we were in, there were little offices or rooms, but no one closed the doors; all the doors were open. And I was sitting in the center of the office space. So if you can imagine coming into a door, there being a receptionist desk, I sat there. And across the hall from me was the office that Dee Dee and Shannon had this phone conference with that was on speakerphone. And Jasmine was in an office that was kind of down the hall, again, all doors open.

HCD. She testified that she was able to hear the June 30, 2016 speakerphone conversation with the WG at issue in the underlying specification based on these specified conditions as quoted above. *Id.* Rodriguez testified that she and Moore looked at one another with a "weird silent eye conversation" after overhearing the appellant and Williams tell the participants that the team had only found two classified documents over the speakerphone, stating in part:

> And during this meeting, Dee Dee had reported that she had only found two classified documents. So obviously, we did not only find two classified documents. ... You know, kind of like, what's going on. Because that's not anything that we talked about, don't know anything about the whole "we only found two documents," because clearly, we found more than two documents.

> So long story short, after the meeting, Dee Dee came out and she was kind of like, I know you guys heard the conversation that took place with DPA[A], you know, we found these documents. And then kind of -- Jasmine was like, yeah, but we didn't. It was just like a weird silent eye conversation kind of like -- it was just more -- no one's really saying anything.

> ...

But we eventually left, and up until this moment, it was very -- for the most part, Dee Dee and Jasmine and Shannon were very vocal with each other. They were very chipper, very chatty. Dee Dee would tell stories. She just would, you know, talk a lot. And then once that whole thing with Jasmine saying -- kind of contradicting what Dee Dee said, Dee Dee really shut down. And we got in the car, she just was very -- had a negative energy.

*Id*. She testified that when they went to the rental car, the appellant addressed the NAI employees as follows:

So while we were sitting in the parking lot outside of the office that we were sitting in, she turned her whole -- me and Jasmine were sitting in the backseat -- and she turned her whole body just like this and was like, okay, *we need to get our story straight*. What are you -- what are you going to say when they pressure you; when Jay [Basham] asks you what took place, what are you going to say? And I'm pretty much -- I didn't say anything. I thought I was -- Jasmine responded and was just like, I'm going to tell the truth. And it was like, well, what is the truth. And then Jasmine didn't really say anything, or if she don't remember and Dee Dee turned around and was just silent. And from that no one talked to each other from, like -- from that moment forward. Jasmine came back, called Vince [Walls] and told Vince what happened.

*Id*. (emphasis added). Turning to her SFR, Rodriguez testified that she gave this to their common superior, NAI Senior Manager Walls, after returning to Virginia, adding that the first classified document was discovered on Monday, the first day of their document review. *Id*. She testified that she initially shared her concern about the shredding with Moore as the team lead, and reported this matter to Walls as the next superior. *Id*. She testified that Moore telephoned Walls to share their concern the following morning while still in Riverside as quoted and discussed below. *Id*. As noted above, there is nothing in the record to suggest that the appellant or Williams reported the removal and/or shredding of any documents during the course of this June 30, 2016 conference call that included the WG and Winbush. *See, e.g.,* HCD (testimony of all); HR (testimony of all).

*Report of Shredding to NAI by NAI Employee*

Moore testified that she telephoned her supervisor Walls on Thursday or Friday morning after breakfast to report that the agency employees were shredding classified documents at the AFB. HCD. Williams then told her that the appellant was upset with her after finding out about her call to Walls. *Id*. Walls similarly testified that Moore called him from the Riverside area on the morning of Friday, July 1, 2016, the morning following the conference call discussed above, expressing concerns about the actions of the appellant and Williams as follows:

Q Okay. What specific thing was she [Moore] concerned about?

A She was -- her principal concern was that she was being asked by Dee Dee to misrepresent what they were finding out in these files, that she wanted to get their stories aligned to make sure that they were all telling the same story, and that they weren't finding any classified documents except for two, I believe. And, you know, they both had TS/SCI's and they were very uncomfortable mispresenting the truth, and plus we have a company code of ethics that we strongly adhere to and they were concerned about that as well.

Q Did Ms. Moore or Ms. Rodriguez explain -- inform you of how many classified documents they found?

A Numerous was, I mean, bags full is what was communicated to me. There wasn't a specific count, but it wasn't, you know, a dozen, it was bags full.

Q And who communicated specifically this?

A Jasmine.

Q So July 1st when Ms. Moore contacted you, what did you do upon receiving that information?

A I told her not to have anything to do with shredding any kind of classified material or have anything to do with disposal of the shreddings. I told her I would contact the CORE, and I would follow-up with a call to Dee Dee.

…

Q Okay. How did Ms. Kammunkun respond to you providing this information?

A She wasn't happy. She said something like, you know, I don't understand why that -- you know, they played along all week and why all of a sudden they're not toeing the line. I'm paraphrasing, but it was something along those lines.

HCD. He testified that while there was some discussion of consult files, his primary concern involved the shredding of classified materials:

The focus of our discussion didn't have anything to do with other material. It was just focused on the classified content.

*Id*. Walls testified that he met with the contractors after they returned from Riverside to capture independent statements to memorialize what had occurred with the appellant. *Id*.

*Car Conversation with Contractors to "get our stories straight"*

Rodriguez testified that Moore informed her that she had called Walls to report this matter. HCD. Moore instructed Rodriguez to tell the truth. *Id*. She testified that while the four individuals were in the car together, with the contractors in the back, the appellant told the contractors, "We need to get our stories straight" as quoted more fully above. *Id*. She described an uncomfortable scene as the appellant made this statement to rear seat passengers Rodriguez and Moore as set forth above. *Id*. After initially testifying that he did not recall hearing the appellant's alleged comment above because he was focused on driving, Williams appeared to equivocate on this point as follows:

Q So you were in the car with Dee Dee told the contractors to get their stories straight, correct?

A I was driving at the time, sir.

Q You were driving at the time?

A Yes, sir.

Q So what did you understand to be the reason that Dee Dee was telling them to get their stories straight?

A I really wasn't paying attention to what they was talking about because I was driving in California on the I-5; it's pretty rough.

HCD.

*December 7, 2016 Kramer's ROI and 2017 MFR*

On December 7, 2016, Kramer completed the ROI and presented it through the general counsel, to Winbush in her capacity as the acting Director. IAF, Tab 1 at 20-51. Kramer noted that it is "impossible" to substantiate the allegation that hundreds of classified documents were destroyed because the appellant did not document her page by page inventory *prior* to shipment, and the shredded materials were destroyed as set forth above. *Id*. Kramer made a series of findings and conveyed his opinions on a variety of matters as set forth more fully in the ROI, including his conclusion that the appellant was a "toxic leader." *Id*.

On February 7, 2017, Winbush issued the 2017 MFR and made a series of findings based on the ROI, including the exhibits and Kramer's conclusions. *Id*. at 16-19. Through the 2017 MFR, Winbush closed the investigation and referred the matter to Gagne as follows:

> I direct that this investigation be closed, and that the General Counsel provide a copy of the investigation and this memorandum to the Acting Chief of Staff (ACOS) for his consideration regarding what, if any, administrative personnel actions are appropriate for DPAA employees.

*Id*. The appellant's PFA reflects that he received a copy of the 2017 MFR with the 2017 NOPR. *Id*. at 14, 16, 53. The appellant argues that Winbush's instructions quoted above were improper as set forth below. RAF-2, Tab 7.

*Additional Discussion Specific to First Charge*

Referencing the first charge, the appellant testified that she accurately reported to the WG and senior leadership that two potentially classified documents were found during the Riverside trip:

> There were two.
>
> ...
>
> I reported what we found. We found what we believed to be two classified documents. And then, as I said earlier, it ended up being that they were not even classified.

HR. Through her attorneys, she claimed that she shredded "declassified" materials, "documents from other agencies," and asserted that the NAI contractors "did not know" if the documents pulled by the contractors were actually given to Williams to shred, or returned. IAF, Tab 1 at 54. Through this NOPR response, she argued:

> Ms. Kammunkun reported that only two documents reviewed appeared to be classified and were possibly records.
>
> Every other document that was found and shredded had a declassification stamp or was never classified. Some of the documents were not properly marked but had a stamp. The stamps were from their originating agencies, not DPAA. These were not shredded because of the improper markings but instead because determined they were not records. It is not illegal to shred classified material, only classified records.
>
> ...
>
> The documents shredded were stand alone, declassified, copies of documents from other agencies, not DPAA records.

*Id.* As set forth in greater detail above, the appellant responded to the NOPR, ROI, and 2017 MFR through her April 2017 WR, May 2017 OR, and/or June 2017 SR. IAF, Tab 21 at 25; *see* IAF, Tab 1.

Observing the appellant as she testified during the joined hearing and during the supplemental hearing as set forth in various sections in detail above, I noted that her testimony was inconsistent and unpersuasive. *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987). While she and Williams similarly testified that only two classified, or potentially classified documents, were found within the 113 boxes, the appellant declined to adequately explain why she gave menus, horoscopes, and training flyers to Williams to destroy using the Walmart shredder, rather than directly recycling or otherwise discarding the menus, horoscopes, and training flyers; as noted above, Williams testified that he produced several compressed bags of shredded documents using the Walmart shredder. *Id.* To the extent there were too many questionable documents for Williams, the designated carrier, to carry back from Riverside, the

record reflects that the appellant, as the group's leader, had authority to ship the documents back to the agency, at government expense, as set forth in detail above. *Id*. There is nothing in the record to suggest that shredding documents was part of the mission for the Riverside trip, and there is nothing in the record to suggest that using a shredder to destroy documents shipped to Riverside NARA at government expense was anticipated, approved, and/or disclosed to anyone outside of this Riverside group, until the Moore reported the shredding of documents to NAI management *after* overhearing the WG speakerphone conference call as set forth in detail above; these facts are inconsistent with a conclusion that the appellant only destroyed documents that she believed she was permitted to shred. *Id*.

Even if Winbush failed to convey appropriate instructions for the Riverside trip to the appellant, there is nothing in the record to suggest that the appellant, as the senior agency official on the Riverside trip, sought to clarify whether it was permissible to shred documents shipped to Riverside NARA using the Walmart shredder, and/or using a shredding service as set forth in detail above. *Id.* To the extent the appellant presented DS marked materials for shredding, the record reflects that the appellant was informed, months prior to the Riverside trip, that classified materials can only be declassified by an OCA as set forth in detail above, including the section discussing the February 2016 email. *Id.* Moreover, there is little in the record to support her assertion that she and/or Williams had the authority to determine whether a document marked classified, was not classified. *Id*. To the extent the appellant, the ranking GS-13 Supervisory RS presented ADC materials for shredding to Williams, ADC materials continue to be treated as classified materials absent an OCA declassification as set forth in detail above. *Id.* The appellant's decision to bypass the search for any AFB shredding services, bypass the Base Information Transfer System Office, and bypass the Post Office shipping option discussed above, then use a shredder purchased from Walmart to destroy documents shipped to Riverside NARA, while

on the AFB, is inconsistent with a conclusion that the appellant only destroyed documents she believed she was permitted to discard. *Id*. Further, the appellant's earlier claim to have completed a page by page pre-shipment review of these same documents to ensure that no classified documents were shipped to Riverside NARA, suggests a motive to conceal the discovery of approximately 100 documents containing classified markings. *Id*.

In contrast to the appellant's unpersuasive vague testimony about the documents destroyed at the AFB as set forth above, I found Rodriguez's testimony to be specific and consistent with the record. *Id*. Rodriguez presented detailed testimony about the level and quantity of classified materials she and Moore found in Riverside, exceeding 100, and described the growing mass of classified documents as the materials were stored in a duffle bag then piled, prior to shredding as set forth above in detail. *Id*. Rodriguez testified in detail about the configuration of the AFB building used to review the documents shipped to Riverside NARA, and explained how the header, footer, and/or portion markings were used to identify classified documents as set forth in detail above. Consistent with Rodriguez, Moore similarly testified that the classification markings on these documents included a header, footer, and/or portion markings as set forth in detail above; Moore added that the classified documents included materials that had been improperly marked as declassified using the DS as set forth above. *Id*. While the appellant claimed that these NAI reviewers were confused about these classification markers, the record reflects that Rodriguez and Moore were added to the appellant's Riverside team, at government expense, because Rodriguez and Moore were trained in WHS standards as set forth in detail above; thus, the record is inconsistent with this assertion that Rodriguez and Moore were confused about seeing the large quantity of classified documents in Riverside. *Id*. Additionally, Rodriguez provided detailed testimony about overhearing the June 30, 2016 WG conference call, and her reaction to the appellant's claim of finding two potentially classified documents as set forth

above, even though Rodriguez and Moore had found approximately 100 classified documents as set forth in detail above; this testimony was consistent with Moore's testimony, including Moore's decision to report the shredding to NAI management after breakfast the next morning, the day after overhearing the speakerphone call to the WG, as set forth above in detail. *Id*. Additionally, Rodriguez's detailed testimony is consistent with her SFR as set forth above in detail. *Id*. To the extent the appellant claims that Rodriguez had an incentive to write a false SFR, the appellant fails to adequately explain this assertion based on Rodriguez's status as an NAI employee and role within the broader organization as set forth in detail above. *Id*.

While the appellant had a motive to minimize the and/or otherwise downplay the number of classified documents shipped to Riverside NARA, because the appellant oversaw the pre-shipment review of the 113 boxes of materials shipped to Riverside NARA and stated that her four-member team performed a page by page review through all of the documents to ensure that there were no classified materials in the shipment as quoted above, there is little to suggest that Rodriguez had any interest in the outcome of the Riverside review based on her role as an NAI contractor; as set forth in detail above, Rodriguez's role on the Riverside team was to identify classified documents based on her WHS training; this is also the case for Moore as set forth above. *Id*. For these reasons, I credit the testimony of Rodriguez and Moore over the testimony of the appellant for the matters set forth above. *Id.*

Following a careful review of the entire record, including the testimony presented at the hearing and supplemental hearing as set forth above, I find by preponderant evidence that approximately 100 documents containing classified markings were found during the security review in Riverside, California. I further find by preponderant evidence that the appellant knew that approximately 100 documents containing classified markings had been found by the Riverside team prior to the WG conference call, because, *inter alia*, the documents found by

Moore and Rodriguez were largely presented to the appellant as set forth in detail above. Based on the findings and credibility determination as set forth above, I further find by preponderant evidence that the appellant's statement to DPAA leadership and members of the CMRMWG about finding only two classified documents was untruthful. In addition to showing by preponderant evidence that the appellant did not respond to Winbush's June 30, 2016 conference call question fully and truthfully as set forth above, I find that the agency has shown by preponderant evidence that the appellant failed to disclose something that, in the circumstances, should have been disclosed in order to make her given statement accurate and complete. The appellant's decision to report to DPAA leadership and members of the CMRMWG that the Riverside team only found two classified documents, within the context of her pre-shipment review and prior misuse of the DS, sufficiently evince a motive to deceive DPAA leadership and members of the WG as set forth in detail above; thus, I find that the agency has shown by preponderant evidence that the appellant's representation to DPAA leadership and members of the CMRMWG as set forth in this specification contained an element of deception. For these reasons, inclusive of the six specific findings and credibility determinations as set forth in detail above, the specification is SUSTAINED. Because the specification is sustained, Charge I is SUSTAINED.

CHARGE II: Failure to Carry Out Written Regulations, Orders, Rules, Procedures, or Instructions

To prove this charge, the agency must prove that the regulations, orders, rules, procedures, or instructions given were proper and the appellant failed to carry them out. *See, e.g., Hamilton v. U.S. Postal Service*, 71 M.S.P.R. 547, 555-56 (1996). Unlike the charge of insubordination, the agency need not prove that that the appellant's failure was intentional. *Id*.

> Specification: Between about August 1, 2015 through December 1, 2015, you oversaw the review and inventory of DPAA records to

> ensure that no classified material remained in these records. The records were to be packaged for shipment to the Riverside, CA NARA facility, which was not cleared to handle or store classified material. You certified the records in question for shipment and unclassified storage; however, approximately 100 confidential and classified documents were later found in those records. See Reference A, Enclosures 2, 5, 8, 10, 13, 17.

IAF, Tab 1 at 10.

As discussed and quoted in detail above within the discussion of the first charge, the IO noted that the pre-shipment review was problematic at best. The record reflects that the appellant, in her capacity as the Supervisory RS, oversaw the review and inventory of the DPAA records that were packaged for shipment to the Riverside NARA facility, and this NARA facility was not permitted to handle the classified documents as set forth in detail above. *Id.;* HCD (testimony of the appellant). As set forth in detail above within the discussion of the first charge, the appellant testified that she and three others performed a page by page review to ensure that no classified documents were sent to Riverside NARA. HR; HCD. The appellant specified that she and three others spent a week going through the documents and placed classified documents into safes as quoted above; once this process was completed, the documents were palletized and shipped to Riverside NARA as set forth in detail above. HR.

The record further reflects that the appellant completed a series of SF-135s for Records Transmittal and Receipt, indicating that the documents received by NARA Riverside in December 2015, were "Unclassified" and required a security level of "Standard Storage" as set forth in the record. IAF, Tab 14, Subtab 4l(ii), (iii); Tab 15, Enclosure 8; Tab 66 at 24-53. The SF-135s were created in November 2015, and the shipment of approximately 113 boxes of materials was completed in December 2015. *Id.* Under section 6(g), the appellant specified whether any restrictions applied to the records; as noted above, the appellant specified that the documents were unclassified and did not require heightened security. *Id.*

Through her NOPR reply, the appellant argued that there were no regulations, rules, procedures or instructions for identifying or reporting security violations, and asserts that the appellant had three subordinates screen and remove classified documents. IAF, Tab 1 at 59; RAF-2, Tab 7. However, the appellant testified during the hearing that she asked everyone to bring materials to her at the warehouse for her to "go through" as quoted more fully below, indicating that there were indeed regulations, rules, procedures or instructions for identifying security violations as set forth in greater detail below. HCD. She also testified that NARA came out to "categorize and figure out what we had basically" prior to shipment, to ensure that the shipment to Riverside NARA had been properly prepared, as quoted below. *Id*. Referencing the late November to early December of 2015 period, and an earlier Saint Louis NARA shipment, the appellant testified:

> Q Okay. And how was the preparation and first -- well, was there an examination of these records going to Riverside to determine whether or not -- well, was there an examination of the records before they went to Riverside, and for what purpose?
>
> A Yes, there was. So I decided to review the records myself because of what happened in the St. Louis shipment. There was classified material mixed with unclassified material, stored in unclassified spaces throughout DPAA for decades. So the reason the Riverside shipment came to be was because we were moving from -- from our old building to a new building. And I had been preparing for this move for a year.
>
> . . .
>
> All of this should have been unclassified material because it was coming from conexes, a bunker, Ms. (Indiscernible) personal garage, their own office desks. And I asked everyone to -- whatever you have, just bring it to the warehouse and I will go through it myself.
>
> . . .
>
> I got a small volunteer team together and we planned on one week to go page by page through the entire -- all -- through all the boxes there were delivered to the warehouse. And it took us a week. And within those -- within the material, we pulled several classified documents. And there was even -- I don't remember the highest level.

It could have been secret. I think it was just secret, because we put them in -- we put them in the safes.

HCD.　When asked about the volunteer team's experience in identifying classified documents during the pre-shipment review, the appellant testified that it was easy to identify classified documents based on the markings as follows:

Q What was their knowledge, experience, and background to

actually locate classified documents?

A Well, they're familiar with -- with the documents because these documents came from their areas. But they -- they held clearances. They all -- all of them had secret clearances, had worked with classified documents in the past. It was easy to identify markings. And they pulled several. They -- we went page by page, and anything that had any indication of it being classified or questionable, we pulled it.

Q Okay. Do you have a ballpark idea of how many documents during that sort of -- I guess it was the November period were classified and were found and pulled?

A Probably close to 100.

Q And those documents you then said were secured in safes or --

A Yes.

Q Okay. You were satisfied yourself in respect to Riverside documents that went forward, there had been a full and adequate check to determine and to pull any classified documents that existed?

A Yes.

*Id*. In addition to testifying that she and the pre-shipment review team under her supervision pulled classified documents as part of the pre-shipment review, the appellant indicated that she knew Riverside NARA was an unclassified facility as follows:

Q And the NARA facility was a non-classified facility?

A That's correct.

Q And it was sent to them, (indiscernible) non-classified

facility (indiscernible)?

A Because there weren't -- there wasn't any classified.

Q At least there wasn't supposed to be any classified?

A Well -- no. This is Riverside. There was -- there was no. We did a page by page --

*Id*. The appellant testified that she then worked with NARA to organize the remaining unclassified documents:

Q Okay. You say NARA came out. What did NARA come and do?

A They helped us to -- to categorize and figure out what we had basically. So there were some clear collections, there were (indiscernible), sit reps, there were submission, JFA reports. So those things were clear. And then there was a whole bunch of other stuff. And it looked like the majority of the stuff came from the old J-5 directory, which was policy. So we grouped a lot of this stuff into policy. We weren't really sure if it was actually policy or not, but we just categorized it into some kind of organized fashion, and then we made inventories. It wasn't page by page because it's not required for unclassified material[.]

*Id*. As discussed above, on December 17-18, 2015, Winbush expressed concern that the agency had shipped classified materials to NARA. IAF, Tab 11 at 92-93. On December 24, 2015, the appellant assured Winbush that the SF-135s had been accurately completed by the appellant with respect to classification by stating in part:

We conducted a page by page inventory of all five tri-walls sent to Riverside ensuring there were no classified documents being transferred, I have all of the inventories from our shipment.

*Id*. at 91. As set forth in greater detail above, the appellant responded to the NOPR, ROI, and 2017 MFR through her April 2017 WR, May 2017 OR, and/or June 2017 SR. IAF, Tab 21 at 25; *see* IAF, Tab 1.

As noted above, the record reflects that in addition to the SF-135s, the appellant signed an SF-312 acknowledging that she understood her obligation to properly handle classified information. Moreover, the appellant's statements as set forth above, sufficiently show that the appellant understood that she was under instructions to conduct a pre-shipment review of the records prior to shipping the documents to Riverside NARA, to ensure that no classified

documents would be shipped to the unclassified NARA facility. The record, in particular the appellant's statements, show that the appellant knew that Riverside NARA could not receive classified documents, and reflect that as the Supervisory RS records manager for DPAA completing the SF-135s for the agency, including section 6(g) of this form, she assembled a team of subordinates to assist with the pre-shipment review to ensure that no classified documents were shipped to Riverside NARA, because this NARA facility could not receive classified materials. For these reasons, I find that the agency has shown by preponderant evidence that between August 1, 2015 and December 1, 2015, the appellant was instructed to oversee and inventory DPAA records to ensure that no classified materials remained in these records as part of a pre-shipment review as discussed in detail above. I find by preponderant evidence that the Supervisory RS records manager for DPAA completing the SF-135s for the agency, the appellant oversaw the review and inventory of DPAA records to ensure that no classified material remained in the record as discussed in detail above. I find by preponderant evidence that the records inventories and listed on the SF-135s referenced above were to be packaged for shipment to the Riverside NARA facility, which was not cleared to handle or store classified material as set forth above in detail. I find by preponderant evidence that the appellant assured DPAA and NARA officials that the records in question for shipment to this unclassified NARA facility had been reviewed to ensure that the Riverside NARA shipment contained only unclassified materials as set forth above in detail. However, pursuant to the second finding above within the discussion of the first charge, approximately 100 documents containing classified markings were later found during the security review of this same shipment in Riverside. For these reasons, and following a careful review of the entire record, the specification is SUSTAINED. As noted above, the agency is not required to prove intent as part of this second charge. Because the specification is sustained, Charge II is SUSTAINED.

CHARGE III: Mishandling Government Information or Documentation

To prove this charge, the agency must show that the appellant engaged in the conduct with which he or she is charged. *See, e.g., Otero v. U.S. Postal Service,* 73 M.S.P.R. 198, 201-205 (1997) (charge must be construed in light of accompanying specifications).

> Specification 1: Between about June 26, 2016 through July 2, 2016, you mishandled government documents by failing to discharge your responsibilities under the provisions of DoD Manual 5200.01, Volume 3, "DoD Information Security Program: Protection of Classified Information" (February 24, 2012, Incorporating Change 2, March 19, 2013), Enclosure 2. You failed to take proper precautions to safeguard classified information; specifically, approximately 100 classified documents located at Riverside, CA. See Reference A, Enclosures 2, 13, 17.

IAF, Tab 1 at 10.

Through her attorney, the appellant claimed that the documents were not classified, not records, and not DPAA documents as follows:

> These documents were not records and they were not classified. They did not originate from DPAA and they were duplicate documents from other agencies. The originating agencies are responsible for managing their own records during their life cycle. DPAA had no obligation to maintain documents that were not being used for our business or pay for scanning documents with no value to the agency. Nothing originated from DPAA was destroyed. There was no indication that these documents were used to record our agency business.

*Id*. at 60. As set forth in greater detail above, the appellant responded to the NOPR, ROI, and 2017 MFR through her April 2017 WR, May 2017 OR, and/or June 2017 SR. IAF, Tab 21 at 25; *see* IAF, Tab 1. Even if the approximately 100 documents at issue were classified under a non-DPAA OCA, the appellant had an obligation to protect all classified materials as set forth above in detail. *See* HCD (testimony of all); HR (testimony of all). This remains the case whether the documents bearing classified markings were duplicates or originals, and this remains the case even if the documents are non-records as defined by the

appellant, as discussed in detail above. *See id.*; *see, e.g.,* IAF, Tab 10 at 195-96 (SF-312).

During the supplemental hearing, the appellant claimed that the NAI contractors were confused and improperly performing "inherently government work" by concluding that the documents referenced above were classified as follows:

> Q Okay. Looking at Specification number 2. Oh, going back to the last sentence of Charge 3, I mean, I'm sorry -- yeah. Of Spec 1 of Charge 3. Specifically, approximately 100 classified documents located at Riverside? Do you agree with that?
>
> A No, I -- I do not. There was -- another example. Okay. Not only did the contractors not know what was placed back into -- into the folders, because that was not their area of responsibility, but I want to say something about the -- what's classified and what's not. That was Mr. Williams' responsibility. Ms. Sumpter Winbush had stated that was the contractor's responsibility, and that's not -- that's not correct, that wasn't their role. And their contract, the NALI contract, states that it's -- they do not perform inherently government work. That responsibility relies solely with a government employee. And that's Mr. Williams. Mr. Williams made the determination of -- the final determination of what was classified and what was not. And an example of that is Mr. Williams went -- went over in detail about some emails that were in the shipment. And there was discussion about that, I -- that someone had got a red pen and wrote "secret" on top of these emails. The emails came from an unclassified system, and the way we -- reason we know that is because if they came -- if they were printed out from a classified system, it would say. It's just an automatic top and bottom that would show the level of classification. And so they came from an unclassified printer, and somebody just wrote secret in a red pin.
>
> That could be something that Ms. Moore or -- or Ms. Rodriguez might have been confused about. But even Ms. Sumpter Winbush believed that those would be classified documents, and they are not. It had no -- no stamp. We don't know who -- who did it. Who -- who put the secret writing on there? So Mr. Williams made the determination that those emails were not classified documents.

HR. Even if documents were improperly marked classified, the Riverside team led by the appellant had an obligation to bring these materials back to the agency

for further review, consistent with Williams's July 25, 2016 MFR, and there is little in the record to suggest that the Riverside team was authorized to shred documents shipped to NARA using the Walmart shredder, as discussed in detail above.

Under DoD Manual 5200.01, Volume 3, DoD Information Security Program: Protection of Classified Information (February 24, 2012, Incorporating Change 2, March 19, 2013), the appellant had an obligation to properly safeguard, store, destroy, and transport classified information. IAF, Tab 13 at 72. During the Riverside trip between about June 26, 2016 through July 2, 2016, the appellant knew that approximately 100 documents containing classification markings had been found by the Riverside team under her leadership as set forth in detail above, pursuant to the third finding of the first charge. The record reflects that the entry door to the AFB facility secured by the appellant in her capacity as the team lead for the Riverside review was left open to ensure a nicer breeze, and others outside of the Riverside team had access to this facility through this open door in violation of DoD Manual 5200.01 Volume 3 as set forth in detail above. Moreover, there is nothing in the record to suggest that the Walmart shredder was on the EPL as set forth in detail above. With the exception of the two documents brought back to DPAA by Williams, I find by preponderant evidence that the appellant mishandled government information or documentation by failing to take proper precautions to safeguard approximately 100 documents containing classification markings by failing to properly safeguard, store, destroy, and/or transport these documents, in violation of her duties under DoD Manual 5200.01, Volume 3, DoD Information Security Program: Protection of Classified Information (February 24, 2012, Incorporating Change 2, March 19, 2013) as set forth in detail above. Specification 1 is SUSTAINED.

> Specification 2: Between about June 26, 2016 through July 2, 2016, you failed to discharge your responsibilities under the provisions of DoD Manual 5200.01, Volume 3, "DoD Information Security Program: Protection of Classified Information" (February 24, 2012,

Incorporating Change 2, March 19, 2013), Enclosure 2, by improperly destroying classified information. Specifically, while conducting a security review of information and files located at Riverside, CA, you pulled out documents that were marked classified and directed that they be shredded with a commercially bought shredder that was not compliant with the requirements found in DoDM 5200.01, Volume 3, for shredding classified material. See Reference A, Enclosures 2, 13, 17.

IAF, Tab 1 at 10. This specification is related to the IO's finding that partially sustained an allegation involving the shredding of classified documents and states in part:

> • Mr. Williams **did purchase** a commercial microcut shredder from Walmart, and returned it after the team completed the shredding because the shredder was broken. (Encl 15; Encl 24, Shredder Photo)

> • The shredder was **not approved** to dispose of classified materials. DoD Manual 5200.01, Volume 3, "DoD Information Security Program: Protection of Classified Information" (February 24, 2012, Incorporating Change 2, March 19, 2013) provides in Enclosure 3, Storage and Destruction, that "Only crosscut shredders listed on the "NSA/CSS Evaluated Products List for High Security Crosscut Paper Shredders" (Reference (as)) may be used to destroy classified material by shredding." (Encl 25, DoD Manual5200.01, Vol 3, February 24,2012, incorporating Change 2, March 19, 2013, p. 43) The purchased shredder was not a crosscut shredder. (Encl 24) Additionally, there is no indication that the bags of shred were "stirred" to ensure the content was mixed up, per DoD 5200.01, Vol 3.

> ...

> • The IO assesses that **Ms. Kammunkun is responsible** for use of the shredder because she was the DP AA employee in overall charge of the operation. The contractor employees reported to her as the COTR, and she asserted *de facto* authority over the entire operation, particularly when she invoked the CoS's (Mr. Fletcher's) authority to bring Mr. Williams to Riverside. (Encl 13; Encl 17; Encl 15; Encl 20; Encl 4)

IAF, Tab 1 at 34-35 (italics, bold print, and combined use of italics and bold print in original). The 2017 MFR states:

> Finding: Substantiated as to both Ms Kammunkun and Mr. Williams: Ms. Kammunkun and Mr. Williams were responsible for the purchase and use of a commercial shredder not approved to dispose of classified materials to shred an unknown number of classified documents, after which the shredded documents were placed, unmixed, in a dumpster. The shredder was then returned to the store from which it had been purchased.

*Id*. at 16.

Addressing this specification, the appellant repeated her assertion that the documents she shredded using the Walmart shredder were improperly marked or from non-DPAA OCAs in part as follows:

> Documents that were shredded either had a declassification stamp or were documents that were never classified. Some of the documents were not properly marked but had a stamp. The stamps were from their originating agencies, not DPAA. These were not shredded because of the improperly markings but instead because I determined they were not records. They were not associated with any particular file, therefore there was no way of knowing how or if they were used. They were not records and they were not proven to be classified.

*Id*. at 61. The OCA does not affect the classified status of a document as set forth in detail above. *See id*. As set forth in greater detail above, the appellant responded to the NOPR, ROI, and 2017 MFR through her April 2017 WR, May 2017 OR, and/or June 2017 SR. IAF, Tab 21 at 25; *see* IAF, Tab 1. During the hearing, the appellant then argued that the NAI contractors pulled the documents, not the appellant, as follows:

> First, I didn't pull anything. I didn't pull any documents out of any folders. That was what the contractors did.

HR. As discussed and quoted in detail above, Moore and Rodriguez persuasively testified that they each handed documents marked classified to the appellant, and the appellant; thereafter the documents were conveyed to Williams for shredding using the Walmart shredder. As discussed above, even if documents were improperly marked classified, the Riverside team, led by the appellant, had an obligation to bring these materials back to the agency for further review, and

there is little in the record to suggest that the Riverside team was authorized to shred documents shipped to NARA using the Walmart shredder, as discussed in detail above. Under the referenced section of DoD Manual 5200.01, the appellant had an obligation to properly safeguard, store, destroy, and transport classified information. IAF, Tab 13 at 72; *see* IAF, Tab 10 at 196-97. During the Riverside trip between about June 26, 2016 through July 2, 2016, the appellant knew that approximately 100 documents containing classification markings had been found by the Riverside team under her leadership as set forth in detail above, pursuant to the third finding of the first charge. As the Supervisory RS and ranking agency employee in charge of leading the Riverside team, the appellant had an obligation to oversee the actions of the team. While the shredder was purchased, used, then returned by Williams as set forth in detail above, the record reflects that Williams performed these actions with the appellant as set forth above in detail. Under these circumstances, I find that the agency has shown by preponderant evidence that Williams was acting under the appellant's direction as the team lead. As noted above, there is nothing in the record to suggest that the Walmart shredder was on the EPL. With the exception of the two documents brought back to DPAA by Williams, I find by preponderant evidence that the appellant mishandled government information or documentation by directing that the documents in question be shredded with a commercially bought shredder that was not compliant with the requirements found in DoDM 5200.01, Volume 3, for shredding classified material. Specification 2 is SUSTAINED. *See Hicks v. Department of the Treasury,* 62 M.S.P.R. 71, 74 (1994), *aff'd,* 48 F.3d 1235, 1995 WL 48403 (Fed. Cir. 1995) (Table). Because Specifications 1 and 2 are sustained, Charge III is SUSTAINED.

CHARGE IV: Misuse or Abuse of Contractor Employees

To prove this charge, the agency must show that the appellant engaged in the conduct with which he or she is charged. *See, e.g., Otero,* 73 M.S.P.R. at 201-205.

> Specification 1: Between about June 26, 2016 through July 2, 2016, you directed contractor employees to remove classified documents from holdings and replace them with unclassified documents. See Reference A, Enclosures 2, 13, 17.

IAF, Tab 1 at 10.

This specification is related to the partially substantiated allegation in the ROI finding that the appellant directed Moore and Rodriguez to remove classified documents in the shipment; the IO concluded that the removed documents were not replaced with unclassified documents. IAF, Tab 1 at 34. Through the 2017 MFR, Winbush wrote that the appellant participated in and directed the NAI employees to remove classified documents in the shipment; Winbush wrote that the removed documents were not replaced with unclassified materials. *Id*. at 16, 34. As set forth in greater detail above, the appellant responded to the NOPR, ROI, and 2017 MFR through her April 2017 WR, May 2017 OR, and/or June 2017 SR. IAF, Tab 21 at 25; *see* IAF, Tab 1.

During the hearing, the agency presented testimony indicating that the NAI employees were instructed to manipulate and/or alter the contents of the boxes shipped to Riverside NARA as set forth above within the discussion of the first charge. HCD (testimony of Rodriguez and Moore). However, given the volume of documents removed from the shipment, the agency failed to adequately address the source of these replacement documents. *See id*. Specifically, while Rodriguez and the appellant similarly testified that documents were rearranged within the boxes and/or sleeves, the agency failed to adequately explain how the appellant replaced classified documents with unclassified documents based on the volume of materials at issue, described as exceeding a duffle bag as discussed in detail above. HCD. For these reasons, the agency has failed to prove this specification by preponderant evidence. Specification 1 is NOT SUSTAINED.

> Specification 2: Between about June 26, 2016 through July 2, 2016, you instructed contractor employees to lie about the discovery of approximately 100 classified documents. You told the contractor employees "they must get their stories straight," and said, "If asked,

you tell them you only found 2 classified documents." After they reported a security violation to their superior, you also said to the contractor employees, "We've had this plan all week; why are we stepping away from the plan?" See Reference A, Enclosures 2, 13, 14, 17.

IAF, Tab 1 at 10.

This specification is related to the finding in the ROI finding that the appellant and/or Williams directed the contractors to "get their stories straight" about the discovery of classified documents, and the 2017 MFR finding that the appellant told the contractors to indicate to others that only two classified documents were found, as set forth more fully in the record. IAF, Tab 1 at 17, 35. The IO addressed this allegation in part as follows:

> **Substantiated.** Ms. Kammunkun and/or Mr. Williams directed the two contractor employees that they must "get their stories straight" about the discovery of the approximately 100 classified documents discovered and shredded at the March AFB facility.
>
> • The preponderance of evidence (Encl 13; Encl 17) supports Kammunkun having said this, as reflected in Rodriguez's statement and both of the contractor employees' uncoordinated interviews.
>
> • It also stands to reason that Kammunkun realized that the CMRMWG and DPAA leadership already had an expectation of finding more classified materials in Riverside based on the St. Louis incident. (Encl 12) The entire purpose of the trip reinforces this notion; if there was no expectation of finding classified materials in Riverside, there would have been no need to go in the first place, let alone bring a Security Manager. This could explain Ms. Kammunkun's rationale that reporting the finding of only a small amount of classified material would be better in terms of avoiding scrutiny, rather than reporting that they did not find any or found large amounts. (Encl 13; Encl 17) Ms. Kammunkun herself stated, "What difference would it make if we brought back two pieces or 50,000? We found something .... "

*Id*. at 35 (bold print in original) (ROI). The IO's discussion of this allegation, identified as allegation "(5)" continues for several additional paragraphs, and is supported by footnote 5 as set forth in the record. *Id*. at 35-36.

As pointed out by the appellant and as discussed in detail above, Winbush testified that she wrote the 2017 MFR because the IO's findings were "all over the map" adding that she wrote the MFR to "pull everything together in a succinct way that I could understand[.]" HR. Through the 2017 MFR, Winbush wrote:

> **Finding: Substantiated as to Ms. Kammunkun. Ms. Kammunkun also told the two Na Ali'i contractor employees in the presence of Mr. Williams to indicate to others, if asked, that only two classified documents were found, which statement she and Mr. Williams knew to be untrue.**

*Id*. at 17 (bold print in original). As set forth in greater detail above, the appellant responded to the NOPR, ROI, and 2017 MFR through her April 2017 WR, May 2017 OR, and/or June 2017 SR. IAF, Tab 21 at 25; *see* IAF, Tab 1.

During the supplemental hearing, the appellant addressed this specification in part as follows:

> Q Specification 2. Did you instruct contractor employees to lie about the discovery of approximately 100 classified documents?
>
> A No.
>
> Q Did you tell contractor employees "they must get their stories straight"?
>
> A No.
>
> Q Did you state to them that if asked, to tell them that you had only found two classified documents?
>
> A No. I can add to that, if you want. Okay. So what -- what that's referring to is Ms. Moore had asked me, once this was all done and we -- we were finished. We had wrapped up. Cleaned up, we were ready to leave. Ms. Moore asked me. She said, "You know, DeDe, Jay is going to be asking me what happened out here. What should I tell him?" And I said, "You tell him exactly what we found. What I report, we found two potentially classified documents". That's all that was. I said if he has any -- if he has any questions, you tell him to ask me. So if she took that out of context, I can't help that. But that's what happened.
>
> ...
>
> Q Okay. And did you tell the contractor employees, "we've had this plan all week. Why are we stepping away from the plan?"

A No.

HR. The statements of Rodriguez, Moore, Walls, and Williams are quoted and discussed in greater detail above; these discussions are referenced rather than fully repeated to minimize repetition as noted above. HCD. Rodriguez testified that after the WG meeting, Rodriguez and Moore had a "weird silent eye conversation" after the appellant told Rodriguez and Moore "I know you guys heard the conversation that took place with DPA[A], and you know we found these documents" as quoted in detail above within the discussion of the June 30, 2016 conference call with the WG. HCD. Rodriguez testified that when the team of four went to the rental car following the WG call, the appellant told Rodriguez and Moore "to get our story straight" as quoted in detail above within the discussion of the Charge I. *Id*. Walls similarly testified that on the morning following the WG call, Moore reported to Walls that the appellant wanted the NAI employees "to misrepresent what they were finding out in these files, that she wanted to get their stories aligned to make sure that they were all telling the same story, and that they weren't finding any classified documents except for two" as quoted in detail above within the discussion of the first charge. HCD. As quoted more fully above, when asked about is matter, Williams testified that he was focused on "driving in California on the I-5" and not paying attention to the appellant's alleged instructions to the NAI employees. *Id*.

Observing the appellant as she testified during the joined hearing and the supplemental hearing about the matters at issue in this specification, I found the appellant's denials to be unpersuasive. *Hillen*, 35 M.S.P.R. at 458; *see Hawkins v. Smithsonian Institution,* 73 M.S.P.R. 397, 403-04 (1997). The appellant's additional explanation as quoted in part above was similarly unpersuasive with respect to this specification, and appeared to focus on steering any inquiry by Basham. *Id*.

In contrast, I found Rodriguez's testimony about this specification to be specific and consistent with the record. *Id*. Her testimony about this specified

conversation and events leading to the actions at issue in this specification was detailed and persuasive based on my observation. *Id*. Consistent with Rodriguez, Walls also testified that Moore similarly reported these events on the following morning as set forth above. *Id*. Additionally, Rodriguez's detailed testimony is consistent with her SFR as set forth above in detail. *Id*. To the extent the appellant claims that Rodriguez had an incentive to write a false SFR, the appellant fails to adequately explain this assertion based on Rodriguez's status as an NAI employee and role within the broader organization as set forth in detail above. *Id*.

While the appellant had a motive to minimize the and/or otherwise downplay the number of classified documents shipped to Riverside NARA based on her representations about her pre-shipment review as explained in detail above, there is little to suggest that Rodriguez had any interest in the outcome of the Riverside review based on her role as an NAI employee; as set forth in detail above, Rodriguez's role on the Riverside team was to identify classified documents based on her WHS training; this is also the case for Moore as set forth above. *Id*. For these reasons, I credit the testimony of Rodriguez over the testimony of the appellant for the matters set forth in this specification. *Id*.

For these reasons and following a careful review of the entire record, I find by preponderant evidence that between about June 26, 2016 through July 2, 2016, the appellant instructed contractor employees to lie about the discovery of approximately 100 classified documents and the contractor employees to get their stories straight and to tell others that they only found two classified documents. I find that the agency has shown by preponderant evidence that upon learning that Moore had reported this matter to Walls via telephone from Riverside as set forth in detail above, the appellant commented to at least one NAI employee that the contractors were now stepping away from the plan that had been in place all week as set forth above. The agency has shown by preponderant evidence that as the Supervisory RS and lead for this Riverside trip, the appellant misused or abused

the contractors by seeking to have Rodriguez and Moore report that they only found two documents, even though more documents were discovered. Accordingly, Specification 2 is SUSTAINED. *Hicks,* 62 M.S.P.R. at 74.

> Specification 3: Between about July 1, 2015 through July 8, 2016, you created the perception that you could end two contractor employees' careers and said that the contractor employee were present to shield you in case you did something wrong. See Reference A, Enclosures 2, 10, 13, 17.

IAF, Tab 1 at 11. The agency appears to have sustained this specification based on a remark reported by Kramer during the underlying investigation, and cites the testimony of Winbush and Gagne in support of its burden. IAF, Tab 14 at 90; RAF-2, Tab 6; *see* IAF, Tab 1 at 46.

As noted in part above, a broader section of the ROI has been quoted within the discussion of this specification to avoid repetition, because the appellant argues, *inter alia*, that the 2017 MFR "alleges, *sub rosa,* possible criminal misconduct" as set forth in her closing submission while addressing the sixth allegation in the ROI. RAF-2, Tab 7. Within a section of the ROI titled "Opinions" Kramer wrote in part:

> Ms. Kammunkun is the single common denominator in all of the failures listed above. Given this pattern of conduct, and per the interviews of her staff, the IO assesses with high confidence and near certainty that she is not competent as a Records Manager or a leader in this organization.
>
> • Based on her own actions as documented in both the Frazier and Basham investigations – as well as this one - Ms. Kammunkun has demonstrated that she has little-to-no regard for, or understanding of, classified material, let alone the reasons for its classification.
>
> • Ms. Kammunkun is not a records management expert and is not competent to handle DPAA 's important research materials-classified, unclassified, or otherwise.
>
> o According to Ms. Garo, Ms. Kammunkun once asked her, "What's this?" while in the Records Room. Ms. Garo told her it was research material, and Ms. Kammunkun responded, "I don't care about research material." (Encl 5)

> o   According to Ms. Rodriguez, while at OPAA-East, Ms. Kammunkun said, "I don't really know everything there is to know about Records Management, and I don't really need to - I just need to get it done. Whatever happens along the way, I have people to clean it up. That's why y'all [the contractors] are here- to clean up my messes." (Encl 17)

IAF, Tab 1 at 45-46; *see id*. at 27 (sequence of events in ROI stating the appellant "told two contractor employees they did not have to talk to anybody about anything when they returned to D.C. because they worked for her"), 36 (IO finding on sixth allegation).   The 2017 MFR concluded that this allegation was substantiated by repeating the sixth allegation and finding as follows:

> **Allegation 6:** The two contractor employees were instructed to refer anyone who might ask them about the documents search at the March AFB facility to the contracting officer's representative (COR).
>
> **Finding: Substantiated as to Ms. Kammunkun and Mr. Loo.**

IAF, Tab 1 at 17 (bold in original).   As set forth in greater detail above, the appellant responded to the NOPR, ROI, and 2017 MFR through her April 2017 WR, May 2017 OR, and/or June 2017 SR.   IAF, Tab 21 at 25; *see* IAF, Tab 1.

The agency appears to indicate that the appellant created this perception with Rodriguez and Moore, yet declined to adequately examine the NAI employees about this matter.  HCD.  To the extent the agency is arguing that the appellant created this perception with Winbush, Gagne, or other agency personnel, the agency fails to adequately explain how this evinces misuse or abuse of contractor employees.  RAF-2, Tab 6.  For these reasons, Specification 3 is NOT SUSTAINED.   Because Specification 2 is sustained, Charge IV is SUSTAINED.

The appellant claims that she was denied due process and asserts that the agency committed harmful procedural error.   RAF, Tab 24 at 10-12.   The appellant's arguments are addressed in greater detail below.  RAF-2, Tab 7.

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 546 (1985), which involved the termination of a tenured government employee,

the U.S. Supreme Court stated that an essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for a hearing appropriate to the nature of the case. This principle requires "some kind of hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Id*. The essential requirements of due process are notice and an opportunity to respond. *Id*. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *Id.; see Henton v. U.S. Postal Service*, 102 M.S.P.R. 572, 576 (2006).

To prove harmful procedural error, the appellant must prove that the agency committed an error in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. *See* 5 C.F.R. § 1201.4(r). The burden is upon the appellant to show that the agency committed an error and that the error was harmful, *i.e.*, that it caused substantial prejudice to his rights.

The appellant argues that Charge I is "too vague to satisfy constitutional requirements" because:

> Although the charge is styled as lack of candor or untruthfulness, the agency never noticed which it was (lack of candor or untruthfulness) and Ms. *Kammunkun* was forced to guess. More troubling, the specification does not match the charge: lack of candor is heavily dependent on the exact Q&As. But those are not specified. In fact, the specification does not even hint at how Ms. Kammunkun was evasive, incomplete, etc., all things necessary for a lack of candor charge.
>
> Instead, the specification says only Ms. Kammunkun said the only two classified documents were found and the ROI could not find otherwise.
>
> But the most serious point is this charge is clearly a falsification charge, not lack of candor. Given its ordinary meaning untruthfulness is falsification.

RAF-2, Tab 7. As quoted and discussed in detail above, the underlying specification specifies that the appellant was untruthful in that approximately 100

documents containing classified marking were found during the security review, and the appellant was permitted to respond to this charge and specification through her April 2017 WR, May 2017 OR, and June 2017 OR. IAF, Tabs 1, 19-21. While the appellant now argues that the specification does not match the charge and that the charge was sustained based on an unstated specification as quoted above, there is little in the record to support this assertion. *Id.* There is little in the record to indicate that the agency's use of the term "or" in the charge to indicate an alternative, confused the appellant and/or her attorneys, and there is little in the record to suggest that the appellant sought clarification of the use of this term through her three responses, including the May 2017 OR. *Id.* The charge and specification are quoted above. *Id.*

> Citing the second charge, she argues:
>
> This is trying to be a failure to follow charge. But again, the agency claims that Ms. Kammunkun certified and her conduct was intentional. That makes this an insubordination charge without any notice, without any proof of the elements for that charge.
>
> In any event, the specification is facially defective and fails to satisfy constitutional requirements: It fails to notice what Ms. Kammunkun did wrong, intentionally or unintentionally. It fails to notice what rule, what regulation Ms Kammunkun did not follow, etc. At its best, this specification imputes strict liability, *res ipsa locquitur:* Ms. Kammunkun was in charge and something went wrong. Something more is required.

RAF-2, Tab 7. As quoted and discussed in detail above, the underlying specification specifies that the appellant failed to carry out written regulations, orders, rules, procedures, or instructions; the underlying specification states that she certified the records for shipment to a classified facility. There is nothing in the record to suggest that the agency charged the appellant with insubordination as claimed, and the agency utilized a specific label charge as set forth in detail above, and the appellant was permitted to respond to this charge and specification through her April 2017 WR, May 2017 OR, and June 2017 OR. IAF, Tabs 1, 19-21. While the appellant now argues that the specification is defective, the

referenced enclosures clarify that the referenced record involve Riverside shipment as set forth in detail above within the discussion of this second charge. There is little in the record to indicate that the appellant did not understand this charge and/or specification, and there is little in the record to suggest that the appellant sought clarification of the use of this term through her three responses, including the May 2017 OR. *Id*. The charge and specification are quoted above. *Id*.

> Citing the specifications to the third charge, the appellant argues:

> [C]harge 3 is also constitutionally defective in that the noticed charged is mishandling and it is specified as failing to take precautions (spec 1) and as directing the shredding. But the ROI supports neither. Rather the record shows that Winbush upheld this charge because Ms. Kammunkun and Williams did not bring back for Winbush's review any questionable documents. IAF Tab 21 at 11-16. That alone voids this charge, this adverse action.

> ...

> Specification 1 fails to satisfy constitutional requirements: There is no specific cite to any regulation, rule, etc., and the ROI contains only (as pertinent) 5200 and though the specification notices 5200, it stops short. Most critically, there is no notice vis-à-vis the "proper precautions" Ms. Kammunkun allegedly should have taken. A proper specification should say you failed to take proper precautions in that a directive requires something you did not do. The agency's failures here denied Ms. Kammunkun her opportunity to make an informed reply.

> Turning to specification 2, the voluminous 5200 is admittedly referenced and aside from it there is only a lot of blah, blah, blah: Is it too much to ask, as Amendment 5 does, that the who, what, when, where, why, how, etc., be noticed? Again, clear notice requires something more than cryptic remarks like you were around and something happened. The Board does not recognize *ipso facto* responsibility. *Prouty and Weller, supra*.

RAF-2, Tab 7. As quoted and discussed in detail above, the underlying specification specifies that the appellant failed to comply with a specific section of the cited the DoD Manual. There is little in the record to suggest that the agency sustained this charge based on an inference of negligence, and the

appellant was permitted to respond to this charge and specification through her April 2017 WR, May 2017 OR, and June 2017 OR. IAF, Tabs 1, 19-21. While the appellant now argues that the charge and specifications are impermissibly vague and cryptic, the specifications with referenced enclosures clarify that the referenced documents and/or information involve the Riverside review as set forth in detail above within the discussion of this third charge. There is little in the record to indicate that the appellant did not understand this charge and/or specification, and there is little in the record to suggest that the appellant sought clarification of the use of this term through her three responses, including the May 2017 OR. *Id*. The charge and specification are quoted above. *Id*.

Addressing the fourth charge, the appellant argues:

Specification 1 essentially duplicates charge 3, spec 1, "you pulled" but adds "replace." But there was no replacement; Winbush's findings are the only support. Specification 2 is based on a common place cliché but provides no context. Again based on Winbush's revised findings, it adds "planned all week. Specification 3, "perception," is so vague it cannot withstand constitutional scrutiny.

RAF-2, Tab 7. While Specifications 1 and 3 are sufficiently explicit, Specifications 1 and 3 are not sustained for the reasons set forth in detail above. As quoted and discussed in detail above, the second specification specifies that the appellant misused or abused contractor employees during the Riverside trip by making the statements as quoted above. There is nothing in the record to suggest that the agency sustained this charge based on a cliché, and the appellant was permitted to respond to this charge and specification through her April 2017 WR, May 2017 OR, and June 2017 OR. IAF, Tabs 1, 19-21. While the appellant now argues that the charge and specifications are impermissibly vague and/or provide no context as quoted in part above, the specifications with referenced enclosures clarify that the referenced documents and/or information involve the Riverside review as set forth in detail above within the discussion of this fourth charge. There is little in the record to indicate that the appellant did not

understand this charge and/or specification, and there is little in the record to suggest that the appellant sought clarification of the use of this term through her three responses, including the May 2017 OR. *Id*. The charge and specification are quoted above. *Id*.

Citing *Martinez,* 119 M.S.P.R. 37, the appellant points out that the Board remanded the appeal in *Martinez* to the administrative judge "for a closer look." RAF-2, Tab 7. In *Martinez,* 119 M.S.P.R. 37, the Board explained:

> In any event, the Board has previously concluded that the mere fact that the deciding official was fully apprised of, and had concurred in, the desirability of taking an adverse action before considering the appellant's response to the proposal notice was an insufficient basis on which to find a due process violation or harmful error in the absence of specific allegations indicating that the agency's choice of the deciding official made the risk of unfairness to the appellant "intolerably high." *Beatty*, 20 M.S.P.R. at 438; *see Baldwin*, 26 M.S.P.R. at 387.

*Martinez,* 119 M.S.P.R. 37. The Board added:

> In subsequent similar cases, the Board concluded that the fact that the deciding official may have been predisposed to severely discipline an employee before receiving his response to the notice of proposed adverse action did not constitute harmful procedural error *or a violation of law* if the appellant was afforded an opportunity to reply to the charges against him and, in fact, did submit a response that was considered by the deciding official before he made a final decision. *Deskin v. U.S. Postal Service*, 76 M.S.P.R. 505, 517-18 (1997); *Jackson v. Veterans Administration*, 22 M.S.P.R. 350, 353 (1984).

*Id*. The Board ultimately remanded the initial decision in *Martinez,* 119 M.S.P.R. 37, because the administrative judge failed to hold a hearing, and was unable to consider all of the relevant evidence, especially the testimony of the deciding official; here, the Board convened the hearing and supplemental hearing to ensure that all relevant evidence was considered, especially the testimony of the deciding official. *Cf. id*.; HCD (testimony of Winbush); HR (testimony of Winbush). The Board further explained:

The burden is on the appellant to establish actual bias or an intolerable risk of unfairness.

...

As explained above, a deciding official's familiarity with the facts of the case and expressed predisposition contrary to the appellant's interests does not constitute a due process violation or harmful error. *Deskin*, 76 M.S.P.R. at 517-18; *Baldwin*, 26 M.S.P.R. at 387; *Jackson*, 22 M.S.P.R. at 353; *Facciponti*, 15 M.S.P.R. at 185-86; *Svejda*, 7 M.S.P.R. at 111; *see McGhee v. Johnson*, 420 F.2d 445, 448 (10th Cir. 1969) (the fact that the same official decided an employee's removal in an earlier, procedurally flawed removal action did not invalidate the official's second determination to remove the employee). This is so even if the deciding official had gone so far as to concur previously in the desirability of taking the adverse action against the employee. *Baldwin*, 26 M.S.P.R. at 387; *Beatty*, 20 M.S.P.R. at 438. Furthermore, both the Board and our reviewing court have found that it is permissible for an individual to be both the proposing and deciding official in an action.

*Martinez,* 119 M.S.P.R. 37.

The appellant argues the Board must reverse this removal because Winbush, the deciding official, was familiar with the facts; placed the appellant on administrative leave; and ordered the ROI. RAF-2, Tab 7. However, the appellant fails to adequately explain how it was unconstitutional and/or otherwise improper to utilize a deciding official familiar with the underlying facts, even if the deciding official placed the appellant on administrative leave, after ordering the ROI as set forth in detail above, based on her opportunities to respond to the NOPR. The appellant also fails to adequately explain how it violated the constitution and/or procedures for Winbush to order the ROI based on her acting Director status as set forth above in detail. To the extent the appellant is arguing that Winbush, as the acting Director of DPAA had an obligation to have someone outside of DPAA make these DPAA management decisions, the appellant fails to adequately support this assertion. To the extent the appellant is arguing that Winbush's involvement with the WG call disqualified her from taking related

DPAA actions, the Board addressed this question in *Martinez,* 119 M.S.P.R. 37 as quoted above.

The appellant argues that Winbush improperly "reversed the ROI" and "replaced" the IO's findings with her own. RAF-2, Tab 7. The appellant argues that Winbush "so tainted the process, so created a situation ripe with potential unfairness" that it violated the constitution and that "Winbush was too involved and by reversing the ROI findings alone, she so tainted the process, so created a situation ripe with potential unfairness, that no one should be deprived of property under such circumstances." *Id*. The appellant argues that through the 2017 MFR, "Winbush alleges here a scheme to gag the contractors and obstruct justice" adding that "By revising Kramer's findings on virtually all critical issues involving Ms. Kammunkun, she structured a process of substantial unfairness." *Id*. The appellant argues, "she reversed its critical findings by putting back in those allegations and findings not only misconduct but potentially criminal acts." *Id*.

As quoted and discussed in detail above, Winbush testified that she issued the 2017 MFR because the lengthy findings within the ROI could have been more succinct. HCD; HR. Observing Winbush as she addressed her reasons for writing the 2017 MFR during the hearing and supplemental hearing as discussed in detail above, I noted that her testimony was unequivocal and based on personal knowledge as a percipient witness. *Hillen*, 35 M.S.P.R. at 458. Her reasons for writing the 2017 MFR were specific, consistent with the written record inclusive of the ROI and 2017 MFR, detailed, and not inherently improbable. *Id*. For these reasons, and based on a careful review of the record as set forth in detail above, I find Winbush's testimony on these points to be credible. *Id*.

While the appellant asserts Winbush reversed and replaced the IO's findings while alleging a scheme to obstruct justice as quoted above, the record does not support these claims as set forth in detail above. For example, while the IO addressed the first allegation in the ROI by stating that he could not rule out

the shredding of classified materials as quoted and discussed in detail above, the 2017 MFR specifies that an unknown number, but more than two, classified documents were sent to Riverside NARA; thereafter, based on several paragraphs of discussions within the ROI, Winbush made specific findings as set forth more fully above, including the quoted sections of the first, third and fourth charges. There is little in the record to support the appellant's assertion that Winbush reversed critical findings, alleged a scheme to obstruct justice, revised Kramer's findings on virtually all critical issues involving the appellant, and/or structured a process of substantial unfairness as alleged; the facts do not support the appellant's assertions as set forth in detail above. While the appellant claimed on remand that she discovered newly found evidence that Winbush felt compelled to redo the ROI's findings, the undisputed record reflects that the 2017 MFR containing Winbush's findings was presented to the appellant with the ROI as part of the NOPR as set forth above in detail; thereafter, the appellant received three opportunities to address these same matters as set forth in detail above. *Martinez,* 119 M.S.P.R. 37.

The appellant next argues "Winbush then interviewing witnesses (in camera), doing their statements for them, and then not giving Ms. Kammunkun's reply meaningful consideration" and "denied Ms. Kammunkun's request to observe the contractors' interviews." RAF-2, Tab 7. While the appellant has the right to respond to these referenced statements as set forth within the discussion of her June 2017 response to these referenced statements, the appellant fails to adequately explain how she was unlawfully denied a request to observe the interviews, even if such a request was made. Through the June 2, 2017 notice, the appellant was granted an additional opportunity to address these referenced statements, and submitted her detailed response to these additional matters through her June 12, 2017 supplemental response, prior to the issuance of the July 25, 2017 LOD as set forth above in detail. After testifying that she reviewed the appellant's April 2017 WR and May 2017 OR, Winbush explained that she

interviewed these NAI employees because their accusations were egregious and she did not know the contractors as well as she knew the appellant. HR. She credibly testified that the questions had been prepared in advance and that the contractors' statements were reduced to writing, and provided to the appellant, and that she considered the appellant's June 2017 response prior to issuing the LOD. *Id*. To the extent the appellant is arguing that Winbush denied her an opportunity to present an additional oral reply and/or fourth response to supplement the May 2017 OR and June 2017 SR, there is nothing in the record, including her SR, to suggest that she conveyed such a request to further supplement the June 2017 SR. IAF, Tab 1 at 299-322. Further, there is nothing in the record to present her side of the story as set forth in detail above. More importantly, there is nothing in the record to suggest that Winbush failed to fully and properly consider all of the appellant's responses, including the June 2017 SR, prior to issuing the LOD. To this point, Winbush credibly testified that she considered "all of the responses that Dee Dee provided to the accusations" as set forth more fully in the record. HR.

Referencing the 2017 MFR, the appellant argues that she was "entitled to due process" when Winbush closed the investigation, and sent these materials to the GC for further conveyance to Gagne. RAF-2, Tab 7. The appellant argues that Winbush "directed" the GC to provide the 2017 MFR to Gagne "for him to take immediate corrective actions" based on the 2017 MFR and "freed Gagne to propose" the NOPR because "But for Winbush's reversal the agency action is dead." *Id*. There is nothing in the record to support the appellant's assertion that Gagne was tasked with taking immediate corrective actions as indicated in the quoted section of the appellant's arguments above, and the 2017 MFR expressly tasks Gagne with considering what, if any, administrative actions are appropriate for DPAA employees. IAF, Tab 1 at 18; *see* HCD (testimony of Gagne); HR (supplemental testimony of Gagne). The appellant also claims that she was entitled to due process when Winbush directed Gagne to ensure that all remaining

records at the Riverside were properly secured in accordance with their classification level; follow up with NAI as appropriate; review/consider/revise; consider whether to formally establish and publish a policy concerning the shipment of DPAA materials; consider whether DPAA should identify individuals to be appointed and trained as Foreign Disclosure Officers, as set forth more fully in the record. *Id*.

As noted in part above, through the 2017 MFR, Winbush directed the GC to provide Gagne a copy of the ROI and 2017 MFR for his consideration regarding what, if any, administrative personnel actions are appropriate for DPAA employees; ensure that all remaining records at the Riverside facility are properly secured in accordance with their classification level; follow up with NAI as appropriate, concerning the outcome of the investigation; review/consider/revise DPAA's records schedule, as appropriate; consider whether to formally establish and publish a policy concerning the shipment of DPAA materials; and consider whether DPAA should identify individuals to be appointed and trained as Foreign Disclosure Officers, as set forth more fully in the 2017 MFR. IAF, Tab 1 at 16-19; RAF-2, Tab 7. The appellant fails to adequately explain what procedural and/or constitutional right the appellant had to "clear notice, etc." when Winbush directed the GC and Gagne to taking the actions set forth in the 2017 MFR, and the basis for this assertion remains unclear. *Id*. As discussed above, the appellant fails to adequately explain how it violated the constitution and/or procedures for Winbush to close the investigation based on her acting Director status as set forth or refer to the matter to the DPAA GC or other subordinates. To the extent the appellant is arguing that Winbush, as the acting Director of DPAA had an obligation to have someone outside of DPAA make these DPAA management decisions, the appellant fails to adequately support this assertion.

The appellant argues assigning the matter to Gagne, a subordinate, for review was improper because, "It's about Gagne understanding he could not

disagree with Winbush's findings." RAF-2, Tab 7. She argues "That Gagne could be an impartial check and had a choice to charge or not is pure fiction. ... Those findings coupled with the corrective actions and all the rest left Gagne with Hobson's choice" and "Gagne had no discretion and his proposal was the Winbush proposal." *Id*. The appellant argues that Winbush appointed Gagne to serve as the proposing official, arguing "he could not disagree with Winbush's findings" and that "Gagne saw himself as a sentencing judge struck with a jury verdict analogy[.]" *Id*.

Addressing these allegations, Gagne testified:

Q So going back a little bit, how would you describe your

relationship with Mr. Kammunkun before the Riverside incident?

A She was my friend. She was more than a coworker.

...

Q You were saying how you considered Dee Dee to be a friend

prior to the Riverside incident, correct?

A Yes, even during the Riverside incident, I still consider -- even today. I gather she does not feel the same way about me, but I still consider her a friend. So much so, she's invited me to her home before to -- to introduce me to her family, to share her food with me, to share time with me. She was more than a coworker to me, more than probably she would ever know.

...

Q And in the time that you've known her, what would you said is your impression of her character?

A I think Dee Dee is a good person; I never had reason to doubt her integrity or character.

HCD. Gagne explained that he considered the entire investigation in deciding to issue the NOPR:

Q And did you rely on Col. Kramer's findings in his report in making your proposal?

A No.

Q No, just Ms. Sumpter-Winbush's?

A Well, the whole investigation, which included Ms. Sumpter-Winbush, not the investigating officer solely, no.

Q Now, you did mention that you spoke to Ms. Sumpter-Winbush about her findings, correct?

A No.

...

Q Were you advised that the recommendation should be termination?

A No.

Q Did you consider anything other than termination?

A I -- I looked at the investigation as a whole. Given the serious -- of the allegations, I was conflicted.

Q How were you conflicted?

A Like I said, Dee Dee's my friend. So it's loyalty to a friend and responsibilities to the families of the missing. And my decision, given the seriousness of the allegations and the offense -- and the offenses, findings of the whole investigation, I felt the appropriate recommendation was removal. It would undermine the credibility the agency for the families of the missing.

*Id*. Gagne testified that it was not his role to reopen the investigation or override the findings of the underlying investigation including the 2017 MFR, rather, it was his role to make an appropriate recommendation with the assistance of human resources and the GC's office:

Q Okay, so fair to say, then, your instructions were, Dee Dee is guilty of this, move on her proposal?

A No, not at all.

Q Okay. Could you maybe clarify what your role in it was?

A It was based off the investigation as to make a recommendation.

...

Q So when you did actually contact general counsel and HR about your decision, okay, what was the actually wording that you used? How did you convey it? What did you say?

A It was verbally, that I -- I've come to a conclusion and I'm going to recommend removal.

*Id*. When called for the supplemental hearing, Gagne testified:

Q And did you agree with the findings in the acting director's MFR?

A Yes.

Q Okay. And did you believe that the acting director's findings were supported by the evidence in the Riverside investigation?

A Yes.

Q Okay. In addition to the acting director's findings, did this MFR provide any instructions or directions?

A Yes, it did.

Q And what were they?

A Directed investigation be closed and that me as the acting chief of staff to consider what if any administrative personnel actions that I feel would be appropriate for the DPAA employees.

HR. When questioned about the substance of the investigation, he explained:

BY MR. E. Z. SMITH:

Q Okay. Can you explain why it is that you took the statements of the contractors over Dede's?

A Yeah. I remember thinking about why would they lie? Why would they make this up? It just didn't make sense. Why would they lie about this? And then, Vince Walls, who wasn't there, but had -- he had -- I recall, in his testimony -- his -- when the investigating officer talked to him, he made a comment that, hey, Dede had asked him, or made the comment, why are -- are they -- or why is she drifting from the plan? Yeah. It just -- it just didn't make sense to me why they would lie and make up something like this.

Q Okay. Do you have any -- or why -- in your opinion, why would Dede lie?

A Well, I think it goes back to a matter of the -- I think her concern about if there was a whole bunch of classified documents that were found in the facility -- or not in the facility, but in the boxes, I think she was very concerned about that.

Q Why do you think she was concerned?

A Well, because they were shipped to a facility that wasn't authorized to store classified documents. There was supposed to have been a review to remove all the classified documents before they went there. She had oversight and responsibility of ensuring that that was done properly.

*Id*. Addressing the NOPR within the context of the investigation, he testified:

> Q Did you make a recommendation based off the Riverside investigation?
>
> A Yes, I did.
>
> Q And did the Riverside investigation include reviewing the acting director's findings in her MFR?
>
> A Yes.
>
> Q The instructions -- directions that you said were in this MFR, did the acting director direct or instruct you to propose a personnel action based on the Riverside investigation?
>
> A No.
>
> Q Did the acting director direct or instruct you to issue a proposal for removal based on the Riverside investigation?
>
> A No.
>
> Q Okay. After you were identified to make a recommendation, did you have any communication with the acting director regarding the Riverside investigation?
>
> A No.

*Id*. He continued:

> Q Did you have any conv -- did you have any conversations with Ms. Kammunkun regarding the Riverside investigation?
>
> A No.
>
> Q What were your thoughts after you reviewed the Riverside investigation?
>
> A It was upsetting for me, disturbing, or depressing for me to read those things that are being said about Dede.
>
> Q Why was that?
>
> A Well, she's -- she's a friend of mine. And to hear those things being said -- or not hear, to read those things being said about a friend, somebody you care about, she was more to me than just an employee. She was a friend. And you know, that was just very disheartening.
>
> ...
>
> Q Did you discuss this proposal with anyone?
>
> A Yes.

Q Who was that?

A General Counsel.

Q Anyone else?

A I think if I recall correctly, Ms. Farrow may have been in the discussion but I'm not sure.

Q Okay. And who is Ms. Farrow?

A She was our HCD, Human Capital -- or HR, I guess, person.

...

Q Okay. And so that was -- what was the range of options that they provided you with?

A If I recall, there was no recommendation at all would have been one of my options. Because I do recall asking them, what if I don't agree with the findings for the investigation. And they said, in that case, you wouldn't recommend any personnel action. Or it could be all the way up to removal.

*Id*. Observing Gagne as he addressed his reasons for issuing the NOPR during the hearing and supplemental hearing as discussed in detail above, I noted that his testimony was unequivocal and based on personal knowledge as a percipient witness. *Hillen*, 35 M.S.P.R. at 458. His reasons for issuing the NOPR were specific, consistent with the written record inclusive of the ROI and 2017 MFR, detailed, and not inherently improbable. *Id*. For these reasons, and based on a careful review of the record as set forth in detail above, I find Gagne's testimony on these points to be credible. *Id*.

There is little in the record to support the appellant's assertion that Gagne believed he had no discretion in issuing the NOPR as claimed, and little to suggest that Gagne saw himself as a sentencing judge with a jury verdict as claimed by the appellant above. To the contrary, the record, in particular Gagne's testimony as quoted in part above, reflects that Gagne acted independently and properly; the record further reflects that the appellant had ample opportunity to respond to the NOPR through her April 2017 WR, May 2017 OR, and June 2017 SR as set forth in detail above. To the extent the

appellant argues that Winbush should have assigned the matter to someone other than a subordinate, including Gagne, the appellant fails to adequately explain how Winbush's actions violated the constitution and/or evinced a violation of procedures as set forth above. As noted above, Winbush credibly testified that she considered "all of the responses that Dee Dee provided to the accusations" as set forth more fully in the record. HR.

The appellant claims that the agency denied her due process and/or committed harmful procedural error when Winbush relied on an unnoticed aggravator to uphold the penalty evinced by the decision notice referencing the Saint Louis shipment. To this point, the record reflects that Winbush considered the Saint Louis investigation when determining the clarity with which the appellant had been warned about the conduct in question as discussed in greater detail below within the penalty section. *Id.* Due process dictates a deciding official is not allowed to consider, either in connection with the charge itself or the penalty, new and material information he obtained *ex parte*. *Ward v. U.S. Postal Service*, 634 F.3d 1274, 1280 (Fed. Cir. 2011); *Stone v. Federal Deposit Insurance Corporation*, 179 F.3d 1368, 1377 (Fed. Cir. 1999). Information is considered having been obtained *ex parte* if the appellant was not informed it would be taken into account. *Lopes v. Department of the Navy*, 116 M.S.P.R. 470, ¶ 10 (2011). In determining whether a deciding official's consideration of information obtained *ex parte* violates due process, the question is whether the information is "so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Stone*, 179 F.3d at 1377. Relevant factors include: (1) whether the *ex parte* communication merely introduces cumulative information or new information; (2) whether the employee knew of the information and had a chance to respond to it; and (3) whether the *ex parte* communications were of the type likely to result in undue pressure upon the deciding official to rule in a particular manner. *Id.* The record reflects that the Saint Louis NARA shipment was

Reference A to the ROI and discussed throughout the investigation by the IO as noted in part above; moreover, the appellant and her attorneys referenced the IO and the appellant throughout the process leading to the LOD, including the appellant's April 2017 WR and June 2017 SR. IAF, Tab 1 at 20-322. Specifically, the ROI, received as Reference A to the NOPR, listed "References: (a) Shipment to NARA (St. Louis, MO) Investigation, Ms. Sheila Frazier Investigating Officer, October 8, 2015" and this same Saint Louis matter was referenced by the appellant throughout the ROI and responses to the NOPR as set forth in the record, and the appellant included an email between her attorney and a NARA Saint Louis employee as an attachment to her NOPR response. *Id.* at 19-266. Thus, while Gagne did not expressly reference the Saint Louis NARA shipment, there is little to support a conclusion that any new information was introduced. As noted above, Winbush credibly testified that she considered "all of the responses that Dee Dee provided to the accusations" as set forth more fully in the record. HR.

Following a careful review of the entire record, including the matters discussed in detail above, I find that the agency has met its burden of providing the appellant minimum due process. I further find that the appellant has failed to show that the agency committed an error, and that the error was harmful.

Nexus and Penalty

When such charges of misconduct are sustained by preponderant evidence, the agency must show that there is a nexus between the sustained charges and either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest. *See Merritt v. Department of Justice*, 6 M.S.P.R. 585, 596 (1981), *modified*, *Kruger v. Department of Justice*, 32 M.S.P.R. 71, 75 n.2 (1987). Here, there is a direct relationship between the appellant's sustained misconduct at issue, and the appellant's role as the Supervisory RS, responsible for overseeing the DPAA records management program, including the

shipment of DPAA documents to the unclassified Riverside NARA facility for scanning and digitalization. HCD (testimony of the appellant). Accordingly, I find that nexus has been established.

Where, as here, all of the agency's charges have been sustained, the Board will review an agency-imposed penalty only to determine if the agency considered all of the relevant factors and exercised management discretion within tolerable limits of reasonableness. *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 306 (1981). In making that determination, the Board must give due weight to the agency's primary discretion in maintaining employee discipline and efficiency, recognizing that the Board's function is not to displace management's responsibility but to insure that management discretion has been properly exercised. *See, e.g.*, *Brown v. Department of the Treasury*, 91 M.S.P.R. 60, ¶ 7 (2002). Thus, the Board will disturb the agency's chosen penalty only if it finds that the agency failed to weigh relevant factors or that the agency's judgment clearly exceeded the limits of reasonableness. *Toth v. U.S. Postal Service*, 76 M.S.P.R. 36, 39 (1997).

In addition to her testimony, the deciding official in this case, Winbush, set forth her consideration of the *Douglas* factors. IAF, Tab 21, Subtabs 4B, 4C; HR (testimony of Winbush); *see* IAF, Tab 16, Subtab 4J. The record reflects that Winbush considered the relevant factors, most notably the nature and seriousness of the offense, which was aggravated by the fact that the appellant was a Supervisory RS. *Id*. Winbush and Gagne similarly noted that the appellant was working in this capacity as a supervisor during the Riverside trip, when the misconduct arose. *Id*. As the records manager for the agency, the appellant was a high level employee entrusted with properly maintaining records for the agency. *Id*. Gagne similarly indicated that as a supervisor, the agency must have the utmost confidence in her ability to uphold the highest standards as set forth in the record. *Id*. Gagne also noted that the appellant's failure to abide by DoD requirements was serious and went to the core of her duties as the agency's

records manager, and affected the appellant's credibility as the records manager. *Id.* Thus, the appellant was placed on notice of these considerations, and received an opportunity to respond. *Id.*

Winbush explained that the appellant's mishandling of documents bearing classification markings was intentional and in violation of her duties as the Supervisory RS. *Id.* While the appellant argued that this was an improper consideration, the record reflects that Gagne informed the appellant that he had considered the fact that the appellant had intentionally mishandled classified information and lied about it, as a basis for proposing the penalty, allowing the appellant an opportunity to address this factor through her three NOPR responses as set forth above in detail. *Id.* Thus, I find no merit to the appellant's assertion.

Winbush also considered the fact that the misconduct was directly related to her job as a Supervisory RS. *Id.* As the records manager, the appellant was responsible for all of DPAA's classified and unclassified holdings, including the documents shipped to NARA. *Id.* The appellant's sustained misconduct was inconsistent with the duties, responsibilities, and trust related to this supervisory position. *Id.*

Winbush considered the appellant's more than 30 years of combined uniformed and Federal civilian service as a mitigating factor in considering the penalty. *Id.* Winbush specified that the appellant had no prior disciplinary record and reaffirmed during the supplemental hearing that the appellant had no prior disciplinary record. *Id.* She also considered the appellant's favorable performance ratings. *Id.* She explained that the appellant's past service to the nation could not be discounted or discredited. *Id.* However, these mitigating factors, were outweighed by the seriousness of the offenses. *Id.*

Winbush noted that there were no comparators committing the same offense; however, Winbush noted the appellant's subordinate, Williams, while in a different role as noted above, had also been issued an NOPR. *Id.* As noted within the second enumerated footnote of *Kammunkun*, slip op., Williams

testified that he was removed. *Kammunkun*, slip op. Winbush explained that the appellant's removal was consistent with the agency's table of penalties, identified as Administrative Instruction 8 in the record. IAF, Tab 21, Subtabs 4B, 4C; HR (testimony of Winbush); *see* IAF, Tab 16, Subtab 4J.

Addressing notoriety, Winbush explained that the missing or incomplete documentation could negatively affect the agency when interacting with non-DPAA organizations and individuals, because DPAA must be able to present all supporting documentation to support DPAA's decisions. *Id*. The appellant argued that that Gagne failed to place the appellant on notice that this would be considered an aggravating factor. Within the penalty section of the NOPR, Gagne specifically placed the appellant on notice that her disgraceful and unprofessional conduct went to the core of her duties as the agency's records manager and raised serious concerns about her ability to carry out her assigned duties and responsibilities, and that the sustained misconduct specifically affected her ability to manage records for the agency and seriously degraded her credibility as set forth more fully in the NOPR. *Id*. The appellant knew that the appellant was the DPAA records manager, had some understanding of the DPAA mission, and knew that the appellant had been hired to oversee the DPAA records management program as set forth above within the discussion of the appellant's testimony about the appellant role with the agency; it followed that the appellant's failure to properly oversee the DPAA records management program, including the shredding of the documents that DPAA shipped to Riverside NARA, could affect DPAA's ability to present all documents to support DPAA's decisions, based on the core duties of the appellant as set forth in the NOPR. Under these circumstances, the NOPR with attachments sufficiently placed the appellant on notice of this aggravating factor. *See id*.

Addressing the clarity of notice factor, Winbush explained that the appellant knew or should have known that unclassified NARA facilities could not receive classified documents from DPAA. *Id*. Winbush testified:

> We already -- we had had a discussion about the potential of finding classified in the Riverside shipment. I was hopeful that, of course, we wouldn't find any, but it was her recommendation to take one more final look, which I supported. Yeah, and so we knew that based on the previous [Saint Louis] investigation, and based on everything that the classified materials working group had talked about and discussed, and that Dee Dee had sent me in an email about how records were being reviewed, classified was being pulled out, and then further reviewed, I was not concerned at the time that she would do anything other than pull out the classifieds and bring it back, because she certainly was on notice.

HR (testimony of Winbush). As noted above, the appellant had no prior discipline, and the reference to the Saint Louis investigation was made for the purposes of addressing notice. *Id*.

Addressing the appellant's potential for rehabilitation, Winbush noted that the appellant's inability to accept responsibility for her misconduct undermined this potential. IAF, Tab 21, Subtabs 4B, 4C; HR (testimony of Winbush); *see* IAF, Tab 16, Subtab 4J. After considering the mitigating and aggravating factors, Winbush concluded that no alternative sanction was adequate or effective for this misconduct. *Id*. Based on a careful review of the entire record, in particular the NOPR materials with penalty discussion within the NOPR, I find that the agency provided sufficient notice of the aggravating factors considered by Winbush as set forth above. *Id.*

In view of the considerations just cited, I find that the deciding official considered relevant factors and exercised his discretion within tolerable limits of reasonableness. *Douglas*, 5 M.S.P.R. at 306.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:                           _____/S/_____
                                         Franklin M. Kang
                                         Administrative Judge

### NOTICE TO APPELLANT

This initial decision will become final on **October 27, 2021**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

### BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

## Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to

warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the

pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

**NOTICE TO AGENCY/INTERVENOR**

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

**NOTICE OF APPEAL RIGHTS**

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and

to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S.

Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

<u>http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx</u>

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**DIANA Z. KAMMUNKUN,**
*Petitioner*

v.

**DEPARTMENT OF DEFENSE,**
*Respondent*

---

2019-1374

---

Petition for review of the Merit Systems Protection Board in Nos. SF-0752-17-0667-I-1, SF-1221-17-0675-W-1.

---

Decided: April 6, 2020

---

RENN C. FOWLER, Gilbert Employment Law, PC, Silver Spring, MD, argued for petitioner. Also represented by GARY M. GILBERT; ELBRIDGE W. SMITH, Smith Himmelmann ALC, Honolulu, HI.

NATHANAEL YALE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by JOSEPH H. HUNT, ALLISON KIDD-MILLER, ROBERT EDWARD KIRSCHMAN, JR.

---

Before PROST, *Chief Judge*, BRYSON and WALLACH, *Circuit Judges.*

PROST, *Chief Judge.*

Ms. Diana Z. Kammunkun petitions for review of a Merit Systems Protection Board ("MSPB") decision (1) dismissing her action contesting her removal from Federal service pursuant to Chapter 75 of Title 5 of the United States Code; and (2) denying her individual right of action appeal seeking corrective action for whistleblowing reprisal. *Kammunkun v. Dep't of Defense*, Nos. SF-1221-17-0675-W-1, SF-0752-17-0667-I-1, 2018 WL 4739856, (M.S.P.B. Oct. 25, 2018). We have jurisdiction under 28 U.S.C. § 1295(a)(9).

As the government concedes, Ms. Kammunkun's Chapter 75 action must be remanded for further proceedings. Resp't's Br. 52–54.

The administrative judge dismissed Ms. Kammunkun's Chapter 75 action because (a) Ms. Kammunkun had previously elected to contest her removal with the Office of Special Counsel and subsequent individual right of action appeal; and (b) the election requirement of 5 C.F.R. § 1209.2(d) prevented Ms. Kammunkun from also challenging her removal via a Chapter 75 action. The administrative judge's decision became the decision of the MSPB.

The administrative judge erred in interpreting 5 C.F.R. § 1209.2(d), which applies only to employees, as applying to Ms. Kammunkun, who was a supervisor. Section 1209.2(d) states that, "[u]nder 5 U.S.C. 7121(g)(3), an *employee* who believes he or she was subjected to a covered personnel action in retaliation for whistleblowing or other protected activity" may elect only one of three listed remedies. 5 C.F.R. § 1209.2(d)(1) (emphasis added). An "employee" for purposes of 5 U.S.C. § 7121(g)(3) is defined by 5 U.S.C. § 7103(a)(2), which specifically excludes

"supervisor[s]."   It is undisputed that Ms. Kammunkun was a supervisor.  Pet'r's Br. 3; Resp't's Br. 1.  Accordingly, the election requirement of § 1209.2 does not apply to Ms. Kammunkun.

We therefore vacate the administrative judge's decision with respect to the Chapter 75 action and remand for further proceedings.  The parties disagree as to the appropriate scope of the proceedings on remand.  *Compare* Pet'r's Reply Br. 10–14, *with* Resp't's Br. 54.  We leave it to the administrative judge to make this determination in the first instance.

We affirm the decision of the administrative judge with respect to the individual right of action claim.

### VACATED-IN-PART, AFFIRMED-IN-PART, AND REMANDED

#### COSTS

The parties shall bear their own costs.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1900

**Short Case Caption:** Kammunkun v. Defense

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __5,681__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __10/07/2024__       Signature: /s/ Christopher H. Bonk

Name: Christopher H. Bonk

Save for Filing